Nos. 2016-1670, -1673

United States Court Of Appeals for the Federal Circuit

VMWARE, INC., INTERNATIONAL BUSINESS MACHINES CORPORATION, AND ORACLE AMERICA, INC.,

*Appellants,*

v.

ELECTRONICS AND TELECOMMUNICATIONS RESEARCH INSTITUTE,

*Appellee.*

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board, Nos. IPR2014-00901 and IPR2014-00949

APPELLANTS' OPENING BRIEF

John A. Dragseth
FISH & RICHARDSON P.C.
60 South Sixth Street
3200 RBC Plaza
Minneapolis, MN 55402
(612) 337-5070

Katherine Kelly Lutton
FISH & RICHARDSON P.C.
500 Arguello Street, Suite 500
Redwood City, CA 90463
(650) 839-5070

Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Suite 2800
Houston, TX 77010
(713) 654-5300

*Attorneys for VMware, Inc.*

John C. O'Quinn
William H. Burgess
KIRKLAND & ELLIS LLP
655 Fifteenth St. N.W.
Washington, D.C. 20005
(202) 879-5000

Todd M. Friedman
Benjamin A. Lasky
KIRKLAND & ELLIS LLP
New York, N.Y. 10022
(212) 446-4800

*Attorneys for International Business Machines Corporation and Oracle America, Inc.*

## U.S. Patent No. 6,978,346, Claim 1 (Appx53)

**1.** An apparatus for a redundant interconnection between multiple hosts and a RAID, comprising:

a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers, the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit; and

a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers, wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units, and the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit.

# CERTIFICATE OF INTEREST
## (VMWARE)

**1.     The full name of every party represented by us is:**

VMware, Inc.

**2.     The name of any real party in interest represented by us, and not identified in response to Question 3, is:**

VMware, Inc.

**3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:**

The parent corporation of VMware is EMC Corporation, which owns more than 10% of VMware's stock.   No other publicly held corporation other than EMC Corporation owns more than 10% of VMware's stock.

**4.     The names of all law firms and the partners or associates that appeared for the party now represented by us at the agency or are expected to appear in this Court are:**

Fish & Richardson P.C.:  Katherine K. Lutton, Timothy W. Riffe, John A. Dragseth, Leeron G. Kalay, and Michael R. Rueckheim

# <u>CERTIFICATE OF INTEREST</u>
## (IBM AND ORACLE)

**1.    The full name of every party represented by us is:**

International Business Machines Corporation and Oracle America, Inc.

**2.    The name of any real party in interest represented by us, and not identified in response to Question 3, is:**

International Business Machines Corporation and Oracle America, Inc. are the real parties in interest.

**3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented by us are:**

International Business Machines Corporation has no parent corporation and no other company owns 10% or more of its stock.

Oracle Corporation is the parent of Oracle America, Inc.  No other company is the parent or owns 10% or more of the stock of Oracle Corporation or Oracle America, Inc.

**4.    The names of all law firms and the partners or associates that appeared for the party now represented by us at the agency or are expected to appear in this Court are:**

<u>Kirkland & Ellis LLP:</u> John C. O'Quinn, Todd M. Friedman, Benjamin A. Lasky, William H. Burgess, Eugene Goryunov, and Steven T. Skelley

# TABLE OF CONTENTS

Statement of Related Cases ..................................................... vi

Statement of Jurisdiction ....................................................... ix

Preliminary Statement ............................................................ 1

Statement of the Issues .......................................................... 5

Statement of the Case and Facts ............................................. 6

A.    Technical Background and Prior Art ........................... 6

    1.    Networked Storage Systems in the Prior Art ............... 6

    2.    Hathorn Teaches Benefits of Swapping Through-the-Network Connections for Direct Connections Between Storage Controllers ...................................... 10

B.    The '346 Patent ....................................................... 12

C.    *Inter Partes* Review Proceedings ............................... 15

    1.    Institution Decisions ................................................. 15

    2.    Final Written Decision .............................................. 16

Summary of the Argument ................................................... 23

Standard of Review .............................................................. 26

Argument ............................................................................ 26

I.    The Board's Non-Obviousness Rulings Should Be Reversed. ....... 26

A.    The Board Erred As A Matter of Law By Requiring Technical And Physical Combinability Of The Prior Art Systems. ................................................................... 29

    1.    The Board Erroneously Required Petitioners to Show that Mylex and Hathorn Were Technically and Physically Combinable. ..................................... 30

    2.    The Board Erroneously Accepted ETRI's Disavowed "Technical Infeasibility" Argument ........... 32

B.    The Board Erred As A Matter of Law By Applying An Overly Rigid Motivation-To-Combine Standard. ....... 36

1.    Combining Mylex and Hathorn Would Better Achieve Mylex's Redundancy Goals, Which the Board Erroneously Rejected. ........................ 38

2.    Hathorn Explicitly States a Motivation to Combine (Cost-Saving), Which the Board Erroneously Rejected. ................................... 41

3.    ETRI's Concessions Establish A Motivation To Modify Mylex. ................................................ 44

C.    The Board Erred as a Matter of Law by Relying on the Existence Of Other Obvious Solutions to Undercut the Obviousness of the '346 Patent's Claims. ................................. 45

D.    The Court Should Reverse The Board And Find Obviousness As A Matter Of Law; No Remand is Necessary. ................................................................. 47

II.    Alternatively, The Court Should Remand For Further Proceedings According To The Correct Legal Standards, And Under The Correct Claim Constructions. ........................................ 48

A.    If, in the *Dell* Appeal, the Court Corrects the Board's Construction of "RAID" or the Board's Finding that Hathorn Does Not Disclose a RAID, Appellants are Entitled to a Remand in this Case. ........................................... 50

B.    The Court Should Remand Based on the Board's Errors in Construing "RAID" and Finding that Hathorn Does Not Disclose a RAID. ..................................................................... 52

1.    The Board Erred in Construing "RAID." ..................... 52

a.    Intrinsic Evidence Defines "RAID" as a "Redundant Array of Inexpensive Disks." .......... 54

b.    Extrinsic Evidence Confirms that The Broadest Reasonable Interpretation Of "RAID" is "A Redundant Array Of Inexpensive Disks." ............................................. 57

2.    Even Under its Construction, The Board Erred in Finding that Hathorn Does Not Disclose a RAID. ...... 63

III.   The Board Abused its Discretion in its Institution Decisions
       by Declining to Consider "Redundant" Grounds. ..........................67

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*01 Communique Lab., Inc. v. LogMeIn, Inc.*,
   687 F.3d 1292 (Fed. Cir. 2012) ........................................................56

*ABT Sys., LLC v. Emerson Elec. Co.*,
   797 F.3d 1350 (Fed. Cir. 2015) ........................................................47

*ACCO Brands Corp. v. Fellowes, Inc.*,
   813 F.3d 1361 (Fed. Cir. 2016) .................................................44, 46

*Alza Corp. v. Mylan Labs., Inc.*,
   464 F.3d 1286 (Fed. Cir. 2006) ........................................................39

*Apple Inc. v. Samsung Elecs. Co., Ltd.*,
   816 F.3d 788 (Fed. Cir. 2016) ..........................................................47

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
   365 U.S. 336 (1961).............................................................................5

*Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*,
   555 F.3d 984 (Fed. Cir. 2009) ....................................................39, 48

*Belden Inc. v. Berk-Tek LLC*,
   805 F.3d 1064 (Fed. Cir. 2015) ................................................*passim*

*Christian Legal Soc'y v. Martinez*,
   130 S. Ct. 2971 (2010).......................................................................35

*Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*,
   246 F.3d 1336 (Fed. Cir. 2001) ........................................................65

*In re Cuozzo Speed Techs., LLC*,
   793 F.3d 1268 (Fed. Cir. 2015) ...............................................5, 26, 67

*Custom Accessories, Inc. v. Jeffrey-Allan Indus.*,
   807 F.2d 955 (Fed. Cir. 1986) ..........................................................44

*Dell, Inc. v. ETRI*,
   No. IPR2013-00635, 2015 WL 1009191 (P.T.A.B. Feb. 27, 2015) ..........*passim*

*In re Etter*,
    756 F.2d 852 (Fed. Cir. 1985) (*en banc*) ..........................................29

*Galderma Labs., L.P. v. Tolmar, Inc.*,
    737 F.3d 731 (Fed. Cir. 2013) ...........................................................46

*Graham v. John Deere Co.*,
    383 U.S. 1 (1966)...............................................................................47

*Helmsderfer v. Bobrick Washroom Equip., Inc.*,
    527 F.3d 1379 (Fed. Cir. 2008) ..................................................54, 57

*Kara Tech. Inc. v. Stamps.com Inc.*,
    582 F.3d 1341 *(Fed. Cir. 2009)* ......................................................58

*In re Keller*,
    642 F.2d 413 (CCPA 1981) ..............................................................29

*KSR Int'l Co. v. Teleflex, Inc.*,
    550 U.S. 398 (2007)....................................................................*passim*

*In re Man Machine Interface Techs., LLC*,
    --- F.3d ----, 2016 WL 1567181 (Fed. Cir. 2016).............................52

*MBO Labs., Inc. v. Becton, Dickinson & Co.*,
    474 F.3d 1323 (Fed. Cir. 2007) .......................................................55

*Ex Parte Mitsubishi Denki Kabushiki Kaisha*,
    No. 2007-2483, 2007 WL 2758445 (B.P.A.I. Sept. 12, 2007)..........65

*In re Mouttet*,
    686 F.3d 1322 (Fed. Cir. 2012) ...................................30, 31, 43, 46

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2015) (*en banc*) ..................................53, 57

*Randall Mfg. v. Rea*,
    733 F.3d 1355 (Fed. Cir. 2013) .......................................................26

*Ruiz v. A.B. Chance Co.*,
    357 F.3d 1270 (Fed. Cir. 2004) .......................................................41

*In re Sang-Su Lee*,
   277 F.3d 1338 (Fed. Cir. 2002) ......................................................68

*Shaw Indus. Grp. V. Automated Creel Sys.*,
   817 F.3d 1293 (Fed. Cir. 2016) ......................................................67

*In re Sneed*,
   710 F.2d 1544 (Fed. Cir. 1983) ......................................................29

*Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*,
   135 S. Ct. 831 (2015)............................................................26, 54

*Thorner v. Sony Comp. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012) ......................................................53

*TiVo, Inc. v. EchoStar Commc'ns Corp.*,
   516 F.3d 1290 (Fed. Cir. 2008) ......................................................56

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996) ......................................................57

*Wyers v. Master Lock Co.*,
   616 F.3d 1231 (Fed. Cir. 2010) ......................................................48

**Statutes**

28 U.S.C. § 1295(a)(4)(A) ............................................................ xii

35 U.S.C. § 103 ............................................................15, 26, 46

35 U.S.C. §§ 141, 319 .................................................................. xii

35 U.S.C. § 142 .......................................................................... xii

35 U.S.C. § 311 .......................................................................... xii

Administrative Procedure Act..........................................................68

**Other Authorities**

37 C.F.R. § 42.100(b) ............................................................26, 54

37 C.F.R. § 90.3(a)(1), (b)(1)......................................................... xii

## STATEMENT OF RELATED CASES

These appeals are from consolidated IPRs that challenged claims of U.S. Patent 6,978,346.  The pending appeal in *Dell Inc. v. Electronics & Telecommunications Research Institute*, No. 2015-1719, is related to this appeal.  It arose from IPR2013-00635, involves one common reference (Hathorn), and had the same panel at the Board.  Briefing in that appeal is complete, and the joint appendix was filed April 6, 2016.

|  | *Dell v. ETRI* | *This appeal* |
|---|---|---|
| **IPR** | IPR2013-00635 | IPR2014-00901, -00949 (joined) |
| **Petition Filed** | September 2013 | June 2014 |
| **Institution Decision** | March 2014 | December 2014 |
| **Final Written Decision** | February 2015 | December 2015 |
| **Result** | Claims 1-3, 5-8 not shown to be anticipated by Hathorn | Claims 1-9 not shown to be obvious over Mylex and Hathorn |
| **Notice(s) of Appeal Filed** | April 2015 | January 2016 |
| **Fed. Cir. Appeal(s)** | 2015-1719 | 2016-1670, -1673 |

This appeal may be affected by the Court's disposition of two issues in the *Dell* appeal—i.e., (a) construction of "RAID" and (b) whether the Hathorn reference discloses a "RAID" under any construction.  *See Argument § II, infra.*  The Court may wish to assign this appeal and the *Dell* appeal to the same panel for argument.

The following cases in the U.S. District Court for the District of Delaware also involve the '346 patent.  To Appellants' knowledge, all are either terminated or stayed pending disposition of IPR proceedings (including any appeals to this Court).

- *Safe Storage LLC v. Dell Inc.*, 1:12-cv-01624 (filed Nov. 30, 2012);
- *Safe Storage LLC v. Dot Hill Sys Corp.*, 1:12-cv-01625 (filed Nov. 30, 2012);
- *Safe Storage LLC v. Hewlett-Packard Co.*, 1:12-cv-01626 (filed Nov. 30, 2012);
- *Safe Storage LLC v. NetApp Inc.*, 1:12-cv-01628 (filed Nov. 30, 2012);
- *Safe Storage LLC v. Silicon Graphics Int'l Corp.*, 1:12-cv-01629 (filed Nov. 30, 2012);
- *Safe Storage LLC v. Cisco Sys. Inc.*, 1:13-cv-00926 (filed May 23, 2013);
- *Safe Storage LLC v. VMware Inc.*, 1:13-cv-00928 (filed May 23, 2013);
- *Safe Storage LLC v. Infotrend Corp.*, 1:13-cv-00929 (filed May 23, 2013);
- *Safe Storage LLC v. Nexsan Corp.*, 1:13-cv-00931 (filed May 23, 2013);
- *Safe Storage LLC v. Overland Storage Inc.*, 1:13-cv-00932 (filed May 23, 2013);
- *Safe Storage LLC v. Oracle Am. Inc.*, 1:13-cv-01089 (filed June 17, 2013);
- *Safe Storage LLC v. ATTO Tech. Inc.*, 1:13-cv-01090 (filed June 17, 2013);
- *Safe Storage LLC v. Emulex Corp. et al.*, 1:13-cv-01150 (filed June 28, 2013); and
- *Safe Storage LLC v. Int'l Business Machines Corp.*, 1:13-cv-01151 (filed June 28, 2013).

Appellants are not otherwise aware of any cases pending in this Court or any other court that would directly affect or be directly affected by this Court's decision in this appeal.

## STATEMENT OF JURISDICTION

The Board had jurisdiction over these IPRs under 35 U.S.C. § 311. The Board joined the IPRs (IPR2014-00901, filed by VMware, and IPR2014-00949, filed by IBM and Oracle) after institution, and issued its final written decision December 9, 2015.

All appellants filed timely notices of appeal January 28, 2016. *See* 35 U.S.C. § 142; 37 C.F.R. § 90.3(a)(1), (b)(1). This Court has jurisdiction under 35 U.S.C. §§ 141, 319, and 28 U.S.C. § 1295(a)(4)(A).

# PRELIMINARY STATEMENT

The '346 patent and the prior art concern ways that storage controllers communicate with (a) computers over a network, and (b) each other to coordinate their work.  The putative invention was that controllers (components that control the operation of a storage device) can communicate with each other over the same network they use to communicate with computers, rather than through a separate direct connection between the storage controllers.  That was not inventive.

Rather, the primary reference before the Board (the Mylex publication) showed ***every claim element*** other than swapping out direct connections for the cheaper, more flexible through-the-existing-network connections that were already known in the art.  A second reference (the Hathorn patent) showed that direct connections and through-the-existing-network connections were two of a limited set of connection options, for which the substitution of one for the other was no less obvious than the mechanical-to-electronic throttle substitution made in *KSR* to render a claimed invention obvious.

The Board refused to make the simple, straightforward combination of Mylex and Hathorn because of four fundamental legal errors.

***First***, the Board was swayed by supposed problems in physically combining embodiments in the two references.  It relied on "differences in the taught ports of Mylex and Hathorn," "fundamental operational differences," and evidence that "the transmission protocols in Hathorn and Mylex are different standards."  That was legal error.  Even before *KSR*, this Court's precedents were clear that the test for obviousness is not whether prior art embodiments could be physically combined.

***Second***, the Board relied on a lack of explicit motivation to combine in the secondary reference.  In the Board's own words, "Hathorn does not specifically address redundancy."  This Court has clearly stated, however, that there is no requirement to find an explicit motivation to combine in the prior art.  Nor should the Board have assumed that a skilled artisan would have been led only to those elements of prior art designed to solve the same problem.  Under *KSR*, the Board should have considered whether Mylex's redundancy goals, and/or the known cost and complexity problems associated with direct connections, would have

2

prompted the combination. Further, Hathorn actually included an explicit cost-savings motivation to combine, which the Board discounted by again, erroneously focusing on discrete technical embodiments in the references.

***Third***, the Board held the claims were not obvious because there were other alternatives to direct connections, which, in the Board's view, were more obvious than over-the-existing-network connections. However, this Court has explained that a solution need not be the most obvious to invalidate a patent—a problem can have multiple obvious solutions. Again, the Board committed legal error.

***Fourth,*** the Board also erred in its analysis of whether Hathorn disclosed a "RAID" within the meaning of the claims. Mylex undisputedly discloses a "RAID," and the proper inquiry for obviousness purposes is not a search for individual claim elements within each prior art reference. Moreover, the Board erred in construing "RAID," and in finding that Hathorn does not disclose a "RAID."

This case presents a clear-cut candidate for reversal. The dispute is narrow and legal. Mylex discloses all but one element of the '346 claims. Hathorn explicitly teaches that element. The Board's legal errors

are plain and explicit—requiring physical combinability of embodiments, relying on a lack of explicit motivation to combine in the secondary reference, assuming that there can only be one obvious solution, and requiring the existence of specific claim elements in both prior art references as part of an obviousness analysis. Had the Board followed *KSR* and this Court's law, it could only have found claims 1-9 obvious.

# STATEMENT OF THE ISSUES

**1.** Whether the Board erred as a matter of law in its obviousness analysis of claims 1-9 by:

**(a)** requiring a showing that prior art embodiments could be technically and physically combined;

**(b)** requiring petitioners to show an explicit motivation to combine and disregarding the actual explicit motivations to combine in the record; and

**(c)** finding the claims to be non-obvious based on the purported existence of a more obvious solution to the same problem the claims purport to solve.

**2.** Whether the Board erred in weighing its finding that Hathorn lacked a "RAID" in favor of non-obviousness, when Mylex indisputably disclosed a RAID, and by narrowly construing "RAID" inconsistent with the intrinsic and extrinsic evidence in any event.

**3.** Whether the Board abused its discretion by denying institution of certain invalidity grounds as "redundant" without providing supporting reasoning (an issue being preserved because of the pendency of *Cuozzo* in the Supreme Court).

5

## STATEMENT OF THE CASE AND FACTS

Appellants petitioned in the joined IPRs from which these appeals arise. The Board ruled that claims 1-9 of ETRI's U.S. Patent 6,978,346 were not unpatentable over the combination of **(1)** the "Mylex" publication[1] and **(2)** the "Hathorn" patent.[2]

### A.    Technical Background and Prior Art

#### 1.    Networked Storage Systems in the Prior Art

The technology in this appeal relates to systems that connect computers to disk drives over a network. By the '346 patent's 2000 priority date, such systems were advanced and widely available. (Appx1420) (1994 publication: "Today they appear in the product lines of most major computer manufacturers."). A 1998 publication by Mylex Corporation described such systems—referred to in the paper as "Storage Area Networks (SANs)." (Appx376). Its Figure 17 showed a simplified system architecture, with a network depicted as a shaded oval that connects computers (labeled HBAs in upper left and right) to two storage controllers via network ports (Port 1, Port 2, and Reserved) (Appx392):

---

[1] Kevin J. Smith, Mylex Corp., *Storage Area Networks; Unclogging LANs and Improving Data Accessibility*, published May 29, 1998 (Appx374-395).
[2] U.S. Patent 5,574,950, issued November 12, 1996 (Appx356-373).



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

Each controller also connects to an array of disks (middle). The controllers coordinate with each other using digital "heartbeats" on a direct connection that is separate from the main data network. A "heartbeat" is a signal each controller sends at regular intervals to indicate that it is working. (Appx390). The heartbeats protect the system from controller failure—i.e., if a controller stops getting heartbeats from its mate, it uses its "Reserved" port to assume the identity and functionality of the active port on the failed controller, thereby maintaining access to the stored data. (*Id.; see also* Appx392). This handoff is known as "failover." (Appx390).

The system is protected from drive failure by keeping multiple redundant copies of each stored file across multiple disk drives. The particular technology, known as RAID (which stands for "redundant

array of inexpensive disks"),[3] uses multiple disks to keep redundant copies of data and reconstruct any files when a disk fails. This too was old technology by 2000, with the term "RAID" coined in 1987 (Appx191), when engineers realized that an array of cheap consumer drives, if properly coordinated with RAID controllers, could be as reliable as expensive mainframe drives. The defining characteristics of such a system, then, were drives in a coordinated group, or array, storing information redundantly on cheap disk drives—a "redundant array of inexpensive disks."

With one minor exception,[4] it is undisputed that Mylex discloses all but one element of claims 1-9 of the '346 patent. Specifically, the '346 claims recite that the controllers communicate with each other using the same network that they use to communicate with computers (*i.e.*, the oval at the top of Figure 17 of Mylex (Appx392)). (*See* Appx53 at claims 1 and 9 (reciting "network controlling units exchanging information with each

---

[3] (*See* Appx191 at ¶ 21 (Appellants' expert) and Appx1731 at ¶ 29 and n.1 (ETRI's expert)). "RAID" can also refer to redundant arrays of *independent* disks, but there is undisputedly no difference between those usages. (*Id.*).

[4] The exception is one limitation of claim 5. ETRI argued that Mylex does not disclose the "hub equipment" element of claim 5 (Appx1713-1714), but the Board rejected that argument. (Appx15-16).

other)).    In Mylex, Figure 17 shows communication between the controllers on a separate dedicated connection.  (Appx392). However, Mylex repeatedly teaches the goal of having redundant (multiple) communication paths to provide fault tolerance (ability to function when there is an error) and better performance.[5]    Having the controllers communicate through the network would achieve Mylex's redundancy goals because networks have multiple possible communication paths that provide back-up if one path fails, whereas the Figure 17 direct connection does not.

---

[5] (*E.g.*, Appx376 ("Increased fault tolerance and availability with redundant paths to data"); Appx380 ("Optional redundancy for high availability"); Appx383 ("Redundant links can be used for fault tolerance and higher data availability"); Appx384 ("Redundant links can be used to increase data accessibility"); Appx385 ("<u>SAN's should be designed without any *single point of failure*</u> that can cause storage devices to become inaccessible") (emphasis in original); Appx389 ("Each controller has redundant paths to host systems and pairs of controllers provide redundant paths to disks."); Appx390 ("Mylex controllers have dual SAN ports which doubles the bandwidth to controllers and allows redundant paths from other SAN devices to the controllers to increase the resiliency of the SAN topology.")).

### 2. Hathorn Teaches Benefits of Swapping Through-the-Network Connections for Direct Connections Between Storage Controllers

While Mylex urges redundancy goals that are better achieved by using a through-the-network connection, the Hathorn patent[6] explicitly teaches that direct controller-to-controller connections (such as that found in Figure 17 of Mylex) and through-the-network connections (recited by the claims of the '346 patent) are interchangeable alternatives. Hathorn centers on "data shadowing" (Appx366 at 1:1-11)—i.e., copying data between a primary storage site and cooperating remote storage site.

Hathorn shows the two types of connections as alternatives—the direct controller-to-controller connection by elements 247 and 248 in its Figure 2, and the alternative through-the-network connection element 351 in Figure 3—"using shared communication links that can dynamically interface either a host processor to a storage controller, or … one storage controller to another storage controller, thus reducing a number of communication links required" (Appx367 at 4:32-36):

---

[6] U.S. Patent No. 5,574,950 (Appx356-373).



**Direct Connection**                    **Through-the-Network Connection**

(Appx358-359). If one storage site fails, the same data can be accessed from the secondary storage site.  (Appx366 at 2:40-43).  Hathorn thus discloses redundant storage in arrays of inexpensive disks—and shows the two alternative ways to connect the controllers for that storage.

Hathorn also has an explicit motivation for this swap—i.e., reducing the "expense" of having multiple different and under-utilized

direct path communication links.[7]   Other references, such as the DeKoning patent, also identify that direct paths between disk storage controllers (such as presented in Mylex) may present "cost and complexity problems" (Appx439 at 4:61-5:6), and also identify through-the-network connections between controllers as a solution.  (Appx440 at 5:3-5).

## B.    The '346 Patent

The putative invention in the '346 patent is to eliminate the direct connection between disk storage controllers (as in Mylex), and instead send the coordination messages over the main network (the alternative also shown in Hathorn).   The patent, in fact, makes clear that the inventors viewed their invention as nothing more than this substitution. Specifically, Figure 2 of the '346 patent is labeled "prior art" and is essentially Mylex's Figure 17 and a 90 degree rotation of Hathorn's

---

[7] (*See* Appx369 at 7:45-47 ("An area for improvement to the remote dual copy system [of Figure 2] revolves around the number of required communication links 241-250 and the associated expense."); Appx367 at 4:21-30 ("Each communication link presents a substantial expense in the remote dual copy system … exacerbated by the fact that communication … requires two separately dedicated communication links though these links may be inactive for substantial periods of time.")).

direct-connection figure 2, while figure 5 of the patent (though shown with a slightly larger network) simply swaps the direct connection for a through-the-network connection, just like Hathorn's Figure 3:



**Direct Connection**                    **Through-the-Network Connection**

(Appx46; Appx49).

The claims recite such an apparatus in a RAID context.[8] The patent has two independent claims: claims 1 and 9. Both recite an apparatus comprising, *inter alia*, a "plurality of connection units" for connecting "host computers" and two "RAID controllers"—*i.e.*, the controllers are

---

[8] (*See* Appx53 (claims 1-9)). Also, in the specification, the first sentence of the abstract and the first sentence of the field of the invention identically define the term "RAID: "a redundant array of inexpensive disks (hereinafter, referred to as 'RAID.'" (Appx44 at abstract; Appx51 at 1:8-10).

connected to each other through the same network that connects them to the "host computers."[9]  The two RAID controllers each include two "network interface controller[s]," (NICs)[10] and each NIC "exchanges information" with a corresponding NIC on the other controller:

> 1.  An apparatus for a redundant interconnection between multiple hosts and a RAID, comprising:
>
> a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers, the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit; and
>
> a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers, wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units, and the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit.

---

[9] Claim 9 recites "RAID controllers," while Claim 1 recites "RAID controlling units," but the Board construed them identically as: "a component that controls operation of the RAID."  (Appx17).

[10] Claim 9 recites "network interface controller," while Claim 1 recites "network controlling unit," but the Board construed them identically as: "a component, connected to a network, for providing communication over the network."  (Appx17-18).

(Appx53 at 5:6-26; *see also* Appx53 at 6:20-59 (claim 9)).

The '346 patent's system may be implemented using a wide variety of communication standards, "***such as*** fibre channel, asynchronous transfer mode (ATM) and InfiniBand ***etc.***" (Appx52 at 3:25-38). The patent provides no technical details regarding how RAID controllers and their associated NICs exchange information or take over each other's functions on failover, leaving any such details to a skilled artisan's existing knowledge.

### C.   *Inter Partes* Review Proceedings

#### 1.   Institution Decisions

The IPR petitions challenged claims 1-9 of the '346 patent as obvious on three grounds: (1) Mylex in view of Hathorn; (2) Hathorn in view of Mylex; and (3) Mylex or U.S. Patent 6,578,158 ("Deitz") in view of U.S. Patent 6,401,170 ("Griffith") or U.S. Patent 6,073,218 ("DeKoning"). (Appx754; Appx3076).

The Board instituted proceedings on the Mylex/Hathorn combination, concluding that petitioners had "demonstrated a reasonable likelihood of prevailing on the challenge that claims 1-9 would have been obvious under 35 U.S.C. § 103 over Mylex and Hathorn." (Appx1642). The Board dismissed the other grounds (Mylex or Deitz in view of Griffith

or DeKoning) as "redundant," without any substantive analysis. (Appx1642-43).

The institution decisions construed "RAID." As noted above, another IPR challenging the same patent was pending before the same panel of administrative patent judges—IPR2013-00635. The Board here initially construed "RAID" to mean "redundant array of inexpensive disks"—consistent with the '346 patent's explicit definition, and with the Board's institution in the other IPR (Appx1628):

> "RAID" is well understood by a person of ordinary skill in the art as an acronym for "redundant array of inexpensive disks" [Appx44], Abstract. Dr. Horst's testimony corroborates the stated understanding of the person of ordinary skill as set forth in the '346 patent. [Appx188-189] ¶¶14-16. Consistent with our construction from the '635 IPR, we construe "RAID" to mean "redundant array of inexpensive disks."

### 2.    Final Written Decision

The Board changed course in its final written decision.

For obviousness, it reasoned that fundamental operational differences between Mylex and Hathorn negated any motivation to combine. (Appx36-37). That reasoning followed from ETRI's assertions about the physical combinability of particular embodiments in the art, like "the ESCON-based communication links in Hathorn are circuit-switched, whereas the host-side fibre channel network in Mylex is a

packet-switched network." (Appx1708-09). Yet, the '346 patent does not describe its "invention" as a technical improvement with respect to any particular type of communication protocol or link. Rather, the '346 patent describes, at a high level, that the network communication links can be implemented using a wide variety of communication standards, "*such as* fibre channel, asynchronous transfer mode (ATM) and InfiniBand *etc.*" (Appx52 at 3:25-38).[11] The specification also provides no technical implementation details regarding how its controllers exchange information or take over the function of a failed controller for any communication standard, leaving any such details to a skilled artisan's existing knowledge. (Appx1167-1168 at 65:5-66:19). Similarly, Mylex discloses that its connections can use a variety of technologies[12] and

---

[11]  All quoted emphasis is added, unless otherwise noted.

[12]  For example, networks "can be designed with a specialized or standard networking technology, e.g. Fibre Channel" or a variety of different communication standards, such as "ESCON," "HIPPI," and "SSA." (Appx378; *see also* Appx379). Mylex discloses that "Fibre Channel is an ideal SAN interconnect because it provides scaleable performance with virtually unlimited addressing and can span campus-wide distances." (Appx379).

Hathorn's discussion of ESCON connections is merely an exemplary embodiment.[13]

The Board accepted ETRI's argument that Hathorn's teaching to save costs by connecting controllers through the network should be regarded as limited to embodiments where controllers are far apart. Thus, ETRI argued, and the Board agreed, Hathorn does not provide a motivation to combine because Hathorn's cost-savings teaching is limited to embodiments where storage controllers are far-apart while Mylex's controllers are "typically" close together. (*See* Appx 38-39). Yet, both Hathorn and Mylex recite embodiments where controllers span a wide variety of distances. (*See, e.g.,* Appx379 ("can span campus-wide distances"); Appx1691 at 2:43-46 ("just across a fire-wall to several kilometers")). Similarly, the Board discounted Mylex's redundancy goals as prompting the proposed combination, on the basis that Hathorn did not include an explicit teaching for improving redundancy. (Appx31-37). The Board did not address whether the known "cost and complexity"

---

[13] (*See* Appx368 at 6:4-6 ("The communication links 121 can be either parallel or serial links, *for example*, enterprise system connections (ESCON) serial fiber optic links."); Appx372 at claim 2 (limiting independent claim 1 to an ESCON implementation)).

problems associated with direct paths between RAID controllers, for example, as noted in the DeKoning reference (Appx439 at 4:61-5:6), would prompt the combination.

The Board further accepted ETRI's assertion that there are "other, more apparent paths for transporting the heartbeats than the ones resembling the claims" (Appx1702; Appx38-39).  Yet, neither ETRI nor the Board cited any authority for the proposition that a claim is not obvious unless it is the *most* obvious solution to a problem.  And ETRI had admitted at oral argument that it would have been obvious to send Mylex's heartbeat communication over-the-network instead of through a direct link (though ETRI wrongly maintained that its claims required more):

> JUDGE QUINN: So what I'm wondering is, what do we do with respect to is it really obvious to just change the path of the heartbeats from a direct link to the fibre when you're just keeping the same functionality and you're not really changing the heartbeats? You're just routing it through a different communication link.
>
> MR. PHILLIPS: Yes. No, it's not -- ***well, okay. Some modifications would be obvious***, and I'll explain what they are, but not this modification on slide 8. What would be obvious to one skilled in the art is to take that heartbeat path, eliminate it and to, instead, route the heartbeats over the purple path [depicted in slide 9] in Mylex. ***I'll grant right here that would be an obvious modification of Mylex***.

It doesn't result in the claim language, but ***that's an obvious modification***. It has none of the problems that we point out with the actual proposed modification. ***The other obvious modification would be*** to instead of sending the heartbeat over that direct path, ***send it over the disk bus***.

…

***That's a clear alternative to the dedicated path*** between the two controllers. Those are the three and the only three obvious alternatives or obvious options with respect to routing the heartbeats between the two controllers in Mylex.

(Appx2371-2372 at 52:8-53:11). The following annotated figures show the

modifications that the Board and ETRI's counsel were discussing:



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

network controlling unit 1

network controlling unit 2

network controlling unit 3

network controlling unit 4

**Patent Owner Demonstratives Slide 8 (Appx2243)**



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

**Patent Owner Demonstratives Slide 9 (Appx2244)**

The Board also accepted an argument ETRI had made in briefing—but then *disavowed* at oral argument—that it would be infeasible to combine Mylex and Hathorn because the "reserved" ports in Mylex (see Figure 2 above) "are inactive" (Appx1684-1686; Appx32-37). Again, that position focused on particular embodiments in the prior art rather than the broader teachings. And it was a position that ETRI expressly disavowed at oral argument, changing its position midstream by conceding that a skilled artisan would have known how to activate the "reserved" ports of Mylex to exchange information with the active ports and falling back on its improper argument that Hathorn lacked an explicit teaching for the combination:

> MR. PHILLIPS: Hathorn does not teach how to activate reserved ports. It assumes that you have active ports that can

21

communicate and it communicates through active ports. It does not teach activating an inactive port. ….

JUDGE ANDERSON: Didn't your expert -- I believe I heard Petitioner quote your expert as saying that it was something well within the skill of one of ordinary -- well within the ordinary skill to activate a port that wasn't active in the first place.

MR. PHILLIPS: That's right. Dr. Conte did say that and we're not disputing that one skilled in the art would know how to do that, but the next question is why would one skilled in the art do that and Hathorn doesn't give a reason….

(Appx2356-2357 at 37:22-38:12). In other words, the ports were already there, and simply needed to be turned on, and one skilled in the art knew how to do that based on knowledge in the field. Without suggesting that ETRI was wrong to disavow its "infeasibility" argument, the Board nonetheless relied on that argument in its decision. (Appx32-37).

Finally, the Board narrowed its construction of "RAID" between institution and final decision to add additional requirements, including that the drives in the RAID present themselves as a "single logical unit." (Appx14). Under that narrower construction, ETRI argued and the Board agreed, that Hathorn did not disclose a RAID. (Appx25-28). Showing that the construction mattered, ETRI and the Board both stated at argument that the claims would more readily be found obvious if Hathorn disclosed a RAID system, like Mylex did:

22

JUDGE ANDERSON: Wouldn't it be more likely to combine – wouldn't a person of ordinary skill more likely combine Hathorn if it was considered to be a RAID, albeit it a different kind of RAID than what we construed in the other case?

MR. PHILLIPS: Yes, I think so and that's what Dr. Horst said. He said if Hathorn is a RAID, it makes more sense -- it makes sense to combine it with Mylex.

(Appx2365 at 46:14-20).  Based on the foregoing, the Board concluded that petitioners did not show that claims 1-9 were unpatentable over Mylex and Hathorn.  (Appx41).

## SUMMARY OF THE ARGUMENT

**I.**    Mylex all but anticipates claims 1-9, with the only difference being a simple substitution of a dedicated path connection with a through-the-network connection.  The Board's decision not to find those claims obvious rests on multiple errors in applying the law of obviousness that *KSR* and this Court's precedent have explicitly addressed.  First, the Board erred in requiring the prior art to be technically and physically combinable and in adopting ETRI's disavowed "technical infeasibility" argument.  Second, the Board erred by requiring Hathorn to include an explicit motivation to combine.  Likewise, the Board erred in only considering Hathorn's explicit cost-savings motivation in the context of discrete Mylex co-located embodiments and Hathorn far-apart

embodiments, rather than considering the references as a whole. Third, the Board erred in basing its non-obviousness conclusion on the purported existence of a more obvious alternative, while ignoring that Mylex's RAID controllers only had a few potential ways to exchange information, each of which would be obvious to try with a reasonable expectation of success.

II.  If the Court does not reverse outright, it should at least remand for reconsideration of obviousness—either (or both) in light of the Board's legal errors with respect to obviousness and the Board's further legal errors with respect to the term "RAID" (which are also the subject of Appeal No. 2015-1719, *Dell v. ETRI*).

The Board's obviousness analysis was improperly influenced by its finding that Hathorn lacked a "RAID." Mylex clearly discloses a "RAID" and the issue before the Board was obviousness, not anticipation. Further, the Board's finding was based on an unduly narrow construction of "RAID" and its conclusion that Hathorn did not disclose a "RAID" under that narrower construction. "RAID" is an acronym with an ordinary meaning and an explicit definition in the patent. The Board erred by imposing the additional limitation of "a single logical unit."

24

Further, the Board erred in finding that Hathorn does not disclose a system that presents "a single logical unit," when Hathorn's system can operate both as a single logical unit (in some modes) and as multiple logical units (in others).  Nothing in the '346 claims precludes a "RAID" from operating in non-RAID modes in some circumstances.  Hathorn thus necessarily discloses a RAID, and the Court should at least remand under a correct construction of "RAID" because the Board and ETRI weighed Hathorn's purported lack of a RAID disclosure in favor of non-obviousness.

III.   The Board abused its discretion by declining to institute IPR proceedings on the remaining grounds as "redundant," without providing substantive reasoning.  Appellants are aware that this Court's precedent currently holds that this Court has no jurisdiction to review that aspect of an institution decision, but present this argument to preserve it, because the Supreme Court is considering the scope of this Court's jurisdiction to review institution decisions.

## STANDARD OF REVIEW

Obviousness is a question of law, reviewed *de novo*, that depends on underlying facts, reviewed for substantial evidence. *See Randall Mfg. v. Rea,* 733 F.3d 1355, 1362 (Fed. Cir. 2013).

This Court reviews the Board's claim construction according to *Teva Pharmaceuticals USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831 (2015): "underlying factual determinations concerning extrinsic evidence" are reviewed "for substantial evidence and the ultimate construction of the claim [is reviewed] de novo." *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1279-80 (Fed. Cir. 2015). Claims of an unexpired patent in *inter partes* review are given their broadest reasonable interpretation consistent with the specification. *Id.* at 1275; 37 C.F.R. § 42.100(b).

## ARGUMENT

## I.    The Board's Non-Obviousness Rulings Should Be Reversed.

A patent claim is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the claimed invention as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103(a).

In *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. 398 (2007), the Supreme Court emphasized that "[t]he obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents." *Id.* at 419. Rather, the proper approach is "expansive and flexible," *id.* at 415, and "need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ." *Id.* at 418. "A person of ordinary skill in the art is also a person of ordinary creativity, not an automaton." *Id.* at 421.

In addition to making clear that no explicit "teaching, suggestion, or motivation to combine" was required, *KSR* specifically noted several "errors" in the decision it reviewed, including (1) "holding that courts and patent examiners should look only to the problem the patentee was trying to solve," and (2) "assum[ing] that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *Id.* at 420. The Board committed these very errors here.

Particularly in light of *KSR*, the obviousness case here is much stronger than is typical. It is undisputed that Mylex nearly anticipates, and Hathorn provides the missing element. Also, Hathorn explicitly recites a cost-saving motivation to modify systems like Mylex (by using a through-the-network connection instead of dedicated pathways between storage controllers). Other design reasons also would have prompted the combination, such as better achieving Mylex's goal of having redundant (multiple) communication paths and addressing the known "cost and complexity problems" of Mylex's direct heartbeat path, as acknowledged by DeKoning (Appx439 at 4:61-5:6).

Further, as ETRI conceded below, modifying Mylex to have its RAID controllers communicate over the network was well within the technical grasp a skilled artisan—it required nothing more than activating Mylex's inactive ports, which ETRI and its expert conceded a skilled artisan would have known how to do. (Appx2357 at 38:5-10). Under *KSR*'s "expansive and flexible approach," the '346 patent system is obvious as a matter of law.

The Board's contrary ruling depends on cascading legal errors, directly contrary to *KSR* and the precedents of this Court.

### A. The Board Erred As A Matter of Law By Requiring Technical And Physical Combinability Of The Prior Art Systems.

The test for obviousness is whether "the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious" to a skilled artisan.  It is not whether specific prior art embodiments could be physically combined or modified to make a device as claimed in the patent.

This Court's precedent was clear on that point long before *KSR*.  *See In re Etter*, 756 F.2d 852, 859 (Fed. Cir. 1985) (*en banc*) ("Etter's assertions that Azure cannot be incorporated in Ambrosio are basically irrelevant, the criterion being not whether the references could be physically combined…"); *In re Sneed*, 710 F.2d 1544, 1550 (Fed. Cir. 1983) ("[I]t is not necessary that the inventions of the references be physically combinable…"); *In re Keller*, 642 F.2d 413, 425 (CCPA 1981) ("The test for obviousness is not whether the features of a secondary reference may be bodily incorporated into the structure of the primary reference.").  *KSR* made that point clearer still, with its rejection of an overly rigid focus on "the explicit content of issued patents," and "precise

teachings directed to the specific subject matter of the challenged claim." 550 U.S. at 418, 419.

Post-*KSR*, it is clear that "[a] reference must be considered for everything it teaches by way of technology and is not limited to the particular invention it is describing and attempting to protect." *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1076 (Fed. Cir. 2015).  It remains "well-established that a determination of obviousness based on teachings from multiple references does not require an actual, physical substitution of elements." *In re Mouttet*, 686 F.3d 1322, 1332 (Fed. Cir. 2012).  In this case, the Board ran afoul of those principles in two respects.

> ### 1.  The Board Erroneously Required Petitioners to Show that Mylex and Hathorn Were Technically and Physically Combinable.

The Board rested its non-obviousness conclusion on its findings that the Mylex and Hathorn systems in particular embodiments are technologically incompatible.  The Board found, for example, that "a person of ordinary skill would not be prompted to make the proposed modification given the … *differences in the taught ports of Mylex and Hathorn*." (Appx37).  By focusing on such technical details as the specific types of ports (*id.*), differences in "transmission protocols in Hathorn and

30

Mylex," (*id.*), and differences between the "heartbeats" of Mylex and signals between controllers of Hathorn (*id.*; Appx40), the Board required petitioners to prove technical and physical combinability of embodiments. (*See* Appx37 ("*[T]he nature of the heartbeats [in Mylex] and disk drive traffic data [in Hathorn] are different* such that the links dedicated to transferring disk drive traffic data would not motivate the elimination of the heartbeat path [in Mylex].")).

Under the proper legal standards, this should not have been a difficult case. The Mylex paper discloses every claim limitation except the through-the-network connection. Hathorn explicitly teaches that it is advantageous to replace a dedicated path (like Mylex discloses) with a through-the-network connection. And Hathorn and Mylex provide reasons for narrowing the difference between Mylex and the '346 patent: substituting a through-the-network connection in place of a dedicated path connection would (a) per Mylex, improve the performance and fault tolerance that flows from redundant communication paths; and (b) per Hathorn, reduce the "expense" of extra communication links. The '346 patent's teachings (let alone its claims) are not even at the level of technical detail at which the Board operated: the '346 patent discusses

different network protocols as interchangeable, and does not limit the types of ports that can be used or the types of information that can be exchanged through the ports. Nor is there any evidence of "secondary considerations" that weigh against a finding of obviousness.

In sum, by reading Mylex and Hathorn as if they disclosed nothing more than the technical details of specific embodiments, and by requiring petitioners to prove technical combinability of those embodiments, the Board ran afoul of *KSR* and consistent precedent of this Court, and violated the principle that "[a] reference must be considered for everything it *teaches* by way of technology and is not limited to the particular *invention* it is describing and attempting to protect." *Belden*, 805 F.3d at 1076. That alone requires reversal.

## 2. The Board Erroneously Accepted ETRI's Disavowed "Technical Infeasibility" Argument

The Board likewise focused erroneously on discrete embodiments in adopting a "technical infeasibility" argument that ETRI made in its brief, but disavowed at oral argument. Doing so was erroneous, both substantively and procedurally.

ETRI had argued in its briefs that it would not have been "feasible" to modify Mylex in the manner claimed, because Mylex's Figure 17

depicted a fibre-channel system with "reserved" ports that are "inactive." (Appx1684-1686; *see also* Appx862-864). The position lacked substance because the '346 patent's claims are agnostic as to connection type, and its specification notes that a wide range of connection types can be used. (Appx53 at 5:5-6:69 ('346's claims 1-9 not specifying use of specific networking standard); Appx52 at 3:25-30 (identifying use of fibre channel and other networking standards without reference to "reserved" ports)). More fundamentally, Mylex discloses that its storage networks can be implemented using a wide variety of networking standards and Hathorn discloses using active ports for the connection. (Appx379-80; Appx1700 (ETRI admitting that the ports "in Hathorn are always active")).

The Board's approach is also procedurally suspect because ETRI dropped its technical feasibility argument post-briefing—which was not surprising because the argument made little sense. ETRI's expert conceded at deposition that Mylex's "reserved" ports are actual, functioning ports, and making them "active" is simply a matter of turning them on. This admission forced ETRI to disavow the point at oral argument:

> MR. PHILLIPS: Hathorn does not teach how to activate reserved ports. It assumes that you have active ports that can

communicate and it communicates through active ports. It does not teach activating an inactive port. ….

JUDGE ANDERSON: Didn't your expert -- I believe I heard Petitioner quote your expert as saying that it was something well within the skill of one of ordinary -- well within the ordinary skill to activate a port that wasn't active in the first place.

MR. PHILLIPS: That's right.  *Dr. Conte did say that and we're not disputing* that one skilled in the art would know how to do that….

(Appx2356-2357 at 37:22-38:11).

Nonetheless, the Board adopted that position as a critical part of its reasoning.  (*See*, *e.g.*, Appx33-34 (Acknowledging ETRI's argument that Hathorn "does not teach activating an inactive port" and finding that "Petitioner[s'] position requires use of the inactive 'Reserved' ports to meet the claim language, *making the proposed modification not feasible*"); Appx35-36 ("[W]e are not persuaded that Hathorn[] … rebuts *the inference of unfeasible communication path drawn from the disclosure of Mylex's 'Reserved' ports.*"); Appx37 ("we find that *a person of ordinary skill would not be prompted to make the proposed modification given the unfeasibility of the proposed redundant communication …*")).

And although the Board stated that it "disagree[d] with how Petitioner has characterized the testimony of Dr. Conte" in petitioner's

reply brief (Appx35), the Board never addressed ETRI's oral argument concession or reconcile its decision with that concession. The Board did not suggest that ETRI's counsel misspoke or that ETRI was wrong to concede (a) that "Dr. Conte did say that" and (b) that "one skilled in the art would know how to do that"— i.e. "to activate a port that wasn't active in the first place." (Appx2357 at 38:5-11). The Board's failure to explain why it relied on a disavowed argument is reason enough to reverse. Ordinarily, a clear concession of a factual point removes that point from dispute. *Cf. Christian Legal Soc'y v. Martinez*, 130 S. Ct. 2971, 2983 (2010). ETRI would have no reason to concede the point if it was not true.

Even setting aside the oddity of disregarding ETRI's concession, ETRI and petitioners' reading of Dr. Conte's testimony was correct, and the Board's was clearly erroneous. When questioned about the '346 patent's lack of technical detail in implementing fault tolerance, Dr. Conte testified that a skilled artisan would have known "multiple ways" to modify a RAID system (such as Mylex) so that "reserved ports" could exchange information and still maintain fault tolerance functionality. (Appx2100-01 at 73:24-74:8; *see also* Appx2102 at 75:7-24 (skilled artisan could reconfigure a switch to allow failover in fibre channel

embodiments); Appx2098 at 71:14-25 (skilled artisan could change a port's address to take over the address of a failed port); Appx2107-2108 at 80:22-81:2 (similar)). Among the options available to one of skill in the art, Dr. Conte testified, was to give each port a separate unique address so that each is actively addressable—as Hathorn teaches. (Appx2092 at 65:16-20). The Board evidently misunderstood Dr. Conte's testimony. And its *sua sponte* efforts to limit and qualify Dr. Conte's testimony essentially repeat its error of requiring physical combinability of specific prior art embodiments. ETRI correctly conceded that activating inactive ports was within a skilled artisan's ability; the Board's unexplained reliance on an argument ETRI disavowed is erroneous as a matter of law.

## B.    The Board Erred As A Matter of Law By Applying An Overly Rigid Motivation-To-Combine Standard.

In *KSR*, the Supreme Court criticized what it then viewed as this Court's "narrow conception of the obviousness inquiry reflected in its application of the TSM test." 550 U.S. at 419. *KSR* admonished against an "overemphasis on … the explicit content of issued patents," and the "assumption that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." *Id.* at 419-20. Rather, "[o]ne of the ways in which a patent's

subject matter can be proved obvious is by noting that there existed at the time of the invention a known problem for which there was an obvious solution encompassed by the patent's claims." *Id.* at 419-20; *see also id.* at 424 ("The proper question to have asked was whether a pedal designer of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to upgrading [the prior art]"). Yet, the Board's approach here was precisely what *KSR* said not to do.

The proper question for the Board was whether a skilled artisan would have seen the benefits of applying Hathorn's teaching of eliminating the dedicated pathway between RAID controllers in favor of information exchange over the host-side network. Rather than asking that question, as *KSR* requires, the Board committed the very errors *KSR* identified of overemphasizing the explicit content of Hathorn (and whether it discloses a motivation to combine) and assuming that a skilled artisan attempting to achieve Mylex's redundancy goals would only be led to consider references that specifically addressed improving redundancy. *Cf id.* at 419-20. Those errors led the Board to conclude,

incorrectly, that the multiple reasons identified in the record were insufficient.

### 1.    Combining Mylex and Hathorn Would Better Achieve Mylex's Redundancy Goals, Which the Board Erroneously Rejected.

The Board's primary reason for finding the absence of a motivation to combine was its conclusion that Mylex and Hathorn do not *both* "disclose redundant communications, as opposed to redundant storage." (Appx37). An entire section of the Board's opinion is entitled "*Whether Both Mylex and Hathorn Disclose Redundant Communication and Mylex Would Be Modified According to Hathorn's Teachings*." (Appx31 (original in italics)). In that regard, the Board concluded that the Mylex's no "single point of failure" redundancy goals (Appx385) would not motivate one of ordinary skill to apply Hathorn's teaching because "the heartbeat path of Mylex is just a single path and not a redundant path" and "other than Figures 2 and 3 of Hathorn ..., Hathorn does not specifically address redundancy." (Appx31-32). The Board was thus "not persuaded that both Mylex and Hathorn disclose redundant communications, as opposed to redundant storage," finding "unpersuasive Petitioner[s'] proffered obviousness rationale that relies on redundancy." (Appx37).

Yet, to place dispositive weight on the finding that "Hathorn does not *specifically address* redundancy" is to require an explicit motivation to combine in contravention of *KSR*.[14]  Even before *KSR*, this Court was clear that a motivation to combine "does not have to be found explicitly in the prior art." *Alza Corp. v. Mylan Labs., Inc.*, 464 F.3d 1286, 1290 (Fed. Cir. 2006); *see also Ball Aerosol & Specialty Container, Inc. v. Ltd. Brands, Inc.*, 555 F.3d 984, 991-94 (Fed. Cir. 2009) (trial court "erred in finding a requirement in *KSR* of an explicit motivation to combine"). More generally, by focusing narrowly on whether Mylex and Hathorn were *both* directed to the same specific problem of redundant communication the Board repeated the error *KSR* identified of "assum[ing] that a person of ordinary skill attempting to solve a problem will be led only to those elements of prior art designed to solve the same problem." 550 U.S. at 420.

---

[14] (*See also* Appx2332 at 13:3-21 ("MS. LUTTON: …for redundancy and cost purposes, one would be inclined to look at Hathorn, realize it teaches that you can change the communication paths and can achieve both of those benefits.   JUDGE McNAMARA: ***Is that suggested in your references***? … JUDGE QUINN: "But the question from my colleague was ***where in Hathorn*** do we have that motivation or that suggestion. We know that Dr. Horst has said this, but ***we're looking for*** what he just said, ***the suggestion in Hathorn***.")).

On this record, Mylex itself repeatedly disclosed a specific design need for its system—using redundant communication paths. (*See supra* at p. 9, n.5). And, the testimony of Appellants' expert Dr. Horst—that one skilled in the art would have recognized that modifying the Mylex system according to Hathorn's teaching would further the redundancy goals of Mylex—was unrefuted. (*See* Appx246 at ¶ 118). The annotated Mylex Figure 17 (presented in the petition and copied below) depicts how Hathorn's through-the-network teaching would better effectuate Mylex's redundancy goals. Specifically, as shown in the annotated Mylex Figure 17, modification of the Mylex system in accordance with Hathorn's teachings would have resulted in two pathways for exchange of heartbeats (shown in green and blue) rather than the single, dedicated pathway, thereby eliminating a potential point of failure and improving the redundancy of the system:



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

network controlling unit 1    network controlling unit 2    network controlling unit 3    network controlling unit 4

(Appx84).

Under a proper conception of obviousness, Mylex's statement of the problem should have been amply sufficient. *See KSR*, 440 U.S. at 420 ("Under the correct analysis, *any need* or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed"); *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1276 (Fed. Cir. 2004) (obviousness does not require "an express, written motivation to combine" in the prior art, a motivation to combine may exist in the nature of the problem to be solved). The Board's reason for disregarding that reason—that Hathorn did not also discuss redundant pathways explicitly—is fundamentally inconsistent with *KSR* and cannot be sustained.

### 2.    Hathorn Explicitly States a Motivation to Combine (Cost-Saving), Which the Board Erroneously Rejected.

As discussed above, in § A.2, Hathorn described alternative embodiments with storage controllers exchanging information *either* via a dedicated pathway *or* through-the-network (as claimed in the '346 patent). Hathorn further taught that the host-side network exchange was preferable because it reduced the number of required communication

links and the associated expense. (Appx 367 at 4:21-30; Appx369 at 7:45-47).

The Board discounted this, instead reasoning that: (1) Hathorn's dedicated connections were expensive only because the storage sites are far apart; and (2) Mylex in contrast "has two co-located RAID controllers, and, thus, the distance expense is avoided." (Appx38). Thus, according to the Board, there was no "persuasive evidence that we may disregard the distance differences between Hathorn and Mylex." (*Id.*). That reasoning is both inconsistent with the record and legally erroneous.

As to the record, the Board was incorrect to read Hathorn as limited to storage controllers that are "far apart," and Mylex as limited to storage controllers that are "co-located." Both references taught a range of distances between controllers. Mylex explicitly teaches using fibre channel pathways for connecting RAID system components to enable the system to "span ***campus-wide distances***." (Appx379). ETRI's expert did not disagree; he merely testified that Mylex's RAID controllers are "***typically*** located in close proximity to each other'" not that they are always co-located. (Appx1769 at ¶ 104; Appx2137 at 10:4-5). Hathorn likewise stated that distance could vary widely: "the primary and

secondary locations depends upon the level of risk acceptable to the user, and for synchronous data communications, can vary from ***just across a fire-wall*** to several kilometers."  (Appx366 at 2:43-46).

More important, the Board's reliance on the (factually erroneous) "distance differences between Hathorn and Mylex" is legally irrelevant to obviousness.  For obviousness purposes, a tribunal errs if it considers prior art references only for the specific details of particular embodiments.  *See Mouttet*, 686 F.3d at 1331 ("A reference may be read for all that it teaches, including uses beyond its primary purpose."); *Belden*, 805 F.3d at 1076 (For obviousness purposes, a prior art reference "must be considered for everything it teaches by way of technology").

Moreover, other prior art, such as DeKoning, similarly taught that cost and complexity may be avoided by eliminating direct paths between storage controllers, and did so without assigning any relevance to the physical distance between controllers.  (Appx439 at 4:61-5:6).  These teachings reflect a known design need in Mylex, and should have been considered as part of a proper obviousness analysis.  "The person of ordinary skill is a hypothetical person who is presumed to be aware of all

the pertinent prior art." *Custom Accessories, Inc. v. Jeffrey-Allan Indus.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

### 3. ETRI's Concessions Establish A Motivation To Modify Mylex.

In any event, ETRI itself conceded the salient point in its patent owner response and at argument: it would have been obvious to reroute Mylex's "heartbeat" signals away from the dedicated pathway and the prior art suggested solutions. As explained below, in § I.C, ETRI made those factual concessions to support a misguided legal theory that the existence of *other* obvious solutions to a problem suggests that a *patented* solution was nonobvious. *See ACCO Brands Corp. v. Fellowes, Inc.*, 813 F.3d 1361, 1367 (Fed. Cir. 2016) (rejecting that argument). But regardless of why ETRI made the concessions, they establish a motivation to modify Mylex to eliminate the dedicated pathway.

Specifically, ETRI removed any doubt that it was conceding the obviousness of the "alternatives" it suggested when it acknowledged the following:

> *What would be obvious to one skilled in the art is* to take that heartbeat path, eliminate it and to, instead, route the heartbeats over the purple path in Mylex. *I'll grant right here that would be an obvious modification of Mylex.*

… *The other obvious modification* would be to instead of sending the heartbeat over that direct path, send it over the disk bus.

(Appx2371 at 52:16-24).

To concede that it would have been obvious to modify Mylex to eliminate the direct path for the heartbeat signals—in some manner—is to concede the underlying motivation to do so. Thus, even aside from the Board's errors in disregarding the explicit suggestion in Hathorn, and design reason presented by Mylex (as well as DeKoning), ETRI's concessions further establish the motivation to combine.

## C. The Board Erred as a Matter of Law by Relying on the Existence Of Other Obvious Solutions to Undercut the Obviousness of the '346 Patent's Claims.

As just explained, in § I.B.3, ETRI argued to the Board that it should count the existence of other alternatives against petitioners in evaluating the obviousness of claims 1-9. (Appx1702-1704 (Patent Owner Response); Appx2357 at 38:12-18 (argument transcript)). The Board accepted that argument explicitly. (Appx39 ("We also agree that one of ordinary skill would look to other alternatives, *i.e.*, Mylex alone discloses less expensive ways to communicate between the RAID controllers. *Thus, we are not persuaded* that cost consideration is a reasonable rationale to combine Hathorn with Mylex.")).

45

That reasoning directly contradicts this Court's precedent, which consistently holds that the existence of one obvious solution to a problem does not foreclose or even undermine the possibility of other obvious solutions. *See ACCO Brands*, 813 F.3d at 1367 ("Even if one possible obvious combination falls outside of the claims, *it fails to undercut* the fact that the other possible obvious combination lies within their scope."); *Mouttet*, 686 F.3d at 1334 ("[J]ust because better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes.").

That makes sense. Under the statute, the question is whether the claims cover "obvious" subject matter, not the "most obvious alternative" to prior art, as ETRI argued. *Cf. KSR*, 550 U.S. at 419 ("[N]either the particular motivation nor the avowed purpose of the patentee controls. What matters is the objective reach of the claim. If the claim extends to what is obvious, it is invalid under § 103.").

For similar reasons, precedent rejects arguments that prior art that teaches one solution to a problem necessarily "teaches away" from others. *Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 739 (Fed. Cir. 2013). The implicit premise of the Board's reasoning (and ETRI's argument) is

46

that any given problem can have no more than one obvious solution. That is illogical and, unsurprisingly, the precedent of this Court and the Supreme Court's *KSR* opinion is directly to the contrary. The Board's reliance on the existence of other obviousness solutions is yet another independent reason why the finding of non-obviousness should be reversed, or at a minimum remanded for reconsideration.

**D.    The Court Should Reverse The Board And Find Obviousness As A Matter Of Law; No Remand is Necessary.**

Because obviousness is ultimately a question of law, *Graham v. John Deere Co.*, 383 U.S. 1, 17 (1966), where, as here, the record presents a strong case of obviousness and the lower court's contrary conclusion rests on legal errors or an unreasonable view of the facts, this Court has simply reversed without the need for a remand. *See, e.g.*, *Belden*, 805 F.3d at 1075-77 ("Even giving the Board the deference it is due … we agree that the record requires the finding [of obviousness] Berk-Tek urges. The Board's contrary finding rests on legal errors."); *Apple Inc. v. Samsung Elecs. Co., Ltd.*, 816 F.3d 788, 806, 810 (Fed. Cir. 2016) (reversing denial of JMOL following jury verdict of nonobviousness); *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1362 (Fed. Cir. 2015)

(same; noting this Court's role as "the ultimate decision maker on the question of obviousness"); *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1239, 1241-45 (Fed. Cir. 2010) (same, noting "*KSR* and our later cases establish that the question of motivation to combine may nonetheless be addressed on summary judgment or JMOL in appropriate circumstances"); *Ball Aerosol*, 555 F.3d at 991-94 (reversing denial of summary judgment of invalidity where, as here, the trial tribunal "erred in finding a requirement in *KSR* of an explicit motivation to combine").

Reversal is appropriate here.  For the reasons discussed above, this should not have been a difficult case under the proper legal standards. Neither ETRI nor the Board has identified any secondary considerations or any nonobviousness arguments that are not founded on plain legal error.  No purpose would be served by a remand.

## II. Alternatively, The Court Should Remand For Further Proceedings According To The Correct Legal Standards, And Under The Correct Claim Constructions.

The arguments in the preceding section (Argument § I) are sufficient to dispose of the entire appeal.  If the Court agrees that the Board's nonobviousness determinations should be reversed outright, it need not proceed any further.  The obviousness inquiry here does not

depend upon the precise construction of "RAID" or a finding that Hathorn discloses a RAID because Mylex indisputably discloses a "RAID." Hathorn's through-the-network teaching is applicable to Mylex regardless of whether Hathorn actually describes a "RAID" or, as the Board found, it merely describes a system with similar components and functionality to a "RAID." (Appx26).  Given the substantial showing for why a skilled artisan would combine Mylex with Hathorn's teachings and ETRI's concession that the modification was known and feasible, the Board should reverse and find the claims obvious.

If, however, the Court does not reverse outright, it should at least remand, at a minimum—either (or both) to correct the legal errors identified in § I, and also to correct **(a)** the Board's erroneous construction of "RAID" and **(b)** consequent erroneous conclusion that Hathorn does not disclose such a "RAID," which ETRI and the Board conceded impacted the Board's nonobviousness decision.  (*See, e.g.*, Appx2365 at 46:14-23 ("Wouldn't it be more likely to combine – wouldn't a person of ordinary skill more likely combine Hathorn if it was considered to be a RAID….")).  These issues are also in dispute in *Dell v. ETRI*, Fed. Cir. Appeal No. 2015-1719.  If the Court rules in favor of the appellants in

49

*Dell* with respect to the construction of "RAID" or the application of that construction to Hathorn, Appellants are at least entitled to a remand in this case for reconsideration of obviousness. If the Court reaches those issues in this case, the Board's construction of "RAID" and application of that construction to Hathorn are erroneous, and Appellants are thus entitled to a remand.

### A. If, in the *Dell* Appeal, the Court Corrects the Board's Construction of "RAID" or the Board's Finding that Hathorn Does Not Disclose a RAID, Appellants are Entitled to a Remand in this Case.

The same panel of administrative patent judges that decided this case also decided IPR2013-00635, which led to *Dell v. ETRI*, Fed. Cir. Appeal No. 2015-1719, and which involves the same '346 patent and the same Hathorn reference. Two issues in the *Dell* appeal are also at issue in this case.

*First*, here, as in *Dell*, the Board reversed course between its institution decision and its final written decision and construed "RAID" to mean "a single logical unit for mass storage using multiple physical disk drives." (Appx9 (referencing *Dell* IPR)); *Dell, Inc. v. ETRI*, No. IPR2013-00635, 2015 WL 1009191, at *5 (P.T.A.B. Feb. 27, 2015) (final written decision).

50

*Second*, here, as in *Dell*, the Board found that Hathorn did not disclose a "RAID" as the Board defined that term.  (Appx26); *Dell*, 2015 WL 1009191, at *13.   In the *Dell* case, the Board's finding led it to conclude that Hathorn did not anticipate.  *Id.* at *9-13.  In this case, the Board and ETRI acknowledged, that finding weighed against a finding of obviousness.  (Appx24 ("Patent Owner's main argument is that Hathorn is not a RAID and its teachings are not readily combinable with the RAID of Mylex."); Appx13 ("[W]e are tasked in this Decision with determining whether Hathorn, the asserted prior art, discloses a 'RAID.'"); *cf.* Appx29 ("Notwithstanding the lack of a RAID in Hathorn, we separately determine whether Petitioner has provided a sufficient rationale for a person of ordinary skill in the art to combine Hathorn and Mylex."); Appx2365 at 46:14-23 (JUDGE ANDERSON: "… wouldn't a person of ordinary skill more likely combine Hathorn if it was considered to be a RAID … MR. PHILLIPS: Yes, I think so…")).

Dell has challenged the construction of "RAID" and the finding that Hathorn does not disclose a RAID under the Board's construction in this Court in appeal no. 2015-1719.  If this Court were to rule in the *Dell* case (or here) that the Board erred in its construction of "RAID" and/or that

the Board erred in holding that Hathorn does not disclose a RAID, it will have reversed some of the underpinnings of the Board's nonobviousness rulings in this case, and a remand for reconsideration of obviousness would be required. *See, e.g.*, *In re Man Machine Interface Techs., LLC*, --- F.3d ----, 2016 WL 1567181, at *5 (Fed. Cir. 2016) ("We vacate and remand … for determination of whether those claims would have been obvious under the correct claim constructions.").

### B. The Court Should Remand Based on the Board's Errors in Construing "RAID" and Finding that Hathorn Does Not Disclose a RAID.

### 1. The Board Erred in Construing "RAID."

It is undisputed that "RAID," as used in the patent and the relevant literature, is an acronym for "redundant array of inexpensive disks." The patent explicitly defines RAID as such.[15] Every reference cited to the Board for the purpose of construing "RAID"—including dictionaries, other patents, and publications—uses "RAID" as an acronym for "redundant array of inexpensive disks."[16] And both sides' expert

---

[15] (Appx51 at 1:8-10 ("a redundant array[] of inexpensive disks (hereinafter, referred to as 'RAID')"); Appx44 at abstract (same)).

[16] (Appx520 (IEEE Dictionary); Appx1102 (Microsoft Computer Dictionary); Appx1099 (Webster's Computer Dictionary); Appx1406

52

declarants likewise agreed that "RAID" is an acronym for "redundant array of inexpensive disks."[17]  That unanimity should have settled the matter—particularly under a broadest reasonable construction standard. Unless a patentee has acted as a lexicographer or disclaimed scope, "[t]he words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history." *Thorner v. Sony Comp. Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2015) (*en banc*). There is no issue of disclaimer here; to the contrary, the patent's lexicography explicitly adopts the same definition of RAID as the rest of the prior art:  "a redundant array of inexpensive disks (hereinafter, referred to as "RAID")."  (Appx44 at abstract; Appx51 at 1:8-10).

The Board ruled as it did because it accepted arguments that ETRI developed after institution to avoid the Hathorn reference by narrowing the claims.  In the Dell IPR, the Board instituted to decide whether

---

(Weygant); Appx438 at 1:48-55 (DeKoning); Appx1431 (Chen); Appx366 at 2:6 (Hathorn))

[17] (Appx191 at ¶21 (Petitioners' expert Horst); Appx1731 at ¶ 29 (ETRI's expert Conte)).

Hathorn anticipates. And in this IPR, the Board instituted to decide whether Hathorn and Mylex render the '346 patent's claims obvious. In both IPRs, ETRI presented its "single logical unit" construction for the first time *after* institution, and presented a new expert declaration in support. (Appx1668-1675 (patent owner response); Appx1079-1082 (declaration); 2014 WL 2807664, at 10-12 (ETRI's response in *Dell* IPR)).

The Board erred in this case by elevating a conclusory expert declaration over clear intrinsic evidence, and by ruling that because some extrinsic evidence reflected that the term "RAID" *includes* devices functioning as a "single logical unit," that "RAID" must be *limited* to such devices. The Board's reading in of limitations is unsupportable under any standard, but particularly egregious in an IPR where claims are given their broadest reasonable interpretation consistent with the specification. 37 C.F.R. § 42.100(b).

### a. Intrinsic Evidence Defines "RAID" as a "Redundant Array of Inexpensive Disks."

This Court's precedent makes clear that extrinsic evidence cannot be used to "contradict the meaning otherwise apparent from the intrinsic record." *Helmsderfer v. Bobrick Washroom Equip., Inc.*, 527 F.3d 1379, 1382 (Fed. Cir. 2008). The claims define the patent's scope. *Teva*, 135 S.

Ct. at 835; *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961). Aside from the words themselves, the specification is "the single best guide to the meaning of a disputed claim term." *MBO Labs., Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007).

As discussed above, the '346 patent's specification twice defines "RAID" as "a redundant array of inexpensive disks." (Appx51 at 1:8-10 ("a redundant array[s] of inexpensive disks (hereinafter, referred to as 'RAID')"); Appx44 at abstract (same)). And to the extent the patentee desired to claim something narrower than a "RAID," that is done through additional claim limitations.

Nowhere in the specification does the '346 patent use the phrase "single logical unit," or any variation thereof. The *only* intrinsic evidence the Board cited in support of its construction was the specification's use of singular articles with "RAID"—*i.e.*, it referred to "a RAID." (Appx9-10 ("Consistently throughout the written description, RAID is referred to in the singular, i.e., 'the apparatus for a redundant interconnection between multiple hosts and *a RAID* ....' The claims also recite 'a RAID.'") (original in emphasis).)

That is *nonsequitur* for several reasons.  *First*, the term is "redundant *array* of inexpensive disk*s*."  Using the article "a" before a collective noun is simply ordinary grammar—to refer to "*a* system," "*an* apparatus," "*a* group," or "*an* array of disks," is to say nothing about whether the members of the collective must function as a "single logical entity."  It is unclear what language the Board or ETRI would have patentees use to avoid the implicit "single logical entity" limitation imposed here.  References to "a RAID" mean only that the "disks" within the RAID are part of an "array."  *Second*, the "general rule" for patent claims is that the word "a" or "an" does *not* limit what follows; rather, it means "one or more."  *01 Communique Lab., Inc. v. LogMeIn, Inc.*, 687 F.3d 1292, 1297 (Fed. Cir. 2012); *TiVo, Inc. v. EchoStar Commc'ns Corp.*, 516 F.3d 1290, 1303 (Fed. Cir. 2008).  In sum, nothing about the article "a" in the specification supports the Board's determination to limit "RAID" to a "single logical unit" or to disregard the definition explicit in the patent—not under the *Phillips* standard and certainly not under the broadest reasonable construction standard.

**b.    Extrinsic Evidence Confirms that The Broadest Reasonable Interpretation Of "RAID" is "A Redundant Array Of Inexpensive Disks."**

By discarding the patent's explicit definition of RAID in favor of ETRI's construction, the Board relied on extrinsic evidence, which is generally disfavored. Where, as here, the patent provides an explicit definition, and no intrinsic evidence undermines or modifies that definition, the definition should control and that should be the end of the matter. *See Helmsderfer*, 527 F.3d at 1382; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) ("In those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper.").

Of all the extrinsic evidence the Board cited, the only evidence that suggests that "RAID" should be limited to a "single logical unit" is the testimony of ETRI's expert Dr. Conte. Dr. Conte agreed that "RAID" is an acronym for "redundant array of inexpensive disks," (Appx1731), but then argued that the '346 patent's claims should be further narrowed to avoid Hathorn. Expert testimony, however, cannot be used to contradict the intrinsic evidence or rewrite the claims. *Phillips*, 415 F.3d at 1318 (a court should discount any expert testimony "that is clearly at odds with

the claim construction mandated by the claims themselves, the written description, and the prosecution history, in other words, with the written record of the patent"); *Kara Tech. Inc. v. Stamps.com Inc.*, 582 F.3d 1341, 1348 (Fed. Cir. 2009). ("extrinsic sources like expert testimony cannot overcome more persuasive intrinsic evidence").

With respect to all of the other extrinsic evidence, the only fair reading of the record is that the term "RAID" may include RAIDs whose disks function as a "single logical unit," not that the term "RAID" is limited in that way. At ETRI's invitation, the Board picked out instances in which various references discussed the concept of a "single logical unit" in connection with a RAID, but in none of those instances does the text purport to limit the meaning of "RAID" to a "single logical unit.

The common feature of all dictionary definitions in the record is that they all reaffirm the definition explicit in the patent—a "RAID" is a "redundant array of inexpensive disks." (Appx520 (IEEE Dictionary); Appx1102 (Microsoft Computer Dictionary); Appx1099 (Webster's Computer Dictionary)). The IEEE dictionary makes no reference at all to a "single logical unit." (Appx520-21). When the Microsoft and Webster's computer dictionaries refer to the concept of "function[ing] as

a single storage unit" or a "single logical drive," it is only by way of example.    (Appx1102 (Microsoft Computer Dictionary); Appx1099 (Webster's Computer Dictionary)).    If the Court reaches extrinsic evidence, that should be dispositive under any standard, but certainly under a broadest reasonable construction standard.

The same is true of the prior art references on which the Board relied.  All reaffirm that "RAID" means "redundant array of inexpensive disks."  None state or imply that the term "RAID" is limited to devices functioning as a single logical unit.  At most, the prior art demonstrates that RAIDs can function as a single logical unit, not that they must or that a device that does not ceases to be a "RAID."  In fact, Weygant states that a RAID can be configured "either as a single unit or in various combinations of striped and mirrored configurations":

> RAID is an acronym for redundant array of inexpensive disks. A RAID device consists of a group of disks that can be configured in many ways, *either as a single unit or in various combinations of striped and mirrored configurations.* …

(Appx1406). Instead of acknowledging that Weygant cuts against ETRI's construction, however, the Board cropped the words "either" and "or" from Weygant and contended that Weygant supported ETRI's narrow construction.  (Appx11 ("The prior art also supports a construction of

59

RAID as being a 'single logical drive.'  Weygant discloses that a RAID is a single logical unit, but also in 'various combinations of striped and mirrored configurations.')).  In other words, to narrow the meaning of "RAID," the Board relied in part on clauses in the middle of sentences stripped of their qualifying language.

The Board likewise relied on DeKoning's reference to "a single, highly reliable, high capacity disk drive," but cropped the word "typical" from DeKoning's quote, as ETRI had done in its brief.  (*Cf* Appx11 (Board opinion), *with* Appx438 at 2:65-67 (DeKoning:  "RAID storage subsystems *typically* utilize a control module that … makes the subsystem appear to the host computer as a single, highly reliable, high capacity disk drive.")).

As every other reference in the record did, Hathorn likewise defined RAID as "a redundant array of inexpensive [disks or devices]."  (Appx366 at 2:4-7 ("devices")). Yet, the Board found that this definition supported its construction, under an apparent theory that Hathorn discloses that a RAID has the same serial numbers and addresses for primary and secondary data.  (Appx13-14 (citing Hathorn (Appx366) at 2:16-18)). There, Hathorn was referring to a feature of one RAID level—RAID 1 (mirroring)—not all RAIDs generally. (Appx366 at 2:12-19 ("These back-

up methods are useful only for device failures *since the secondary data is a mirror of the primary data*, that is, the secondary data has the same volume serial numbers (VOLSERs) and DASD addresses as the primary data. System failure recovery, on the other hand, is not available *using mirrored secondary data*.").)

Similarly, the Chen reference[18] on which the Board relied, like the '346 patent, defines "RAID" as "redundant arrays of inexpensive disks." (Appx1420 ("Next, the paper describes seven disk array architectures, called RAID (Redundant Arrays of Inexpensive Disks) levels 0-6 ....").) The Board, however, improperly relied on the reference to "a large, high-performance logical disk" in Chen's *discussion of RAID technology*." (Appx11).  As with the other prior art, the fact that "RAID" may include devices that function as a single unit is no basis for limiting a patent claim's recitation of "RAID" to such devices.

Finally, the Board committed the same error in considering the testimony of Appellants' expert Dr. Horst.  Specifically, the Board pointed to Dr. Horst's statement that "[a] RAID array needs to be able to present

---

[18] (Appx1420 (P. Chen et al., "RAID: High-Performance, Reliable Secondary Storage" (Oct. 29, 1993))).

a set of drives as a single logical unit, but it does not always have to present a single logical unit" (Appx10), but ignored Dr. Horst's subsequent explanation that RAIDs also can present as *multiple* logical units (Appx2004 ("So, for instance, it could provide *several logical units* based on subsets of the storage of the individual drives.") (citing to Appx1794 at 16:14-21)). As with all of the dictionaries, and all of the prior art references, Dr. Horst confirmed that "RAID" means "redundant array of inexpensive disks" (Appx188 at ¶ 15), but never stated or implied that the term is *limited* to single logical units.[19]

The Board's consideration of extrinsic evidence was clearly erroneous in its own right, and entirely unnecessary given the intrinsic record's clarity. Under the proper standard, there is no legally relevant evidence to support the Board's "single logical unit" construction.

---

[19] Similarly, the Board's reliance on statements made in a petition and supporting declaration from a separate IPR proceeding (sought by a subset of the current Appellants) (Appx11-12) is improper. The general labeling of storage that "appear[s] as a single, reliable drive to the hosts" as a RAID is does not define RAID to exclude storage that presents multiple logical units. Instead, these papers defined RAID as a "redundant array of inexpensive disks." (Appx1490; Appx1562 at ¶ 30).

### 2.    Even Under its Construction, The Board Erred in Finding that Hathorn Does Not Disclose a RAID.

It is undisputed that Hathorn discloses a RAID under Appellants' proposed construction for the term. (*See* Appx 2008). However, even if the Court affirms the Board's construction of "RAID," it should vacate and remand the Board's nonobviousness ruling because Hathorn discloses a "RAID" even under the Board's construction ("a single logical unit for mass storage using multiple physical disk drives").

Hathorn discloses multiple embodiments and multiple modes of operation. One embodiment is described as a channel-link "duplex pair" mode. (*See*, *e.g.*, Appx369-370 at 8:64-9:50). In that embodiment, data is stored redundantly on "primary" and "secondary" "direct access storage devices" ("DASDs"). (Appx369 at 8:64-66). The secondary DASD, however, is "fenced from normal data accesses" such that the host only sees the primary DASD, and the pair of DASDs with redundantly stored information is presented to the host as a single logical unit. (Appx370 at 9:45-49).

Appellants' expert Dr. Horst testified about Hathorn's channel link duplex mode and explained that it met the Board's construction. (Appx1885 at 107:9-16 ("[U]nder that definition, yes, I also understand

Hathorn to have a RAID based on its ability to create a single volume that is seen by the hosts as a single volume"); *see also* Appx1798-1799 at 20:21-21:1 (explaining that in some systems a host computer can access individual drives, but when the RAID is configured, "the accesses are fenced off")).

The Board acknowledged that Hathorn's "duplex pair" mode had a "similar" function to the claimed RAID, but found that it was insufficient to disclose a "RAID" as construed, because: (1) "the multiple duplex pairs of Hathorn have not been shown to teach a single logical unit or device"; (2) "[t]he claims affirmatively require 'a RAID' … the claims are not concerned with whether the disks could be configured as a RAID"; (3) "Hathorn is directed to non-RAID mirroring." (Appx26-27). As an initial matter, this case is about obviousness rather than anticipation.

The Board's parsing of Hathorn's details to determine whether what Hathorn discloses is technically a "RAID" under its construction is a sign that the Board was asking the wrong question. For obviousness purposes, "a reference must be considered for everything it teaches … and is not limited to the particular invention it is describing." *Belden*, 805 F.3d at 1076. In other words, "[o]bviousness is not a multi-reference

anticipation: there is no need for the limitations to exist as claimed in the art simply awaiting combination." *Ex Parte Mitsubishi Denki Kabushiki Kaisha*, No. 2007-2483, 2007 WL 2758445, at *5 (B.P.A.I. Sept. 12, 2007). But even on the Board's own terms, each reason the Board gave for finding that Hathorn does not disclose a "RAID" effectively added additional limitations to the claims, beyond the Board's "single logical unit" construction.

First, the Board's finding that "the *multiple duplex pairs* of Hathorn have not been shown to teach a *single logical unit or device*" effectively requires not only that the disks of a RAID act as a single logical unit, but that the device containing the RAID can have no other RAIDs. All claims in the '346 patent, however, use the "comprising" transition. And it is well-established that a claim to a device "comprising" several elements covers devices that include additional unclaimed elements. *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001). If each "duplex pair" of Hathorn is a "RAID," then the fact that the Hathorn system in channel-link mode includes *multiple* "duplex pairs" simply means that it comprises multiple RAIDs. Like most patent claims, the '346 patent's claims all use "comprising", and

nothing otherwise forecloses a RAID from being part of a system that includes other RAIDs or other storage devices, as in Hathorn.

Second, the Board's conclusion that "the claims are not concerned with whether the disks could be configured as a RAID" is erroneous because, as described in Hathorn, in the channel-link mode, the "duplex pairs" are not merely capable of being configured as a RAID, but rather each pair *is* a RAID. This is not a case that turns on a distinction between an anticipatory reference and a reference that is merely capable of being modified to anticipate—the four corners of Hathorn disclose an actual RAID configuration.

Finally, the Board's reference to "non-RAID mirroring" reflects an apparent confusion about the record. The technical literature describes different RAID "levels" with respect to different ways of storing information redundantly on array of disks. (*See, e.g.*, Appx1431-1437; Appx520-521). "RAID 1" or "RAID level 1" *is* defined as "mirroring"— where "[w]henever data is written to a disk the same data is also written to a redundant disk, so that there are always two copies of the information." (Appx1432). The Board's acknowledgment that Hathorn

discloses "mirroring" should have been sufficient by itself to show that Hathorn discloses a RAID.

## III.  The Board Abused its Discretion in its Institution Decisions by Declining to Consider "Redundant" Grounds.

If the Court does not reverse the Board's nonobviousness rulings for the reasons above, then Appellants wish to preserve their right to challenge the Board's rulings in its institution decisions that certain grounds of obviousness would not be considered because they were allegedly "redundant," an issue implicated in *Cuozzo Speed Technologies, LLC v. Lee*, U.S. No. 15-446, pending before the Supreme Court. (Appx1642-1643; Appx3781-3782).

Appellants acknowledge that binding precedent currently holds that this Court lacks jurisdiction to review challenges to "redundancy" rulings in Board institution decisions.   *See Shaw Indus. Grp. v. Automated Creel Sys.,* 817 F.3d 1293 (Fed. Cir. 2016) at 1297-99.   In *Cuozzo*, however, the Supreme Court is considering this Court's jurisdiction to review aspects of institution decisions.   *See* Pet. for Writ of Certiorari*, Cuozzo Speed Technologies, LLC v. Lee*, U.S. No. 15-446, 2015 WL 5895939, at *ii (Oct. 6, 2015) (second question presented), *cert. granted*, 136 S. Ct. 890 (2016).   Appellants do not ask the panel to

disregard *Shaw* and do not propose to burden the Court with extensive briefing on the Board's "redundancy" rulings at this stage.

To preserve the issue, however, Appellants note that the Board erred by finding, without a substantive explanation, that the petitioners' alternative grounds for obviousness (Mylex or Deitz in view of the teachings of DeKoning or Griffith) were redundant. (Appx1642-1643). Where the Board refuses to consider grounds of invalidity for discretionary reasons, it must explain how it exercised that discretion. *See In re Sang-Su Lee*, 277 F.3d 1338, 1342 (Fed. Cir. 2002) (The Administrative Procedure Act "requires that the agency not only have reached a sound decision, but have articulated the reasons for that decision.") (citing *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 374 (1998)).

No procedural reason exists for the Board to have refused to consider those grounds. Both petitions separately argued and supported those grounds of invalidity with evidence, (*see, e.g.,* Appx102-120; Appx292-345; Appx2426-2444), and there is no suggestion in the record that those portions of the petitions were deficient in any way.

Nor is there any substantive reason for the Board to have dismissed those grounds as "redundant" with the instituted-upon grounds. *First*, Deitz, DeKoning and Griffith all indisputably disclose a "RAID"—the element the Board found lacking in Hathorn and strongly emphasized in its analysis of the motivation to combine. (*See* Appx415 at 4:47-48 ("Redundant Array of Inexpensive Disks (RAID) storage systems"); Appx403 at 1:28-29 ("The acronym RAID refers to systems which combine disk drives for the storage of large amounts of data."); Appx438 at 1:49-52 ("These subsystems are typically referred to as redundant arrays of inexpensive (or independent) disks (or more commonly by the acronym RAID).").  *Second*, Griffith and DeKoning both teach that RAID controllers may exchange information either using a dedicated pathway, *or over the host-side network*, with the latter being preferred to mitigate cost and complexity.  (Appx407 at 9:12-18; Appx439 at 4:61-5:6).

Had the Board considered those grounds on their merits, it might have avoided the errors in its analysis of the grounds on which it did institute.

## CONCLUSION

Appellants respectfully request that the Court reverse the Board's

ruling that claims 1-9 were not shown to be obvious over Mylex in view of Hathorn and remand for entry of an order cancelling those claims. Alternatively, Appellants request that the Court vacate the Board's final written decision, and remand for reconsideration of obviousness under the proper legal standards and/or a proper construction of "RAID."

June 8, 2016                            Respectfully submitted,

*/s/ Michael R. Rueckheim*              */s/ John C. O'Quinn*
John A. Dragseth                        John C. O'Quinn
FISH & RICHARDSON P.C.                  William H. Burgess
60 South Sixth Street                   KIRKLAND & ELLIS LLP
3200 RBC Plaza                          655 Fifteenth St. N.W.
Minneapolis, MN 55402                   Washington, D.C. 20005
(612) 337-5070                          (202) 879-5000

Katherine Kelly Lutton                  Todd M. Friedman
FISH & RICHARDSON P.C.                  Benjamin A. Lasky
500 Arguello Street, Suite 500          KIRKLAND & ELLIS LLP
Redwood City, CA 90463                  New York, N.Y. 10022
(650) 839-5070                          (212) 446-4800

Michael R. Rueckheim                    *Attorneys for International*
FISH & RICHARDSON P.C.                  *Business Machines Corporation*
1221 McKinney Street, Ste 2800          *and Oracle America, Inc.*
Houston, TX 77010
(713) 654-5300

*Attorneys for VMware, Inc.*

# ADDENDUM

Final Written Decision (December 9, 2015)................................... Appx1

U.S. Patent No. 6,978,346............................................................ Appx44

Institution Decision, IPR2014-00901 (December 11, 2014) .... Appx1622

Institution Decision, IPR2014-00949 (December 11, 2014) .... Appx3761

Trials@uspto.gov                                    Paper 28
571-272-7822                                        Entered: December 9, 2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

VMWARE, INC., INTERNATIONAL BUSINESS MACHINES
CORPORATION and ORACLE AMERICA, INC.,
Petitioner,

v.

ELECTRONICS AND TELECOMMUNICATIONS RESEARCH
INSTITUTE,
Patent Owner.
_____

Case IPR2014-00901
Case IPR2014-00949[1]
Patent 6,978,346 B2

Before BRIAN J. McNAMARA, MIRIAM L. QUINN, and
GREGG I. ANDERSON, *Administrative Patent Judges.*

ANDERSON, *Administrative Patent Judge.*

FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

_____

[1]This case was joined with IPR2014-00901 on Jan. 28, 2015 by Order in
IPR2014-00949, Paper 25.

IPR2014-00901
Patent 6,978,346 B2

## I.    INTRODUCTION

### A. *Background*

On July 21, 2014, VMWare, Inc. ("Petitioner")[2] filed a Second

Corrected Petition requesting an *inter partes* review of claims 1–9 of U.S.

Patent No. 6,978,346 B2 (Ex. 1001, "the '346 patent").  Paper 8 ("Pet.").

Electronics and Telecommunications Research Institute ("Patent Owner")

filed a Preliminary Response.  Paper 11.  Based on these submissions, on

December 11, 2014, we granted the Petition and instituted trial for claims 1–

9 of the '346 patent on one of the grounds of unpatentability alleged in the

Petition.  Paper 14 ("Institution Decision" or "Dec. Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response.

Paper 19 ("PO Resp.").  Petitioner filed a Reply.  Paper 28 ("Pet. Reply").

In addition, the parties rely upon expert testimony.  Petitioner proffered the

Declaration of Dr. Robert Horst ("Horst Declaration," Ex. 1003).  Patent

Owner proffered two declarations of Dr. Thomas Conte.  First is a

declaration from *Dell Inc. v. Electronics and Telecommunications Research

Institute*, IPR2013-00635 ("'635 IPR"), a trial directed to the same '346

patent ("Conte '635 Declaration," Ex. 2003).  Second is a declaration of Dr.

Conte filed with Patent Owner's Response ("Conte '901 Declaration," Ex.

2301).  Patent Owner also filed a declaration of Dr. Randy Katz ("Katz

Declaration," Ex. 2202), from another inter partes review directed at the

'346 patent, *International Business Machines Corp. v. Electronics and

Telecommunications Research Institute*, Case IPR2014-00976.  A transcript

of Dr. Conte's deposition ("Conte Dep.," Ex. 1017) was submitted by

---

[2] International Business Machines Corporation ("IBM") and Oracle
America, Inc. ("Oracle") are petitioners in IPR2014-00949, which is joined
to this case, and are included in any reference to "Petitioner."

2

Petitioner.  A transcript of Dr. Horst's deposition ("Horst Dep.," Ex. 2302) was submitted by Patent Owner.

An oral hearing was held on August 28, 2015.  The transcript of the consolidated hearing has been entered into the record.  Paper 34 ("Tr.").

We have jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a).  We conclude for the reasons that follow that Petitioner has not shown by a preponderance of the evidence that claims 1–9 of the '346 patent are unpatentable.

B. *Related Proceedings*

Petitioner advises that the '346 patent is involved in the following co-pending district court cases:  *Safe Storage LLC v. StoneFly, Inc.*, 1:13-cv-01152;[3] *Safe Storage LLC v. Int'l Business Machines Corp.*, 1:13-cv-01151; *Safe Storage LLC v. Emulex Corporation et al*, 1:13-cv-01150; *Safe Storage LLC v. 3PAR Inc.*, 1:13-cv-01088; *Safe Storage LLC v. Oracle America Inc. et al*, 1:13-cv-01089; *Safe Storage LLC v. ATTO Technology Inc. et al.*, 1:13-cv-01090; *Safe Storage LLC v. VMware Inc.*, 1:13-cv-00928; *Safe Storage LLC v. Promise Technology Inc.*, 1:13-cv-00927; *Safe Storage LLC v. Nexsan Corporation*, 1:13-cv-00931 ; *Safe Storage LLC v. Overland Storage Inc.*, 1:13-cv-00932; *Safe Storage LLC v. IQSS LLC*, 1:13-cv-00930; *Safe Storage LLC v. Infortrend Corporation*, 1:13-cv-00929; *Safe Storage LLC v. Cisco Systems, Inc.*, 1:13-cv-00926; *Safe Storage LLC v. Silicon Graphics Int'l Corp.*, 1:12-cv-01629; *Safe Storage LLC v. Dot Hill Systems Corp.*, 1:12-cv-01625 ; *Safe Storage LLC v. Hitachi Data Systems Corp.*, 1:12-cv-01627; *Safe Storage LLC v. Dell Inc.*, 1:12-cv-01624; *Safe Storage LLC v. NetApp Inc.*, 1:12-cv-01628; *Safe Storage LLC v. Hewlett-*

---

[3] Litigation concluded.  Paper 3, 3.

IPR2014-00901
Patent 6,978,346 B2

*Packard Company*, 1:12-cv-01626, all pending in the United States District Court for the District of Delaware.  Pet. 1, Paper 3, 2–3.

In a final written decision in the '635 IPR we determined that claims 1–3 and 5–8 of the '346 patent had not been shown to be unpatentable.  '635 IPR, Paper 39.  We declined to institute *inter partes* review of the '346 patent in the following cases: *Dell Inc., Hewlett-Packard Co., & NetApp, Inc. v. Electronics & Telecommunications Research Institute*, IPR2014-00152, Paper 12 (PTAB May 16, 2014); *Dell Inc., Hewlett-Packard Co., & NetApp, Inc. v. Electronics & Telecommunications Research Institute*, IPR2014-00549, Paper 10 (PTAB Mar. 26, 2015); and *International Business Machines Corp. v. Electronics & Telecommunications Research Institute*, Case IPR2014-00976, Paper 14 (PTAB Dec. 11, 2014)("'976 IPR").

## C.  The '346 Patent

The '346 Patent describes an apparatus with "redundant interconnection between multiple hosts and a redundant array of inexpensive disks (hereinafter referred to as 'RAID')."  Ex. 1001, Abstract.  As a result of the redundant interconnection, the apparatus allows increased bandwidth in the event one of the two RAID controllers 460 and 461 has a failure.  *Id.* at 3:1–9.

4

IPR2014-00901
Patent 6,978,346 B2

Figure 4 of the '346 patent is reproduced below:



Figure 4 is a block diagram of a host matching system including RAID 490 and its interconnection to host computers 400–405. Ex. 1001, 2:64–3:6. RAID 490 includes two RAID controllers 460, 461 and hubs 440, 441. *Id.* at 3:10–18. Each RAID controller includes a pair of network interface controllers. For example, RAID controller 460 includes network interface controllers 470, 471, and RAID controller 461 includes network interface controllers 480, 481. *Id.* at 3:11–13. Each host computer has its own network interface controller (410 to 415), which connects the host computer through the hubs and to network interface controllers (470, 471, 480, 481) of RAID controllers 460, 461. *Id.* at 3:31–35.

The '346 patent describes that the result is two independent networks with twice the bandwidth of a single network and a "communication passage" between the two RAID controllers. *Id.* at 3:62–64. The communication passage creates a "fault tolerant function" should one of RAID controllers 460 or 461 fail. *Id.* at 3:64–66. According to Figure 4, communications line 450 interconnects network interface controller 480 of RAID controller 461 and network interface controller 470 of RAID

5

controller 460.  *Id.* at 4:2–6; Fig. 4.  Then, RAID controller 461 may send

information to RAID controller 460.  *Id.*  In like manner, network interface

controller 471 of RAID controller 460 may be connected over

communications lines to network interface controller 481 of RAID controller

461, allowing RAID controller 460 to send information to RAID controller

461.  *Id.* at 3:66–4:2.

By the arrangement described, the apparatus continues to operate in

the event either RAID controller 460 or 461 has an "occurrence of an error."

Ex. 1001, 4:19–25.  The interconnected network interface controller of the

operational RAID controller assumes the functions of the network interface

controller of the failed RAID controller.  *Id.*

### D. *Illustrative Claims*

Claims 1 and 9, the two independent claims of the challenged claims,

are reproduced below:

> 1.   An apparatus for a redundant interconnection between
> multiple hosts and a RAID, comprising:
>
> a first RAID controlling units and a second RAID controlling
> unit for processing a requirement of numerous host computers,
> the first RAID controlling unit including a first network
> controlling unit and a second network controlling unit, and the
> second RAID controlling unit including a third network
> controlling unit and a fourth network controlling unit; and
>
> a plurality of connection units for connecting the first RAID
> controlling units and the second RAID controlling unit to the
> numerous host computers, wherein the first RAID controlling
> unit and the second RAID controlling unit directly exchange
> information with the numerous host computers through the
> plurality of connecting units, and the first network controlling
> unit exchanges information with the fourth network controlling

IPR2014-00901
Patent 6,978,346 B2

unit, and the second network controlling unit exchanges information with the third network controlling unit.

Ex. 1001, 5:7–26.

9. An apparatus for a redundant interconnection between multiple host computers and a RAID, the apparatus comprising:

a plurality of connection units for connecting the host computers and the RAID;

a first and a second RAID controllers, included in the RAID, each of which having a first network interface controller and a second network interface controller for processing requests from the plurality of the host computers connected through the plurality of the connection units,

wherein the first network interface controller in the first RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the second RAID controller,

wherein the first network interface controller in the second RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the first RAID controller,

wherein the second network interface controller in the first RAID controller is used for fault tolerance by performing functions of the first network interface controller in the second RAID controller when the second RAID controller is faulty, and

wherein the second network interface controller in the second RAID controller is used for fault tolerance by performing functions of the first network interface controller in the first RAID controller when the first RAID controller is faulty, and

7

IPR2014-00901
Patent 6,978,346 B2

> wherein the first network controlling unit in the first RAID
> controlling unit exchanges information with the second network
> controlling unit in the second RAID controlling unit, and the
> second network controlling unit in the first RAID controlling
> unit exchanges information with the first network controlling
> unit in the second RAID controlling unit.

Ex. 1001, 6:20–59.

### E. Grounds Upon Which Trial was Instituted

*Inter partes* review was instituted on the following grounds: 1–9 as obvious over Mylex[4] and Hathorn.[5]  Dec. Inst. 22.

### F. Claim construction

In an *inter partes* review, "[a] claim in an unexpired patent shall be given its broadest reasonable construction in light of the specification of the patent in which it appears."  37 C.F.R. § 42.100(b); *see In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1275–76 (Fed. Cir. 2015); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012) (Claim Construction).  Under the broadest reasonable construction standard, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).  Any special definition for a claim term must be set forth in the specification with reasonable clarity, deliberateness, and precision.  *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).  In the absence of such a special definition or other consideration, "limitations are not to be read into

---

[4] Kevin J. Smith, Mylex Corp., STORAGE AREA NETWORKS; UNCLOGGING LANS AND IMPROVING DATA ACCESSIBILITY, published May 29, 1998 ("Mylex," Ex. 1006).
[5] US 5,574,950 to R. G. Hathorn et al., issued Nov. 12, 1996 ("Hathorn," Ex. 1006).

8

IPR2014-00901
Patent 6,978,346 B2

the claims from the specification." *In re Van Geuns*, 988 F.2d 1181, 1184
(Fed. Cir. 1993).

### 1. *Terms Disputed After the Decision on Institution*

Patent Owner identifies three terms for construction in its Response.
PO Resp. 12–22. Petitioner contests two of the terms, "RAID" and "hub and
switch." Pet. Reply 2–7.

### a. *"RAID" (Claims 1 and 9)*

In the Final Written Decision in the '635 IPR ("'635 Final Decision"
or "'635 Final Dec."), we construed "RAID," as the term is used in the '346
patent, to mean "a single logical unit for mass storage using multiple
physical disk drives." '635 Final Dec. 9. In the Petition, prior to the '635
Final Decision, Petitioner asserted that "RAID" should be construed as
"redundant array of inexpensive disks." Pet. 6 (citing Ex. 1001, Abstract,
Ex. 1003 ¶¶ 14–16).

Both Patent Owner's Response and Petitioner's Reply were filed after
the '635 Final Decision. For purposes of this case, Patent Owner accepts the
construction from the '635 Final Decision, providing facts and arguments
supporting that construction. PO Resp. 12–16. Petitioner's Reply continues
to urge adoption of its proposed construction from the originally filed
Petition. Pet. Reply 2–6.

The written description of the '346 patent restates the acronym for
RAID, but otherwise lacks additional description of RAID or its
functionality. Consistently throughout the written description, RAID is
referred to in the singular, i.e., "the apparatus for a redundant
interconnection between multiple hosts and *a RAID* comprises a plurality of
RAID controllers." Ex. 1001, 2:16–18 (emphasis added). The claims also

9

IPR2014-00901
Patent 6,978,346 B2

recite "a RAID." *Id.* at 5:7–8. Figure 4 of the '346 patent shows RAID 490 as a single component within a box which includes two RAID controllers 460 and 461. Similarly, the '346 patent represents the prior art RAID as a single component. Ex. 1001, Fig. 1, element 130; Fig. 2, element 240; Fig. 3, element 340. Neither party relies on the prosecution history (Exhibits 1002, 2001), and our independent review of that history failed to reveal any additional insight as to the term's meaning.

Patent Owner's expert, Dr. Conte, testified that a RAID is a mass storage device built from multiple, physical disk drives. Ex. 2003 ¶ 18, Ex. 2301 ¶ 30. Patent Owner and Dr. Conte both point to dictionary evidence to respectively argue and opine that a RAID is a "single logical drive." PO Resp. 14, Ex. 2301 ¶ 30 (citing Exs. 2004,[6] 2005[7]). That a RAID is built from multiple, physical disk drives is uncontroverted. That a RAID is a single logical unit is supported by Petitioner's expert, Dr. Horst, who testified that "[a] RAID array needs to be able to present a set of drives as a single logical unit, but it does not always have to present a single logical unit." Ex. 2302, 16:14–21.

Although the two dictionary definitions cited by Patent Owner and Dr. Conte are found in dictionaries published after the foreign priority date of the '346 patent, they further substantiate the proposition that those of ordinary skill generally refer to RAID as a single logical unit. *Webster's*, for example, generally defines RAID as proposed by Petitioner. Ex. 2004, 308. However, *Webster's* proceeds to define various levels of RAID, e.g., RAID 0, 1, 2, 5, and 10, all including as part of the definition a "single logical

---

[6] *Webster's Computer Dictionary* (9th ed. 2001)("Webster's").
[7] *Microsoft Computer Dictionary* (5th ed. 2002).

10

IPR2014-00901
Patent 6,978,346 B2

drive." *Id.* Similarly, the *Microsoft Computer Dictionary's* definition of RAID, which does not define levels of RAID, states that the "data is distributed across a group of computer disk drives that function as a single storage unit." Ex. 2005, 437.

The prior art also supports a construction of RAID as being a "single logical drive." Weygant discloses that a RAID is a single logical unit, but also in "various combinations of striped and mirrored configurations." Ex. 2101, 153. [8] Chen's discussion of RAID technology states that the problem of obtaining high performance is addressed by "arrays, which organize multiple independent disks into *a large, high-performance logical disk.*" Ex. 2102, 2 (emphasis added).

In further support of its position that our construction from the '635 Final Decision is correct, Patent Owner presents evidence not of record in the '635 IPR, including DeKoning (U.S. Patent No. 6,073,218, Ex. 1010). Patent Owner quotes from DeKoning as explaining that a RAID controller "makes the subsystem [RAID] appear to the host computer as a **single, highly reliable, high capacity disk drive**." PO Resp. 15–16 (citing Ex. 1010, 1:65–2:14).

Patent Owner quotes from the petition in the '976 IPR (Ex. 2201), where Petitioners IBM and Oracle argued that "the Chong reference (U.S. Patent No. 6,070,251; Ex. 2303) discloses a RAID 'because the two data storage devices appear to the hosts as a single, reliable drive.'" PO Resp. 16 (citing Ex. 2201, 13). Patent Owner also points to testimony from the Katz Declaration in the '976 IPR that Chong's alleged "combination of data

---

[8] Page reference is to the actual page number of Weygant and Chen and not Patent Owner's exhibit number.

11

mirroring and fault tolerance makes *the two data storage devices appear as a single, reliable drive to the hosts, or in other words, a RAID*." *Id.* at 16 (citing Ex. 2202 ¶ 36)(emphasis added).

Petitioner argues for its proposed construction, Redundant Array of Inexpensive Disks, is based on the use of quotation marks around "RAID" as used in the '346 patent. Pet. Reply 2–3 (citing Ex. 1001, 1:9–10). We are not persuaded that the use of the acronym in the Specification dictates that the broadest reasonable interpretation of RAID is the words of the acronym. For example, the Specification describes RAID as a single item, i.e., as a "single logical entity."

Petitioner argues that the construction of RAID from the '635 Final Decision is incorrect for a number of reasons. Petitioner points out that the *Webster's* definition does not support the "single logical drive" construction of RAID. Pet. Reply 3 (citing Ex. 2004, 308). As discussed above, *Webster's* describes RAID generally as including levels, then defines the levels separately, each as including a "single logical drive." However, that the general RAID definition and the definition of RAID 10 from *Webster's*, or any other dictionary, do not include the "single logical drive," is not dispositive. Rather, we must look to how the person of ordinary skill in the art would understand a RAID. *See Translogic Tech.*, 504 F.3d at 1257. The evidence of what would be understood by one of ordinary skill, as represented by the testimony of Drs. Horst, Conte, and Katz, and authors Weygant, Chen, and Chong, is compelling. Petitioner's argument based on the *Webster's* definition of RAID is, at best, equivocal from an evidentiary standpoint. Indeed, Petitioner acknowledges that RAID can present as a "single logical unit [drive]." Pet. Reply 3. We, therefore, are not persuaded

12

that Petitioner has met its burden of proving that the proffered dictionaries support a broader construction of RAID, i.e., to not be defined as a "single logical drive."

Petitioner also submits various arguments concerning Hathorn's teachings of the storage devices to inform our analysis of the scope of the term "RAID." Pet. Reply 3–6. These arguments do not persuade us to adopt Petitioner's proposed construction. First, Petitioner's arguments beg for a comparison of the definition of RAID to the storage devices disclosed in Hathorn. We are not persuaded by Petitioner's arguments for three reasons.

First, we are tasked in this Decision with determining whether Hathorn, the asserted prior art, discloses a "RAID." Therefore, relying on Hathorn to guide the definition of the term is putting the cart before the horse. Second, Hathorn's teaching of a RAID is inconclusive. Hathorn statement of a RAID is limited to a discussion in the Background of the Invention where a "redundant array of inexpensive devices (RAID)" is discussed as a data back-up alternative. Ex. 1005, 2:4–7. Hathorn provides no further instruction as to whether the disclosed disks operate in a RAID configuration.

Third, Hathorn confirms our analysis of the scope of the term RAID including a single logical unit. Hathorn appears to dismiss the use of a RAID configuration and single volume of mirrored data for use in disaster recovery of an entire system or site. *Id.* at 2:19–24. For example, Hathorn states that the reason the aforementioned back-up solutions (including a RAID configuration) are useful only for device failures is that "the secondary data has the same volume serial numbers (VOLSERs) and DASD

13

addresses as the primary data." *Id.* at 2:16–18. That is, a RAID-based back-up had the feature of appearing as a single unit. Hence, Hathorn focuses its disclosure of the invention as multiple DASDs with emphasis on remote dual copies. *See, e.g.*, Ex. 1005, 5:25–36, 6:21–39 (describing "remote dual copy systems" and referring to Figure 2 depicting multiple primary DASDs).
[9] We also note that despite RAID being known at the time, Hathorn does not mention a RAID in describing the Hathorn remote dual copy system.

Petitioner concludes with an argument that our construction of RAID from the '635 Final Decision "excludes a fundamental aspect of a RAID—***redundant*** storage—yet includes terms such as 'single logical unit,' 'mass storage,' and 'physical disk drives' that are found nowhere in the '346 patent." Pet. Reply 6. Petitioner's argument does not cite any supporting authority and, accordingly, is unpersuasive. Further, while the Specification is important in our construction, we still need to consider how RAID would be understood by the person of ordinary skill. *See Translogic*, 504 F.3d at 1257.

Accordingly, having considered the claim construction arguments made by Petitioner in its Reply regarding Hathorn, and weighing that against the evidence presented by Patent Owner, including the testimony of Dr. Conte, which we credit, we conclude that a RAID would have been understood by a person of ordinary skill in the art to have a customary meaning of "a single logical unit for mass storage using multiple physical disk drives."

---

[9] Petitioner's arguments regarding Hathorn's allege disclosure of a RAID are considered in more detail in the analysis section of this Decision.

14

IPR2014-00901
Patent 6,978,346 B2

   *b. "connection unit/hub/switch" (Claim 5)*

   In the '635 Final Decision, we found that, consistent with the
definition provided in the Specification, "connection unit" is "a hub or
switch." '635 Final Dec. 14 (citing Ex. 1001, 3:13–18). We noted that
Figure 4 of the '346 patent shows components 440 and 441 labeled as a
"HUB OR SWITCH." *Id.* Petitioner proposed this construction in the
Petition and in the Reply. Pet. 7, Pet. Reply 6–7. Thus, we determined that
the Specification treats "hub" and "switch" as equivalents. '635 Final Dec.
14.

   Relying on the Conte Declaration, Patent Owner argues the person of
skill in the art would view "hub" as different from "switch." PO Resp. 20
(citing Ex. 2301 ¶¶ 58–59). Patent Owner acknowledges that the '346 patent
equates hub and switch, but argues that they are not the same "for all
purposes." *Id.* at 21. If "hub" were intended to mean "hub or switch,"
Patent Owner argues that instead of "HUB OR SWITCH" as the label for
connection units 440 and 441 in Figure 4, the drawings would have just used
the word "hub." *Id.*

   Patent Owner argues our construction based on the Specification
"does not so clearly redefine the term 'hub' so as to conflate terms that have
different meanings." PO Resp. 21–22 (citing *Renishaw PLC v. Marposs
Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed. Cir. 1998)). Patent Owner
also argues against our construction based on claim differentiation, arguing
claim 5 refers to "hub equipment" whereas claims 6 and 7 refer to "network
switch equipment." Claims 5 and 6 are otherwise identical, claim 7 differing
with respect to another limitation not at issue.

15

IPR2014-00901
Patent 6,978,346 B2

We are not persuaded by Patent Owner's arguments. It is always necessary to review the Specification to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).[10] The claims must be read in view of the Specification. *Id.* Patent Owner's evidence of how a person of ordinary skill would understand the terms is that the terms, though different, are both "network interconnection devices." Ex. 2301 ¶¶ 58–59. Additionally, Patent Owner's expert acknowledged "hub" and "switch" may be used interchangeably. *See* Pet. Reply 7 (citing Ex. 2302, 30:16–18). The Specification recognizes this as well, stating that "hubs 440, 441 are provided to connect a system connected to these hubs by one network and maintain the network …, and it can be as a hub or a switch. *Hereinafter, they are named a 'hub' altogether*." *Id.* at 6–7 (citing Ex. 1001, 3:13–18).

Thus, consistent with the Specification and our construction from the '635 Final Decision, "connection unit" is "a hub or switch."

### c. *"exchange/exchanges information" (Claims 1 and 9)*

In the '635 Final Decision, we interpreted "exchange" and "exchanges information" according to their ordinary sense: to transmit and receive information reciprocally.[11] '635 Final Dec. 12. The Petitioner proposed this construction in the Petition. Pet. 7 (citing Ex. 1003 ¶¶ 14–16).

---

[10] While district courts do not apply our broadest reasonable interpretation standard in infringement cases, the Federal Circuit is our reviewing court and this principle is universal.

[11] *Definition exchange (vb) (3)*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1993), *available at* http://lionreference.chadwyck.com (Dictionaries/Webster's Dictionary) (Exhibit 3001).

16

IPR2014-00901
Patent 6,978,346 B2

Patent Owner neither agrees or disagrees with the construction from the '635 Final Decision. PO Resp. 17–19. Instead, based on the language differences in claims 1, 4, and 9, Patent Owner contends there are differences in how "network interface controllers" exchange information. *Id.* at 17. Patent Owner does not raise any issue as to how our construction of "exchanges information" should change as a result.

Consistent with our construction from the '635 Final Decision, we construe "exchange/exchanges information" to mean "to transmit and receive information reciprocally."

### 2. *Terms not Disputed After the Decision on Institution*

The following two terms were construed in the Institution Decision but not addressed in Patent Owner's Response nor Petitioner's Reply.

### a. *"RAID controller/RAID controlling unit" (Claims 1 and 9)*

In the'635 Final Decision, we construed "RAID controlling unit," as the term is used in the '346 patent, to mean "a component that controls operation of the RAID." '635 Final Dec. 10–11. Petitioner proposed this construction in the Petition. Pet. 7 (citing Ex. 1003 ¶¶ 14–16).

Neither the Response nor the Petitioner's Reply propose any alternative construction. Accordingly, applying the broadest reasonable interpretation to the term RAID controlling unit, we construe "RAID controlling unit" to mean "a component that controls operation of the RAID."

### b. *"network interface controller"/"network controlling unit"/"network interface controlling unit" (Claims 1 and 9)*

In the '635 Final Decision we interpreted "network controlling unit." as "a component, connected to a network, for providing communication over the network." '635 Final Dec. 12–14. Petitioner treats the terms "network

<div align="center">17</div>

IPR2014-00901
Patent 6,978,346 B2

interface controller," "network controlling unit," and "network interface controlling unit" as equivalents and urges they should be construed identically.  Pet. 7, *see* also Prelim. Resp. 20 ("synonymous phrases 'network controlling unit' and 'network interface controller'").

The Specification describes each "network interface controller" as having a counterpart "network interface controller," each "network interface controller" associated with a separate RAID controller.  Ex. 1001, 2:26−30.  Furthermore,

> information from a second network interface controller **622** of a first RAID controller **620** is sent to a first network interface controller **632** of a second RAID controller **630**, and information from a second network interface controller **632** of the second RAID controller **630** is transmitted to a first network interface controller **621** of the first RAID controller **620**.

*Id.* at 4:40−46.  Thus, we construe "network controlling unit" and its equivalents to mean "a component, connected to a network, for providing communication over the network."

## II.  ANALYSIS

Petitioner contends that claims 1−9 of the '346 patent are obvious under 35 U.S.C. § 103 over Mylex and Hathorn.  Pet. 17−42.  To support this position, Petitioner relies on the testimony of Dr. Horst.  Ex. 1003 ¶¶ 56−138.

18

IPR2014-00901
Patent 6,978,346 B2

A. *Overview of Prior Art*

1. *Mylex*

Mylex generally describes Storage Area Networks ("SAN") and associated architecture of such networks. Ex. 1006, 4.[12] Storage Area Networks can be configured with switched fabrics or hubs and switches to exchange data between nodes of the network. *Id.* at 8.

Figure 6 of Mylex is reproduced below.



Figure 6. SAN With Switched and Shared (Loop) Interconnects

Figure 6 shows that switches are used to create fibre channel fabric. *Id.* Mylex describes that hub-connected Storage Area Networks bandwidth per node decreases as more nodes are added while bandwidth of fabric connected nodes increases as nodes are added. *Id.*

Figure 7 of Mylex is reproduced below.



Figure 7. Four Node Cluster With Shared Access to RAID Arrays

---

[12] Page references are to Mylex page numbers at the bottom right corner of each page. Petitioner uses the same numbers and not the exhibit page numbers centered at the bottom of the page.

19

IPR2014-00901
Patent 6,978,346 B2

Figure 7 shows a four node cluster with shared access to RAID arrays. *Id.* at 9. Mylex describes that external RAID controllers can be used in a write-back caching scheme to protect data. *Id.* at 12.

Mylex controllers are linked by a private network used to transmit "I'm alive" heartbeat messages. Ex. 1006, 17. The absence of heartbeat messages signals that one of the controllers is off-line and the remaining controller immediately initiates a failover operation and then begins servicing I/O requests directed to itself and its off-line partner to provide non-stop access to data. *Id.* Figure 17 of Mylex is reproduced below.



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

As shown in Figure 17, for fibre controllers, Mylex describes that if a controller fails, i.e., a failover, the surviving controller senses the absence of heartbeats and fails over the ID of the active port (Port 1 and Port 2) on the failed controller to its reserved port (Reserved), and updates its data structures with configuration information stored on the disk. *Id.* at 19.

### 2. *Hathorn*

Hathorn discloses a "remote dual copy system" with dynamically modifiable ports on the storage controller that are alternatively configurable. Ex. 1005, Abstract, 7:57–8:16, Fig.3. A primary storage controller can appear as a host processor to a secondary storage controller. *Id.* Hathorn describes a method for communicating between host processors and storage

20

IPR2014-00901
Patent 6,978,346 B2

controllers, or between storage controllers. Hathorn incorporates direct access storage device ("DASD") for storage of data. *Id.* at 1:28–33.

Figure 3 of Hathorn is reproduced below.



Figure 3 is a block diagram of the preferred embodiment of the remote dual copy system of the invention described in Hathorn. Ex. 1005, 5:27–30. The storage components 323, 326, 333, and 336 are labelled as DASDs.

Primary storage controller 322 communicates through port A 321 with secondary storage controller 332. *Id.* at 8:11−15. As shown in Figure 3, port A 321 acts as a channel link-level facility through communication links 350, dynamic switch 305, communication links 351, dynamic switch 315, and communication links 346 to communicate with secondary storage controllers 332 and/or 335. *Id.*

21

IPR2014-00901
Patent 6,978,346 B2

### B. Obviousness Analysis

### 1. Introduction

*Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966) establishes an objective analysis for determining obviousness under 35 U.S.C. § 103(a) as follows:

> [T]he scope and content of the prior art are ... determined; differences between the prior art and the claims at issue are ... ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*See* 35 U.S.C. § 103(a).

Under the *Graham* analysis, Petitioner has identified the difference between Mylex and the claims at issue: that Mylex does not show "a direct exchange of information between network interface controlling units." Pet. 18. Petitioner asserts that the difference is found in Hathorn. *Id.* Patent Owner argues that the person of ordinary skill in the art would not have combined Hathorn with Mylex, making several arguments in support. PO Resp. 26–56.

Dr. Horst testifies that, as of the year 2000, the person of ordinary skill would have had a B.S. in Electrical Engineering or Computer Science and at least two years of experience in designing storage systems. Ex. 1003 ¶ 12. Dr. Conte does not provide any specific opinion in this regard. *See, e.g.*, Ex. 2301 ¶ 25. We determine Dr. Horst's opinion is both not disputed and reasonable. Accordingly, we adopt Dr. Horst's description of the level of ordinary skill for this case.

22

IPR2014-00901
Patent 6,978,346 B2

*KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398 (2007) provides a framework for analyzing obviousness of claimed subject matter. *KSR* addresses specifically combining elements found in the prior art to establish that the differences between the claim and the prior art combination would have been obvious to the person of ordinary skill at the time the invention was made. *KSR* summarizes factors considered previously, including whether the combination yields no more than predictable results. *KSR*, 550 U.S. at 416.

> Often, it will be necessary to look to interrelated teachings of multiple patents; the effects of demands known to the design community or present in the marketplace; and the background knowledge possessed by a person having ordinary skill in the art, all in order to determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue.

*Id.* at 418. "[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *Id.* At its core, the conclusion of obviousness under § 103 "cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.*

 2. *Summary of Parties' Arguments*

Petitioner argues that claims 1–9 of the '346 patent are obvious over Mylex and Hathorn. Pet. 17. Petitioner argues specifically that Mylex teaches all the limitations of claims 1–9 with the exception of a "direct exchange of information between network interface controlling units." *Id.* at 18. Petitioner acknowledges that Mylex discloses only "heartbeat"

23

IPR2014-00901
Patent 6,978,346 B2

communication, but alleges that Hathorn teaches use of "the existing switch network for communication between RAID controllers." *Id.*

Petitioner argues that one of ordinary skill would have been motivated to combine Hathorn with Mylex. Pet. 14–15 (citing Ex. 1003 ¶¶ 33–34). First, Petitioner alleges that there is a "close relationship" between the references. Pet. 14–15. Petitioner next argues that both Mylex and Hathorn are directed to the same field of endeavor. *Id.* at 15 (citing Ex. 1003 ¶¶ 33–34). Petitioner further argues, regarding motivation, that both Mylex and Hathorn disclose redundancy in "terms of sending communications between two or more RAID controllers and/or network interface controller ports." *Id.* Petitioner argues that Hathorn teaches that communication paths are expensive and discloses using a switch network for communication, and is less costly than the direct heartbeat path of Mylex. *Id.* at 18 (citing Ex. 1003 ¶¶ 32, 48–55). Petitioner also argues more generally that, because of their similarity, the modification of Mylex's heartbeat communications with the information exchange taught by Hathorn would lead to predictable results. *Id.* at 15 (citing Ex. 1003 ¶¶ 33–34).

Patent Owner's main argument is that Hathorn is not a RAID and its teachings are not readily combinable with the RAID of Mylex. PO Resp. 26–27. Patent Owner lists additional reasons why the proposed modification of Mylex with Hathorn would not have been obvious. *Id.* at 27. The additional reasons are as follows: (1) it would not have been possible to modify Mylex to transmit those messages via the fibre loop as claimed because the "Reserved" ports are inactive/offline until a failure occurs on the primary ports (PO Resp. 28–30); (2) the only feasible way to transport the heartbeats over the host-side network in Mylex would not satisfy the claim

24

IPR2014-00901
Patent 6,978,346 B2

language (PO Resp. 30–33); (3) modifying Mylex to send the heartbeats via the host-side network is not supported by a sufficient motivation (PO Resp. 33–37); (4) the proposed modification is not a combination of known elements according to known methods to yield predictable results (PO Resp. 37–46); and (5) if one skilled in the art did not want to send heartbeats over the dedicated path provided for that purpose, then there is another alternative that would have been more apparent to one skilled in the art than the modification proposed by the Petitioner (PO Resp. 46–49).

As set forth in Petitioner's Reply, Petitioner responds to Patent Owner's main argument by stating Mylex and Hathorn are "readily combinable." Pet. Reply 7. Specifically, Petitioner contends Mylex and Hathorn both disclose a RAID. *Id.* at 8. Even if Hathorn does not disclose a RAID, Petitioner asserts Hathorn is "properly combinable" with Mylex. *Id.* at 8–13.

### 3. Petitioner's Arguments

Petitioner has the burden of proof, and, thus, we address each of the arguments made by Petitioner in support of combining Hathorn with Mylex.

### a. Whether Hathorn is Analogous Art to Mylex and a RAID

While Patent Owner concedes that Hathorn and Mylex are in the same field of endeavor, it challenges Petitioner's contention that Hathorn is a RAID. Tr. 44:9–45:3.

As discussed above in the claim construction section, Hathorn discloses a remote dual copy system based on the use of DASDs. Ex. 1005, 6:22–25, Fig. 2. Petitioner argues that Hathorn is a RAID based on our construction here and in the '635 Final Decision because Hathorn's "two controllers are logically paired for data shadowing and treated as a single

25

IPR2014-00901
Patent 6,978,346 B2

logical unit by the hosts." Pet. Reply 8 (citing Ex. 1005, 9:45–49; Ex. 2302, 20:21–21:1, 107:9–25). We find that Petitioner has failed to meet its burden to show that Hathorn's DASDs teach or suggest the use of a RAID, as we have defined the term.

First, we are not persuaded by Petitioner's argument that Hathorn is a RAID that operates in two modes, one where storage is presented as a single logical unit to the host. Pet. Reply 3–4. The argument is premised on Hathorn's disclosure that explains that the secondary device or volume, i.e., storage device, is "fenced from" normal data access but still receive control commands. *Id.* at 4 (citing Ex. 1005, 9:45–49). Petitioner then notes that RAIDs, according to Dr. Horst's deposition testimony, are "fenced off" so that the host cannot access individual drives of the array. *Id.* (citing Ex. 2302, 20:21–21:1, 107:9–25). The cited Hathorn disclosure occurs in the discussion of "data shadowing," where primary and secondary DASDs are paired into duplex pairs. Ex. 1005, 9:29–51. Hathorn describes "data shadowing" as the storage of data in a "secondary or remote location." *Id.* at 2:40–44. The use of "fenced from" in Hathorn, however, only means that for each pair of DASDs, the "secondary device or volume is fenced from normal data access." *Id.* at 9:45–49. Although there is some similarity between the function of Hathorn's DASDs and a RAID, with regard to a "fenced from" volume of data, the fact remains that the multiple duplex pairs of Hathorn have not been shown to teach a single logical unit or device.

We also find unpersuasive the argument that Hathorn discloses a RAID because a RAID can have different configurations, such as individually addressable disks or multiple logical units. Pet. Reply, 4–5 (citing Ex. 2302, 161:25–162:17, 16:14–21). The testimony in this regard

26

IPR2014-00901
Patent 6,978,346 B2

does not support Petitioner's argument.  We find that at best, Dr. Horst's testimony alludes to the ability of a system to include both a RAID volume and individual disks.  *See* Ex. 2302, 161:7−9 ("the system at 3Ware could be configured either with RAID volumes **or** what's called JABOD.  Just a bunch of disks is what that stands for.") (emphasis added).  Further, the proffered testimony is inconsistent with the context of the claim language. *See id.* at 162:16−17 ("As long as it supports some level of RAID, it's still a RAID.").  The claims do not refer to "supporting a RAID."  The claims affirmatively require "a RAID."  That is, the claims are not concerned with whether the disks could be configured as a RAID.  Therefore, we find unpersuasive the testimony bearing on whether the capability of a RAID configuration is present in Hathorn.

Petitioner argues that because a RAID can perform "mirroring," like Hathorn, then Hathorn is a RAID.  Petitioner cites as support Patent Owner's expert, Dr. Conte, who testified that the '346 patent encompasses RAID mirroring.  *Id.* at 5 (citing Ex. 1017, 52:15−17).  Petitioner acknowledges the '346 patent uses RAID in the singular, but contends that does not preclude reference to mirroring, i.e., RAID level 1.  Pet. Reply 5 (citing Ex. 1010, 1:57−60, Ex. 2302, 16:24−17:15).  Again, we find that Hathorn's reference to mirroring does not make Hathorn's DASDs a RAID.  We agree with Patent Owner that Hathorn is directed to non-RAID mirroring.  *See* Tr. 45:19−46:13.  That a RAID may also perform the mirroring function does not tend to prove the DASDs of Hathorn are a RAID, as claimed.

27

IPR2014-00901
Patent 6,978,346 B2

The only use of the word "RAID" in Hathorn is as follows:

> Another data back-up alternative that overcomes the need to double the storage devices involves writing data to a redundant array of inexpensive devices (RAID) configuration. In this instance, the data is written such that the data is apportioned amongst many DASDs. If a single DASD fails, then the lost data can be recovered by using the remaining data and error correction procedures. Currently there are several different RAID configurations available.

Ex. 1005, 2:4–11. Hathorn describes that a mirroring RAID is useful for device failures, not system failures, because that type of back-up method results in the primary and secondary DASD having the same serial number. *Id.* at 2:14–17. For this reason, Hathorn turns to a "remote dual copy system." *Id.* at 7:57–8:16, Fig.3. For example, Figure 3 of Hathorn labels the storage components 323, 326, 333, and 336 as DASDs, which are direct access storage devices, each having its own storage controller. *Id.* Therefore, although we agree that Hathorn discusses mirroring, Hathorn does not employ RAID mirroring. We find, instead, that Hathorn describes mirroring as a known feature, in the Background of the Invention, and instead implements a new copy technique, using dynamic port assignments for either channel or control unit link-level facility. *Id.* at 8:3–15. The evidence is that Hathorn teaches DASDs not implemented as a RAID.

Petitioner argues "[b]oth Mylex and Hathorn disclose RAID 1-type systems (disk mirroring/shadowing)." Pet. 15 (citing Ex. 1006, 12; Ex. 1005, 1:9–12). As was discussed above, that a RAID may also perform the mirroring function does not tend to prove the DASDs of Hathorn are a RAID as claimed. Based on our construction of RAID, we agree with Patent Owner that Hathorn's disks are not a RAID.

28

IPR2014-00901
Patent 6,978,346 B2

Notwithstanding the lack of a RAID in Hathorn, we separately determine whether Petitioner has provided a sufficient rationale for a person of ordinary skill in the art to combine Hathorn and Mylex. One of the arguments presented involves the allegation that Mylex and Hathorn may be combined based on both being analogous art. Pet. 14–15, Pet. Reply 8–13. That Mylex and Hathorn are in one field is not, by itself, dispositive. *See KSR*, 550 U.S. at 418. We must look to other factors, like design incentives and other market forces, to determine whether the person of ordinary skill would be prompted to make the modification. *Id.*

In reviewing the record here, Petitioner's arguments in its briefs that Hathorn is analogous art, i.e., in the same field, do not reach, let alone explain, why the person of ordinary skill would be prompted to combine the two. Pet. 14–15, Pet. Reply 8–13, 20. At the oral hearing, Petitioner did not point to any additional argument or evidence on its field of endeavor argument. Tr. 6:14–23, 7:13–14. Conversely, Patent Owner asserted correctly that, even if the field of endeavor is the same, "[y]ou still need some motivation or other rationale to make a combination and that is what is missing in this case." *Id.* at 47:5–7. Accordingly, Petitioner has not persuaded us that the fact that Mylex and Hathorn are in the same field of endeavor establishes a rationale for combining the two.

### b. Close Ownership Relationship of Mylex and Hathorn

Petitioner alleges there is a motivation to combine based on a close ownership relationship because of the common ownership by IBM of Mylex (Mylex Corporation was acquired by IBM) and Hathorn (assigned to IBM). Pet. 14–15 (citing Ex. 1003 ¶ 34). Petitioner argues common sense, i.e., "one skilled in the art reviewing either reference would look to teachings of

29

related references within this close business relationship." Pet. Reply 19.
As legal authority, Petitioner cites to *KSR*'s statement that: "[r]igid
preventative rules that deny factfinders recourse to common sense, however,
are neither necessary under our case law nor consistent with it." *Id.* at 19–20
(citing *KSR*, 550 U.S. at 426).

We are not persuaded that the close ownership relationship would
prompt the person of ordinary skill to make the proposed combination.
Petitioner does not explain how the person of ordinary skill would be
motivated to combine the teachings of the references because of the "close
ownership relationship" between the two references. Neither are we
persuaded that the use of common sense endorsed in *KSR* would form a
rationale for making the combination. Other than a common ownership by
IBM, there is no factual support for the allegation that a person of ordinary
skill would have had the common sense to combine the teachings of these
references, at the time of the invention. At best, Petitioner alleges, without
factual support, that "later IBM products were partly based on the
technology IBM acquired by Mylex." Pet. 14–15. Even if we regarded the
allegation as substantiated with facts, the inference we draw from this
allegation is that IBM, at some unknown date, made use of acquired
technology in products branded by IBM. Nevertheless, there is no evidence
of the alleged activity by IBM being relevant to the Mylex teachings at issue
in this proceeding or relevant to the Hathorn system. There is also no
evidence of the time frame of these events or to what extent there were
modifications. In short, we are not persuaded that later IBM products
alluded to by Petitioner is evidence of the motivation to combine the
particular teachings at issue in this proceeding. We find the close

IPR2014-00901
Patent 6,978,346 B2

relationship allegation proffered by Petitioner in this case an unsatisfactory rationale or motivation to combine Hathorn with Mylex.

> c. *Whether Both Mylex and Hathorn Disclose Redundant Communication and Mylex Would be Modified According to Hathorn's Teachings*

Petitioner asserts that both Mylex and Hathorn describe redundancy and fault tolerance in terms of sending communications between two or more RAID controllers and both disclose RAID 1-type systems (disk mirroring/shadowing). Pet. 15 (citing Ex. 1006, 12; Ex. 1005, 1:9–12); Pet. Reply 20. Petitioner concludes that these similarities would motivate a person of ordinary skill to modify Mylex's heartbeat communication system with the information communication taught by Hathorn, leading to predictable results. Pet. 15. (citing Ex. 1003 ¶¶ 33–34).

Citing to the Horst Declaration, Petitioner contends that "[o]ne of ordinary skill in the art would have been motivated to use [the Hathorn] configuration to achieve the redundancy goals set forth in the Mylex paper …". Pet. Reply 20 (citing Ex. 1003 ¶ 118). At the oral hearing, however, Petitioner acknowledged that the heartbeat path of Mylex is just a single path and not a redundant path.[13] Tr. 17:23–18:12. Also in argument at the oral hearing, Petitioner summarized its position on why one of ordinary skill would combine Hathorn with Mylex: "[s]o for redundancy and cost purposes, one would be inclined to look at Hathorn, realize it teaches that you can change the communication paths and can achieve both of those

---

[13] Petitioner cites to the Conte Deposition where Dr. Conte states that Hathorn and Mylex both "disclose redundancy." Pet. Reply 9 (quoting Ex. 1017, 51:25–53:9). However, Dr. Conte clarifies that both disclose "redundant storage," as opposed to redundant pathways. Ex. 1017, 44:12–14, 52:5–9.

31

benefits." *Id.* at 13:3–5. Petitioner also conceded that, other than Figures 2 and 3 of Hathorn (*see* Pet. Reply 12–13), Hathorn does not specifically address redundancy. *Id.* at 18:23–19:14.

The Horst Declaration (Ex. 1003 ¶¶ 33–34), cited by Petitioner at page 15 of its Reply, repeats the field of endeavor and ownership arguments discussed above without any additional factual support for the conclusion that the person of ordinary skill would be motivated to combine Hathorn with Mylex. As such, we give it little weight. *See* 37 C.F.R. § 42.65(a).

Regardless, Patent Owner asserts that the alleged combination is not feasible because Mylex's reserved ports are inactive until a failover condition is detected. PO Resp. 28–30; *see* Ex. 1006, 18, Fig. 15. According to Patent Owner, it is impossible for both alleged first and fourth network controllers to exchange information, as required by claims 1 and 9, because they are never active at the same time. *Id.* at 29–30 (citing Ex. 2301 ¶¶ 92–96). Patent Owner explains that after a failover in Mylex, the "Reserved" port assumes the ID address for the failed Port 1 or Port 2. *Id.* at 30–31. Therefore, at all times, the Mylex system has only two network controllers exchanging information with each other, even though the two others are on reserve.

Petitioner's assertion that the Reserved port is a "network controlling unit," is shown in Petitioner's annotation of Figure 17 of Mylex. Petitioner's annotation of Figure 17 is reproduced below.

IPR2014-00901
Patent 6,978,346 B2

**Petitioner's Annotated Figure 17 of Mylex**



Figure 17. Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

Pet. 18.  Petitioner argues the above annotation illustrates the alleged exchange of information of claim 1's first and and fourth (blue path) and second and third (green path) "network controlling units."  *Id.* ( citing Ex. 1003¶¶ 32, 48–55).  Patent Owner contends that this does not meet the limitation because:

> In other words, the two ports at the ends of this blue path share the same address/ID.  As such, they can never communicate with each other on the network.
> Likewise, the green path [referring to drawing figure] is also an impossible communication path, as the "Reserved" port of Controller 0 is inactive and has no network address/ID before failover.

PO Resp. 30–31.

Patent Owner argues this deficiency in Mylex is not cured by Hathorn because it does not teach activating an inactive port.  *Id.* at 30.  Petitioner's response to this argument is that there is a motivation to make the modification "so that the expense of the heartbeat path is avoided ***by modifying the network interface controlling units to exchange information with each other***, as claimed by the '346 patent."  Pet. Reply 13 (citing Ex. 1003 ¶¶ 80, 157; Ex. 2302,  95:12–25).  Petitioner alleges that Patent Owner's argument has no substance because the reserved ports can be made addressable.  Pet. Reply 17.

33

IPR2014-00901
Patent 6,978,346 B2

Patent Owner takes the next step of showing what would be a feasible modification to Mylex, based on its own annotation of Figure 17, as shown below:

**Patent Owner's Annotated Figure 17 of Mylex**



Figure 17.  Normal Operating Mode of Dual DAC SF and FL Fibre Controllers

PO Resp. 32.  Patent Owner argues the path shown in purple in its annotation of Figure 17 of Mylex (communication between Port 1 of Controller 0 and Port 2 of Controller 1) could be used instead of the "Heartbeats" path shown (direct connection between Controller 0 and Controller 1).  *Id.* (citing Ex. 2301 ¶ 99).  However, as Patent Owner argues, and we agree, this proposed path does not satisfy the language of claim 1 reciting "the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit."  *Id.*  "In other words, claim 1 requires the blue path and the green path, not the purple path.  Claim 9 uses different language but requires the same."  *Id.*  In addition, Patent Owner points out correctly that two communication paths are required by the claim language.  *Id.*  As previously discussed, Petitioner's position requires use of the inactive "Reserved" ports to meet the claim language, making the proposed modification not feasible.

34

IPR2014-00901
Patent 6,978,346 B2

Petitioner argues the operability of Mylex's reserved ports being addressable because fibre channel chips can have multiple addresses at different times.  Pet. Reply 15 (citing Ex. 1017, 80:22–81:2), 21 (citing Ex. 1006, 14).  Further, Petitioner argues Dr. Conte agrees that the address of ports in a fibre channel system could be changed in "multiple ways."  *Id.* at 16.  Although Petitioner argues that Hathorn teaches establishing peer-to-peer paths, Petitioner acknowledges that Hathorn does not "specifically disclose the modification of the ports."  *See* Pet. Reply 16–17; Tr. 25:12–13.

We disagree with how Petitioner has characterized the testimony of Dr. Conte to support Petitioner's contention of a motivation to combine Hathorn with Mylex.  The line of questioning of Dr. Conte referred to whether a person of skill in the art would know from the disclosure of the '346 patent how the data is rerouted in the event of a failover.  Ex. 1007, 72:9–75:24.  Dr. Conte testifies that the way to achieve that in the 2000 time frame was to reconfigure the switch.  *Id.*  And he clarified that whether a port address in an active network interface controller could be changed was an option "if there was no other facility to change the routing in an active switch."  *Id.* at 79:17–82–2.  That is, we are not persuaded that Dr. Conte admitted that the port addressability was achievable under the failover conditions disclosed in Mylex and Hathorn.  Neither are we persuaded that Dr. Conte's testimony regarding how a person of ordinary skill would regard the disclosure of the switch operation of the '346 patent switch compels us to find that Mylex and Hathorn would be equally regarded.

Furthermore, we are not persuaded that Hathorn's teaching of peer-to-peer paths, as alleged in the Reply, rebuts the inference of unfeasible communication path drawn from the disclosure of Mylex's "Reserved"

35

IPR2014-00901
Patent 6,978,346 B2

ports.  First, the ground of unpatentability at issue relies on modification of Mylex's reserved ports to establish the heartbeat path through a network switch, motivated by Hathorn's communication paths through network switches.  *See* Ex. 1003 ¶¶ 78–80.  Petitioner does not allege, nor do we find, that Hathorn teaches or suggests modifying an offline port in a controller to establish a peer-to-peer connection through the network switch.  The address of the Hathorn secondary device, although set to zero, is an address nonetheless.  *See* Ex. 1005 at 11:62–12:2.  We credit Dr. Conte's testimony that "the storage pertinent controller ports in Hathorn are always active."  Ex. 2301 ¶ 116.  Petitioner's offer of Hathorn's peer-to-peer connection as some evidence of addressability of ports is incompatible with Mylex's port operation.

Moreover, even if Mylex's "Reserved" ports were to be modified to operate like Hathorn's ports, Petitioner offers no credible explanation of how or why the person of ordinary skill would make modification.  The Petition states that the expense of communication paths would be reduced "by *modifying network interface controlling unit ports* to use the existing switch network for communications between RAID controllers (instead of using a direct "hearbeat" path).  Pet. 18 (emphasis added).  The Declaration of Dr. Horst repeats this general statement *verbatim* with no added factual support or further explanation.  *See* Ex. 1003 ¶ 32.

Furthermore, to the extent Petitioner's declarant testifies that Mylex's ports are *replaced* with or *substituted* by Hathorn's "dynamically modifiable ports," we find the testimony not persuasive.  *See* Ex. 1003 ¶¶ 48–55 (cited in Petition at page 18).  Instead, we agree with Patent Owner that Hathorn's ports are not interchangeable with Mylex's ports because of the fundamental

36

IPR2014-00901
Patent 6,978,346 B2

operational differences of these devices. *See* PO Resp. 52–54. For example, we credit Dr. Conte's testimony that the Hathorn ports operate as endpoints of established links in a circuit-switched network, whereas Mylex's ports are nodes in a fibre-channel network that use packet-switched communications. Ex. 2301 ¶ 117. Further, we credit Dr. Conte's testimony that the nature of the heartbeats and disk drive traffic data are different such that the links dedicated to transferring disk drive traffic data would not motivate the elimination of the heartbeat path. *Id.* at ¶¶ 118–119. Lastly, we credit Dr. Conte's testimony that the transmission protocols in Hathorn and Mylex are different standards, Hathorn's is IBM's proprietary technology, and Mylex's is an open, industry standard. *Id.* at ¶¶ 48, 85. As such, we find that although Hathorn's controller ports are dynamically modifiable, the modifications are the result of a protocol and link architecture that is unique to Hathorn and not interchangeable with Mylex's system.

In summary, we are not persuaded that both Mylex and Hathorn disclose redundant communications, as opposed to redundant storage. Therefore, we find unpersuasive Petitioner's proffered obviousness rationale that relies on redundancy. Notwithstanding the redundancy issue, we are persuaded by Patent Owner's argument and evidence of record that the proffered rationale of Mylex's modification, as proposed by Petitioner, is not reasonable. Consequently, we find that a person of ordinary skill would not be prompted to make the proposed modification given the unfeasibility of the proposed redundant communication and the differences in the taught ports of Mylex and Hathorn.

37

IPR2014-00901
Patent 6,978,346 B2

### d. Cost as a Motive to Modify Mylex With Hathorn

Petitioner contends that a person of ordinary skill would modify the Mylex direct path for sending the heartbeat messages by substituting a switch network, such as taught by Hathorn, for communication between RAID controllers. Pet. 18 (citing Ex. 1003 ¶¶ 32). This approach, according to Petitioner is less costly than the direct heartbeat path of Mylex. *Id.* (citing Ex. 1003 ¶¶ 32, 48–55). Dr. Horst states that Hathorn teaches that the need for expensive direct controller-to-controller communication, as disclosed by Mylex, is avoided by using the switch network of Hathorn. *Id.*; *see* Ex. 1003 ¶ 54. Petitioner points to its annotated Figure 17 of Mylex (reproduced above) as illustrative of the proposed combination. *Id.*

As Patent Owner notes, Petitioner's proposed combination requires modification of Mylex to send the heartbeat message over the fibre loop (football shaped connection between HBAs of Figure 17 above) rather than through Mylex's private network specifically provided for the heartbeats. PO Resp. 33 (citing Pet. 18, 25–27, 42; Ex. 1003 ¶¶ 32, 76–80, 138). Patent Owner does not dispute that controller-to-controller ESCON (enterprise system connections) described in Hathorn (*see* Ex. 2301 ¶¶ 83–86) are expensive, but notes that is because the sites are far apart. PO Resp. 34 (citing Ex. 2301 ¶ 103). Mylex, according to Patent Owner, has two co-located RAID controllers, and, thus, the distance expense is avoided. *Id.* (citing Ex. 2301 ¶ 104). Petitioner argues the lower cost motivation in its Reply without pointing to persuasive evidence that we may disregard the distance differences between Hathorn and Mylex. *See* Pet. Reply 19.

Patent Owner hypothetically proposes that, if one skilled in the art "were motivated to eliminate the direct heartbeat connection and to send the

38

IPR2014-00901
Patent 6,978,346 B2

heartbeats by some other path, then there is another, more apparent path to do so." PO Resp. 46. That path is via the disk bus illustrated in Figures 23 and 24 of Mylex. *Id.* To the extent that the direct heartbeat path is too costly, the disk channel already exists and is utilized already for cache mirroring. *Id.* (citing Ex. 2301 ¶¶ 108–110).

We agree with Patent Owner that there is no evidence that the proposed cost savings motivation would be applicable to Mylex. PO Resp. 35. We also agree that one of ordinary skill would look to other alternatives, i.e., Mylex alone discloses less expensive ways to communicate between the RAID controllers. Thus, we are not persuaded that cost consideration is a reasonable rationale to combine Hathorn with Mylex.

*e. The Combination Would Lead to Predictable Results*

Petitioner argues that both Mylex and Hathorn use known techniques and components to achieve predictable results. Pet. 15 (citing Ex. 1006, 15); Ex. 1005, 6:25–34). Petitioner concludes that as a result of their similarity, "one of ordinary skill would have been able to apply the fault tolerance teachings of Mylex to the system disclosed by Hathorn, or the modifying NICs to communicate teachings of Hathorn to the system disclosed by Mylex with predictable results." *Id.* (citing Ex. 1003 ¶¶ 33–34).

Petitioner argues "predictable results" based in part on *KSR. See KSR* 550 U.S. at 416 ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."). Patent Owner acknowledges both references would use unspecified computer equipment. PO Resp. 38. Patent Owner argues that the Petition fails to set forth evidence with specificity. *Id.* For example, Patent Owner contends there is a lack of evidence that "the particular

39

components [as between Mylex and Hathorn] disclosed were compatible or interchangeable." *Id.* (citing Ex. 2301 ¶ 111).

In its Reply, Petitioner argues there are "functional and structural similarities" associated with redundant storage systems. Pet. Reply 21. Absent some specificity, we find that Petitioner's argument is conclusory and lacks factual support sufficient to weigh in favor of a finding of obviousness. *KSR*, 550 U.S. at 418 ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness")(internal citation omitted).

Patent Owner argues that the combination of Mylex and Hathorn does not teach "that sending heartbeats over the host-side network, such as a fibre channel network, was known." PO Resp. 40. Although this argument may go to motivation, it does not relate to a claim element, as Patent Owner proposes. *Id.* at 39 (citing MPEP § 2143(I)(1)).

Nonetheless, we agree with Patent Owner that what was known to Mylex was a direct path transport for heartbeats, and nothing in Hathorn pertains to transporting heartbeats at all. *Id.* at 40. Patent Owner contends that Hathorn's system has no need for heartbeats, and we agree. *Id.* (citing Ex. 2301 ¶ 112). This fact persuades us that a person of ordinary skill faced with Mylex would not need to consult Hathorn for teachings on improving the heartbeat communication exchange or that there is a problem that would be solved by the combination.

Petitioner's predictable result argument is also unpersuasive because there is no evidence or argument that a person of ordinary skill would be motivated to make the combination in the first instance. As *KSR* points out:

<div align="center">40</div>

IPR2014-00901
Patent 6,978,346 B2

> *When there is a design need or market pressure to solve a problem* and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103.

*KSR*, 550 U.S. at 421 (emphasis supplied).

The Petition lacks specific evidence that the claimed invention could be constructed by interconnecting off-the-shelf components in order to lead to a predictable result. *See* Ex. 2301 ¶ 111. We find instructive Dr. Conte's testimony that given the differences between the heartbeats of Mylex and the Hathorn system, customization would have been required. *Id.* The customization would raise additional problems to the person of ordinary skill making the motivation to combine less likely. *Id.* We credit Dr. Conte's testimony in this regard. Therefore, we are not persuaded that Petitioner has met its burden in showing that the combination of Mylex and Hathorn are merely the use of known techniques to achieve a predictable result.

### f. Conclusion

Petitioner has failed to show by a preponderance of the evidence that the person of ordinary skill would have been motivated to combine Hathorn with Mylex. Thus, Petitioner has not shown that claims 1–9 would have been unpatentable over Mylex and Hathorn.

41

IPR2014-00901
Patent 6,978,346 B2

## III.  ORDER

For the reasons given, it is

ORDERED that claims 1–9 of U.S. Patent No. 6,978,346 have not been shown by a preponderance of the evidence to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

42

IPR2014-00901
Patent 6,978,346 B2

For PETITIONER:

Katherine Lutton
lutton@fr.com

Timothy Riffe
IPR27450-0011IP1@fr.com

For PATENT OWNER:

Matthew Phillips
Matthew.phillips@renaissanceiplaw.com

Derek Meeker
Derek.meeker@renaissanceiplaw.com

43



US006978346B2

(12) **United States Patent**
Baek et al.

(10) **Patent No.:     US 6,978,346 B2**
(45) **Date of Patent:      Dec. 20, 2005**

---

(54) **APPARATUS FOR REDUNDANT INTERCONNECTION BETWEEN MULTIPLE HOSTS AND RAID**

(75) Inventors: **Sung-Hoon Baek**, Taejon (KR);
**Joong-Bae Kim**, Taejon (KR);
**Yong-Youn Kim**, Taejon (KR)

(73) Assignee: **Electronics and Telecommunications Reseach Institute**, (KR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 856 days.

(21) Appl. No.: **09/753,245**

(22) Filed: **Dec. 29, 2000**

(65) **Prior Publication Data**

US 2002/0035669 A1     Mar. 21, 2002

(30) **Foreign Application Priority Data**

Sep. 19, 2000    (KR) ............................... 2000-54807

(51) **Int. Cl.**$^7$ ........................ **G06F 13/00**; G06F 12/00
(52) **U.S. Cl.** ........................................ **711/114**; 709/250
(58) **Field of Search** ................................ 709/201–203, 709/217–219, 223–224, 239–240, 244, 250; 711/114; 710/38; 370/360, 412

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,652,536 | A | 3/1987 | Nakajima et al. |
| 5,251,062 | A | 10/1993 | Snitzer et al. |
| 5,798,306 | A | 8/1998 | Dickinson, Jr. |
| 5,812,754 | A * | 9/1998 | Lui et al. ....................... 714/6 |
| 6,192,485 | B1 * | 2/2001 | Takita et al. .................... 714/6 |

| | | | |
|---|---|---|---|
| 6,609,213 | B1 * | 8/2003 | Nguyen et al. ................. 714/4 |
| 6,820,171 | B1 * | 11/2004 | Weber et al. ............... 711/114 |

OTHER PUBLICATIONS

Tellurite glass: a new candidate for fiber devices by J.S. Wang: Optical Materials 3 (1994) 187-203.
Structure and optical properties of rare earth doped zinc oxyhalide tellurite glasses by D.L. Sidebottom: Journl of Non-Crystalline Solids 222 (1997), pp. 282-289.
Raman spectra snd thermal analysis of a new lead-tellurium-germanate glass system by Z. Pan: Journl of Non-Crystalline Solids 210 (1997), pp. 130-135.

* cited by examiner

*Primary Examiner*—Krisna Lim
(74) *Attorney, Agent, or Firm*—Blakely Sokoloff Taylor & Zafman

(57) **ABSTRACT**

The apparatus for a redundant interconnection between multiple hosts and a redundant array of inexpensive disks (hereinafter, referred to as 'RAID'), which is capable of supporting a fault tolerance of RAID controllers and simultaneously heightening a performance, comprises a plurality of RAID controlling units for processing a requirement of numerous host computers connected with one another through the industrial standard communication network and for fault tolerance; a plurality of connecting units for connecting the plurality of RAID controlling units to the numerous host computers; and a plural number of network interface controlling units respectively contained into the plurality of RAID controlling units, for exchanging information directly with an opposite network interface controlling unit provided within an opposite RAID controlling unit and the numerous host computers, through the plurality of connecting units.

**9 Claims, 6 Drawing Sheets**



    VMWARE, INC. 1001

## FIG. 1

--PRIOR ART--



## FIG. 2
--PRIOR ART--



## FIG. 3
--PRIOR ART--



4



FIG. 4



FIG. 5



FIG. 6

600
601
602
603
604
605
HOST COMPUTER
NETWORK INTERFACE CONTROLLER
TX
RX
610
611
NETWORK SWITCH
620
621
622
630
631
632
RAID CONTROLLER
RAID

US 6,978,346 B2

# APPARATUS FOR REDUNDANT INTERCONNECTION BETWEEN MULTIPLE HOSTS AND RAID

## FIELD OF THE INVENTION

The present invention relates to an apparatus for a redundant interconnection between multiple host computers and a redundant arrays of inexpensive disks (hereinafter, referred to as 'RAID'); and, more particularly, to an apparatus for a redundant interconnection between multiple host computers and multiple controllers of the RAID, which is capable of supporting a fault tolerance of the RAID controllers and simultaneously heightening performance.

## PRIOR ART OF THE INVENTION

A RAID is a storage system based on a large capacity and a high performance, by using much quantity of disks, and is a fault tolerant system in which the disks or controllers etc. have a redundant nature. In general, the RAID has two controllers, which are used like a method shown in FIG. 1 or 2.

FIG. 1 is an exemplary block diagram showing a general connection method between the host computers and the RAID having the conventional two controllers.

As shown in the drawing, the RAID 130 includes two RAID controllers 140, 141 and each of RAID controllers 140, 141 includes network interface controllers 150, 151. The network interface controllers 150, 151 of the RAID controllers 140, 141 are independently connected to network interface controllers 110, 111 of the host computers 100, 101 through communication links 120, 121 such as a copper line and an optical fiber. That is, such system has twice the bandwidth and twice the performance. However, there is such a problem that a loss of data occurs when one out of two RAID controllers 140, 141 has a trouble, in other words, this system does not become the fault tolerant system.

FIG. 2 is an exemplary block diagram of a general host interface system having a communication interface for an error recovery between the conventional two controllers.

In order to provide fault tolerance not provided in FIG. 1, RAID 240 includes two RAID controllers 230, 231 and two RAID controllers 230, 231 and host computers 200, 201 are connected with each other through a hub or switch 210 in one network. The RAID controller 230 includes a pair of network interface controllers 220 and 221 and the RAID controller 231 includes a pair of network interface controllers 222 and 223. Thus, even though one RAID controller 230 or 231 has a trouble, all of the host computers 200, 201 are connected to a RAID controller that does not have a trouble. That is, this RAID controller not having the trouble serves as a role of the controller that has the trouble. Also, since the RAID controllers 230, 231 should exchange information with each other by preparing in advance against some trouble, the RAID controllers 230, 231 are connected with each other through communication controllers 221, 222. However, in this case only a half of performance for the bandwidth provided in FIG. 1 can be obtained.

FIG. 3 is an exemplary block diagram showing a wiring method between a conventional RAID and the host computers.

The construction shown in the drawing partially represents a systematic connection between a RAID and host computers, which is extracted from contents disclosed in the U.S. Pat. No. 5,812,754. The RAID 340 includes two RAID controllers each of which has network interference control-lers 330, 331 and four ports 310, 311, 320 and 321. However, this construction has no any difference from that of FIG. 2, in the structure of a communication network, and in case that one out of two host computers 300, 301 has rather a trouble, there is caused a problem that a network is broken. Thus, this construction is inferior to the construction of FIG. 2.

## SUMMARY OF THE INVENTION

Therefore, it is an object of the present invention to provide an apparatus for a redundant interconnection between multiple host computers and a RAID, which is capable of supporting a fault tolerance of a RAID controller and simultaneously heightening a performance.

In accordance with the present invention, the apparatus for a redundant interconnection between multiple hosts and a RAID comprises a plurality of RAID controllers for processing requests of numerous host computers connected with one another through an industrial standard communication network such as fibre channel and performing fault tolerant function; a plurality of connecting units for connecting the plurality of RAID controllers to the numerous host computers; and a plural number of network interface controllers respectively contained into the plurality of RAID controllers, the network interface controllers being for exchanging information directly with each of opposite network interface controllers provided within the numerous host computers and within opposite RAID controllers, through the plurality of connecting units.

## BRIEF DESCRIPTION OF THE DRAWINGS

The above and other objects and features of the instant invention will become apparent from the following description of preferred embodiments taken in conjunction with the accompanying drawings, in which:

FIG. 1 is an exemplary block diagram showing a general connection system between host computers and a RAID having conventional two controllers;

FIG. 2 indicates an exemplary block diagram of a general host interface system having a communication interface for an error recovery between the conventional two controllers;

FIG. 3 illustrates an exemplary block diagram of a wiring method between a conventional RAID and host computers;

FIG. 4 is a block diagram showing one embodiment of a host interface system as an internal installment system between a RAID and host computers in accordance with the present invention;

FIG. 5 depicts a block diagram providing one embodiment of a host interface system as an external installment system between a RAID and host computers in the present invention; and

FIG. 6 is a block diagram showing one embodiment of a host interface system as a network switch between a RAID and host computers in the invention.

## PREFERRED EMBODIMENT OF THE INVENTION

Hereinafter, preferred embodiments of the present invention will be described in detail with reference to the accompanying drawings.

FIG. 4 is a block diagram showing one embodiment of a host matching system as an internal installment system between a RAID and host computers in accordance with the present invention.

US 6,978,346 B2

3

As shown in FIG. 4, in the inventive host interface system, a communication circuit is provided in order for an error recovery between two RAID controllers 460, 461, and the bandwidth between two groups as the host computers 400 to 405 and two RAID controllers 460, 461 becomes twice the single connection bandwidth. Also, in the inventive host interface system, even though one RAID controller 460 or 461 has an occurrence of a trouble, the bandwidth becomes twice the single connection bandwidth.

That is to say, in a RAID 490, two RAID controllers 460, 461 and hubs 440, 441 exist, and in each of the RAID controllers 460, 461, a pair of network interface controllers 470, 471; 480, 481 are provided. Herewith, the hubs 440, 441 are provided to connect a system connected to these hubs by one network and maintain the network even though one system has an occurrence of a trouble or a short of a line, and it can be as a hub or a switch. Hereinafter, they are named a "hub" altogether.

Hub ports, 420 to 424, 430 to 434, shown in FIG. 4 indicate an example for a simple internal structure of a fibre channel arbitrated loop hub, and this is based on an already well-known technique, thus there will be herein no more description therefore in the invention. The hub observes its corresponding communication network standard.

A network, in which the RAID controllers, the hubs and the host computers are connected with one another, corresponds to the industrial standard communication network such as fibre channel, asynchronous transfer mode (ATM) and InfiniBand etc. and they are hereinafter named a 'network'.

Network interface controllers, 410 to 415, contained into the host computers, 400 to 405, and the network interface controllers 470, 471, 480, 481 of the RAID controllers 460, 461 are connected with one another by two networks through two hubs 440, 441, and according to a sort of the networks, the network interface controller becomes a fibre channel controller, an ATM controller and an InfiniBand controller etc.

At this time, a communication line, representatively shown as 450 in the drawing, for connecting the network interface controller to the hub is a copper line or an optical fibre, which is matched to a corresponding standard.

Meanwhile, two network interface controllers 470, 471 of the first RAID controller 460 are respectively connected to two different hub ports 423, 432, and two network interface controllers 480, 481 of the second RAID controller 461 are respectively connected to two different hub ports 422, 433. The rest ports 420, 421, 424, 430, 431, 434 of the hubs 440, 441 are connected to the host computers 400 to 405. Just, there is no distinction between the hub ports 420 to 424 of the first hub 440 at all. Also, there is no distinction between the hub ports 430 to 434 of the second hub 441 at all.

The hub port connected to the host computer among the hub ports of the hub 440, namely, 420, 421, 424, is more than one, and there is no limitation to the maximum number. Further, What it is connected to the host computer among the hub ports of the second hub 441, namely, 430, 431, 434, is more than one, and there is no limitation to the maximum number. The hub ports 424, 434 and the host computers 400, 405, which are shown as dot lines in FIG. 4, mean that there is no, or more than one hub port or host computer.

Since, in such construction, two independent networks are constructed; it has twice the bandwidth of the single network, and a communication passage between two RAID controllers needed to perform the fault tolerant function of two RAID controllers 460, 461 is formed. Thus, information from the second network interface controller 471 of the first

4

RAID controller 460 is sent to the first network interface controller 481 of the second RAID controller 461. Also, information from the second network interface controller 480 of the second RAID controller 461 is transmitted to the first network interface controller 470 of the first RAID controller 460. Further, information from the first network interface controller 481 of the second RAID controller 461 is transmitted to the second network interface controller 471 of the first RAID controller 460, and information from the first network interface controller 470 of the first RAID controller 460 is sent to the second network interface controller 480 of the second RAID controller 461.

The first network interface controllers 470, 480 of two RAID controllers 460, 461 respectively supply data of the host computers 400 to 402 connected to the first hub 440 and the host computer 403 to 405 connected to the second hub 441, and process information transmitted from the opposite network interface controllers 471, 481.

If any one out of two RAID controllers 460, 461 has an occurrence of an error, the RAID controller having the error occurrence is removed from the network, and a second network interface controller of an opposite RAID controller not having the error occurrence takes over a function of a first network interface controller of the RAID controller having the error occurrence.

FIG. 5 is a block diagram providing one embodiment of the host interface system as an external installation system between the RAID and the host computers in the present invention.

As shown in FIG. 4, the present invention can be constructed by a method of internally installing the hubs 440, 441 in the RAID 490, and as shown in FIG. 5, the host computers 500, 501, 502, 503, 504 and 505 are connected to the RAID 530 by using external hubs 510 and 520.

FIG. 6 is a block diagram showing one embodiment of the host interface system as a network switch between the inventive RAID and host computers.

As shown in the drawing, a plurality of host computers 600, 601, 602, 604 and 605 are connected to RAID through a network switch 610. In other words, information from a second network interface controller 622 of a first RAID controller 620 is sent to a first network interface controller 632 of a second RAID controller 630, and information from a second network interface controller 632 of the second RAID controller 630 is transmitted to a first network interface controller 621 of the first RAID controller 620. Further, information from the first network interface controller 631 of the second RAID controller 630 is transmitted to the second network interface controller 622 of the first RAID controller 620. Also, information from the first network interface controller 621 of the first RAID controller 620 is sent to the second network interface controller 632 of the second RAID controller 630.

Just, there is no distinction between respective ports, representatively 611, of a network switch 610 at all and also, the internal structure of a network switch 610 can be configured according to a selection of a user (not shown in FIG. 6).

In accordance with the present invention, as afore-mentioned, even in a case of an error occurrence in a RAID controller, there exist two independent networks and two network interface controllers, and the bandwidth of a single network can be twice maintained. Accordingly, a function of fault tolerance between two RAID controllers can be constructed without a drop of the bandwidth.

It will be apparent to those skilled in the art that various modifications and variations can be made in the present

9

US 6,978,346 B2

5

invention without deviating from the spirit or scope of the invention. Thus, it is intended that the present invention cover the modifications and variations of this invention provided they come within the scope of the appended claims and their equivalents.

What is claimed is:

1. An apparatus for a redundant interconnection between multiple hosts and a RAID, comprising:

a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers, the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit; and

a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers, wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units, and the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit.

2. The apparatus as recited in claim 1, wherein said respective RAID controlling units are connected to the plurality of individual connecting units.

3. The apparatus as recited in claim 2, wherein the first network interface controlling unit is coupled to the connecting unit of one side and the second network interface controlling unit is coupled to the connecting unit of another side.

4. The apparatus as recited in claim 3, wherein

the first network interface controlling unit and the third network interface controlling unit process the requirement of the numerous host computers; and

the second network interface controlling unit and the fourth network controlling unit are used for communication between the first RAID controlling unit and the second RAID controlling unit when the first and second RAID controlling units are not faulty and the second network interface controlling unit and the fourth network controlling unit are used for executing a function of the first network interface controlling unit and the third network controlling unit when one of the first RAID controlling unit and the second RAID controlling unit is faulty.

5. The apparatus as recited in claim 1, wherein said plurality of connecting units have at least three connection ports, two of the at least three connection ports is coupled to one of the first network interface controlling unit and the third network controlling unit and the rest of the connection ports being provided as a hub equipment connected with the numerous host computers.

6. The apparatus as recited in claim 1, wherein said plurality of connecting units have at least three connection ports, two of the at least three connection port are coupled to one of the first network interface controlling unit and the third network controlling unit and the rest of the connection

6

ports being provided as a network switch equipment connected with the numerous host computers.

7. The apparatus as recited in claim 1, wherein said plurality of connecting units have at least five connection ports, four of the at least five connection ports is coupled to one of the first network interface controlling unit and the third network controlling unit and the rest of the connection ports being provided as a switch connected with the numerous host computers.

8. The apparatus as recited in claim 1, wherein the first network interface controlling unit of the first RAID controlling unit being connected to a first connecting unit, the second network interface controlling unit of said first RAID controlling unit being connected to a second connecting unit, the third network interface controlling unit of the second RAID controlling unit being connected to the second connecting unit, and the fourth network interface controlling unit of the second RAID controlling unit being connected to the first connecting unit.

9. An apparatus for a redundant interconnection between multiple host computers and a RAID, the apparatus comprising:

a plurality of connection units for connecting the host computers and the RAID;

a first and a second RAID controllers, included in the RAID, each of which having a first network interface controller and a second network interface controller for processing requests from the plurality of the host computers connected through the plurality of the connection units,

wherein the first network interface controller in the first RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the second RAID controller,

wherein the first network interface controller in the second RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the first RAID controller,

wherein the second network interface controller in the first RAID controller is used for fault tolerance by performing functions of the first network interface controller in the second RAID controller when the second RAID controller is faulty, and

wherein the second network interface controller in the second RAID controller is used for fault tolerance by performing functions of the first network interface controller in the first RAID controller when the first RAID controller is faulty, and

wherein the first network controlling unit in the first RAID controlling unit exchanges information with the second network controlling unit in the second RAID controlling unit, and the second network controlling unit in the first RAID controlling unit exchanges information with the first network controlling unit in the second RAID controlling unit.

*    *    *    *    *

10

Trials@uspto.gov                                    Paper 14
571-272-7822                                        Entered: December 11, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

VMWARE, INC.,
Petitioner,

v.

ELECTRONICS AND TELECOMMUNICATIONS RESEARCH
INSTITUTE,
Patent Owner.
_____

Case IPR2014-00901
Patent 6,978,346 B2

Before BRIAN J. McNAMARA, MIRIAM L. QUINN, and
GREGG I. ANDERSON, *Administrative Patent Judges.*

ANDERSON, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2014-00901
Patent 6,978,346 B2

## I.    INTRODUCTION

On July 21, 2014, VMWare, Inc. ("Petitioner") filed a Second Corrected Petition requesting an *inter partes* review of claims 1–9 of U.S. Patent No. 6,978,346 B2 (Ex. 1001, "the '346 patent"). Paper 8 ("Pet."). Electronics and Telecommunications Research Institute ("Patent Owner"), filed a Preliminary Response. Paper 11 ("Prelim. Resp."). Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioner would prevail with respect to at least one challenged claim, we institute an *inter partes* review of claims 1–9. The Board has not made a final determination of the patentability of any claim.

### A.  Related Proceedings

Petitioner advises that the '346 patent is involved in the following co-pending district court cases:  *Safe Storage LLC v. StoneFly, Inc.*, 1-13-cv-01152; *Safe Storage LLC v. Int'l Business Machines Corp.*, 1-13-cv-0 1151; *Safe Storage LLC* v. *Emulex Corporation et al*, 1-13-cv-01150; *Safe Storage LLC v 3PAR Inc.*, 1-13-cv-01088; *Safe Storage LLC v Oracle America Inc. et al*, 1-13-cv-01089; *Safe Storage LLC v ATTO Technology Inc. et al.*, 1-13-cv-01090; *Safe Storage LLC v. VMware Inc.*, 1-13-cv-00928; *Safe Storage LLC v. Promise Technology Inc.*, 1-13-cv-00927; *Safe Storage LLC v. Nexsan Corporation*, 1-13-cv-00931 ; *Safe Storage LLC v. Overland Storage Inc.*, 1-13-cv-00932; *Safe Storage LLC* v. *IQSS LLC*, 1-13-cv-00930; *Safe Storage LLC v. Infortrend Corporation*, 1-13-cv-00929; *Safe Storage LLC* v. *Cisco Systems Inc.*, 1-13-cv-00926; *Safe Storage LLC* v. *Silicon Graphics Int'l Corp.*, 1-12-cv-0 1629; *Safe Storage LLC v. Dot Hill Systems Corp.*, 1-12-cv-01625 ; *Safe Storage LLC v. Hitachi Data Systems Corp.*, 1-12-cv-01627; *Safe Storage LLC v. Dell Inc.*, 1-12-cv-01624; *Safe*

2

IPR2014-00901
Patent 6,978,346 B2

*Storage LLC v. NetApp Inc.*, 1-12-cv-01628; *Safe Storage LLC* v. *Hewlett-Packard Company*, 1-12-cv-01626, all pending in the United States District Court for the District of Delaware.[1]  Pet. 1.  The '346 patent is the subject of an instituted *inter partes* review in *Dell Inc. v. Electronics and Telecommunications Research Institute*, Case IPR No. IPR2013-00635 (PTAB)(the "'635 IPR").  *Id.*  Additional petitions for review have been filed in *Internation Business Machines Corp. v. Electronics and Telecommunications Research Institute*, Case IPR2014-00949(PTAB) and *International Business Machines Corp. v. Electronics and Telecommunications Research Institute*, Case IPR2014-00976(PTAB).  *Id.*

### B.  The '346 Patent

The '346 Patent describes an apparatus with "redundant interconnection between multiple hosts and a redundant array of inexpensive disks (hereinafter referred to as 'RAID')."  Ex. 1001, Abstract.  As a result of the redundant interconnection, the apparatus allows increased bandwidth in the event one of the two RAID controllers 460 and 461 has a failure.  *Id.* at 3:1–9.

Figure 4 of the '346 patent is reproduced below:

---

[1] Petitioner lists only the case numbers.  The case names are provided from IPR2013-00635, which Petitioner identifies here.

IPR2014-00901
Patent 6,978,346 B2



Figure 4 is a block diagram of a host matching system including RAID 490 and its interconnection to host computers 400–405. Ex. 1001, 2:64–3:6. RAID 490 includes two RAID controllers 460, 461 and hubs 440, 441. *Id.* at 3:10–18. Each RAID controller includes a pair of network interface controllers. For example, RAID controller 460 includes network interface controllers 470, 471, and RAID controller 461 includes network interface controllers 480, 481. *Id.* at 3:11–13. Each host computer has its own network interface controller (410 to 415), which connects the host computer through the hubs and to network interface controllers (470, 471, 480, 481) of RAID controllers 460, 461. *Id.* at 3:31–35.

The '346 patent describes that the result is two independent networks with twice the bandwidth of a single network and a "communication passage" between the two RAID controllers. *Id.* at 3:62–64. The communication passage creates a "fault tolerant function" should one of RAID controllers 460 or 461 fail. *Id.* at 3:64–66. According to Figure 4, communications line 450 interconnects network interface controller 480 of RAID controller 461 and network interface controller 470 of RAID

4

IPR2014-00901
Patent 6,978,346 B2

controller 460. *Id.* at 4:2–6; Fig. 4. Then, RAID controller 461 may send information to RAID controller 460. *Id.* In like manner, network interface controller 471 of RAID controller 460 may be connected over communications lines to network interface controller 481 of RAID controller 461, allowing RAID controller 460 to send information to RAID controller 461. *Id.* at 3:66–4:2.

By the arrangement described, the apparatus continues to operate in the event either RAID controller 460 or 461 has an "occurrence of an error." Ex. 1001, 4:19–25. The interconnected network interface controller of the operational RAID controller assumes the functions of the network interface controller of the failed RAID controller. *Id.*

*C. Illustrative Claim*

Claim 1, one of the two independent claims of the challenged claims, is reproduced below:

> 1. An apparatus for a redundant interconnection between multiple hosts and a RAID, comprising:
>
> a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers, the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit; and
>
> a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers, wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units, and the first network controlling unit exchanges information with the fourth network controlling

5

IPR2014-00901
Patent 6,978,346 B2

unit, and the second network controlling unit exchanges information with the third network controlling unit.

### D. Prior Art Relied Upon

Petitioners rely upon the following prior art references.  Pet. 4–5.

| Reference | Description | Publication or Issue Date | Exhibit No. |
|---|---|---|---|
| Hathorn | US 5,574,950 | Nov. 12, 1996 | Ex. 1005 |
| Mylex | Storage Area Networks; Unclogging LANs and Improving Data Accessibility, Mylex Corporation (1998) | May 29, 1998[2] | Exs. 1006 and 1009 |
| Griffith | US 6,401,170 B1 | June 4, 2002 | Ex. 1007 |
| Dietz | US 6,578,158 B1 | June 10, 2003 | Ex. 1008 |
| DeKoning | US 6,073,218 | June 6, 2000 | Ex. 1010 |

### E. The Alleged Grounds of Unpatentability

Petitioners allege the following grounds for unpatentability.  Pet. 4.

| Claims | Grounds | References |
|---|---|---|
| 1–9 | § 103 | Mylex and Hathorn |
| 1–9 | § 103 | Hathorn and Mylex |
| 1–9 | § 103 | Dietz or Mylex and Griffith or DeKoning |

### F. Claim construction

The Board interprets claims using the broadest reasonable construction in light of the specification of the patent in which they appear.

---

[2] Petitioners assert the Mylex paper was publicly available for download via www.mylex.com on May 29, 1998.  Pet. 4.

6

IPR2014-00901
Patent 6,978,346 B2

37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

### 1.  *"RAID" (Claims 1 and 9)*

Petitioners assert that "RAID" should be construed as "redundant array of inexpensive disks."  Pet. 6 (citing Ex. 1001, Abstract, Declaration of Dr. Robert Horst, Ex. 1003 ¶¶ 14–16).  Patent Owner does not propose a construction for "RAID" but rather argues that technical details of a RAID are "relevant to an analysis of the challenges raised in this Petition."  Prelim. Resp. 12.  Determining the ordinary and customary meaning of the term as that meaning would be understood by a person of ordinary skill in the art does not require us to incorporate technical details of a construed term.

"RAID" is well understood by a person of ordinary skill in the art as an acronym for "redundant array of inexpensive disks."  Ex. 1001, Abstract. Dr. Horst's testimony corroborates the stated understanding of the person of ordinary skill as set forth in the '346 patent.  Ex. 1004 ¶¶ 14–16.  Consistent with our construction from the '635 IPR, we construe "RAID" to mean "redundant array of inexpensive disks."

### 2.  *"RAID controller/RAID controlling unit" (Claims 1 and 9)*

Petitioner proposes that "RAID controller" and "RAID controlling unit" should both be construed as "a component that controls operation of the RAID."  Pet. 7 (citing Ex. 1003 ¶¶ 14–16).  Patent Owner acknowledges that Petitioner's proposal is the same as our construction of the term from the '635 IPR, which Patent Owner characterizes as "not incorrect."  Prelim. Resp. 18–19.  Patent Owner goes on to state that "it would be useful in deciding the patentability issues in this case to elaborate on what there terms in that interpretation mean."  *Id.* at 19.  To the extent Patent Owner is

7

IPR2014-00901
Patent 6,978,346 B2

arguing a different construction than what we found in the '635 IPR, we disagree. Patent Owner's arguments relate to patentability issues. Although a specific construction may well determine patentability, a proper construction is not based upon the patentability issues.

Thus, consistent with our construction from the '635 IPR, we construe "RAID controlling unit" and "RAID controller" to mean "a component that controls operation of the RAID."

### 3. *"exchange/exchanges information" (Claims 1 and 9)*

Petitioner proposes that the phrases "exchange information" and "exchanges information" should both be construed to mean "to transmit and receive information reciprocally." Pet. 7 (citing Ex. 1003 ¶¶ 14–16). Patent Owner notes correctly that Petitioner's proposal is consistent with our construction from the '635 IPR. Prelim. Resp. 22. Patent Owner relies on the prosecution of the application, where "exchanges information" was added by amendment, to argue that "exchanges information" takes place via the "connection units." *Id.* at 22 (citing Ex. 1001, Fig. 4, elements 440 and 441).

The claims use "exchange" and "exchanges information" according to their ordinary sense: to transmit and receive information reciprocally.[3] The claim recites the structures between which information is exchanged, i.e., between the RAID controlling units and the host computers, between the first and fourth network controlling units, and between the second and third network controlling units. The claim language requires only the information

---

[3] *Definition exchange (vb) (3),* WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY, UNABRIDGED (1993), *available at* http://lionreference.chadwyck.com (Dictionaries/Webster's Dictionary) (Exhibit 3001).

IPR2014-00901
Patent 6,978,346 B2

to and from the host computers to be exchanged through the connection units. The specification of the '346 patent is consistent with the ordinary meaning of giving and receiving information reciprocally, because it describes that information is transmitted to and from a network interface controller of a first RAID and another network interface controller of a second RAID. Ex. 1001, 3:66–4:12.

Consistent with our construction from the '635 IPR, we construe "exchange/exchanges information" to mean "to transmit and receive information reciprocally."

### 4. "connection unit/hub/switch" (Claim 5)

Petitioners propose the phrase "connection unit" should be construed, consistently with the '635 IPR construction of the term, as "a hub or switch." Pet. 7 (citing Ex. 1003 ¶¶ 14–16). Petitioners cite to the Specification for support. *Id.* (citing Ex. 1001, 3:13–18). Patent Owner agrees. Prelim. Resp. 20.

Thus, consistent with the definition provided in the specification and our construction from the '635 IPR, "connection unit" is "a hub or switch."

### 5. "network interface controller"/"network controlling unit"/"network interface controlling unit" (Claims 1 and 9)

We did not interpret "network interface controller"[4] in the '635 IPR. Petitioner proposes that the phrases "network interface controller," "network controlling unit," and "network interface controlling unit" should be construed as "the part of a RAID controller that allows the RAID controller to communicate with the 'connection units.'" Pet. 7 (citing Ex. 1003

---

[4] Patent Owner acknowledges "network controlling unit" and "network interface controller" are synonomous. Prelim. Resp. 20. For purposes of this decision we agree and reference "network interface controller."

9

IPR2014-00901
Patent 6,978,346 B2

¶¶ 14–16).  Patent Owner acknowledges that Petitioner's proposal is "not incorrect."  Prelim. Resp. 21.  Regardless, Patent Owner's proposal adds specifics regarding the ports associated with a "network interface controller."  *Id.*  Patent Owner's proposed construction of the term is "a controller that <u>includes one or more ports</u> as an interface to a computer network and that supplies communication functionality when attached to the computer network."  *Id.* (citing Declaration of Dr. Thomas M. Conte,[5] Ex. 2002 ¶ 44).

The Specification describes each "network interface controller" as having a counterpart "network interface controller," each "network interface controller" associated with a separate RAID controller.  Ex. 1001, 2:26–30.  Furthermore,

> information from a second network interface controller **622** of a first RAID controller **620** is sent to a first network interface controller **632** of a second RAID controller **630**, and information from a second network interface controller **632** of the second RAID controller **630** is transmitted to a first network interface controller **621** of the first RAID controller **620**.

*Id.* at 4:40–46.

Thus, we construe the "network interface controller" to mean "the part of a RAID controller that allows the RAID controller to communicate with another RAID controller."

## II.  ANALYSIS

### A.  *Obviousness of Claims 1–9 over Mylex and Hathorn*

Petitioner contends that claims 1–9 of the '346 patent are obvious under 35 U.S.C. § 103 over Mylex and Hathorn.  Pet. 17–42.  To support

---

[5] Dr. Conte's declaration is part of Patent Owner's Response in the '635 IPR.

10

IPR2014-00901
Patent 6,978,346 B2

this position, Petitioner relies on the testimony of Dr. Horst.  Ex. 1003
¶¶ 56–138.

### 1. Mylex

Mylex generally describes Storage Area Networks ("SAN") and
associated architecture of such networks.  Ex. 1006, 4.[6]  Storage Area
Networks can be configured with switched fabrics or hubs and switches to
exchange data between nodes of the network.  *Id.* at 8.

Figure 6 of Mylex is reproduced below.



Figure 6.  SAN With Switched and Shared (Loop) Interconnects

Figure 6 shows that switches are used to create Fibre Channel fabric.  *Id.*
Mylex describes that hub-connected Storage Area Networks bandwidth per
node decreases as more nodes are added while bandwidth of fabric
connected nodes increases as nodes are added.  *Id.*

Figure 7 of Mylex is reproduced below.



Figure 7.  Four Node Cluster With Shared Access to RAID Arrays

---

[6] Page references are to Mylex page numbers at the bottom right corner of
each page.  Petitioner uses the same numbers and not the exhibit page
numbers centered at the bottom of the page.

IPR2014-00901
Patent 6,978,346 B2

Figure 7 shows a four node cluster with shared access to RAID arrays. *Id.* at 9. Mylex describes that external RAID controllers can be used in a write-back caching scheme to protect data. *Id.* at 12.

     Figure 15 of Mylex is reproduced below.



Figure 15. DAC SX SCSI Array Controller Failover

As shown in Figure 15, Mylex describes that if a controller fails, the surviving controller senses the absence of heartbeats, fails over the ID of the active port on the failed controller to its reserved port, and updates its data structures with configuration information stored on disk. *Id.* at 18.

### 2. *Hathorn Overview*

     Hathorn discloses a remote copy system with dynamically modifiable ports on the storage controller that are alternatively configurable. Ex. 1005, Abstract. A primary storage controller can appear as a host processor to a secondary storage controller. *Id.* Hathorn describes a method for communicating between host processors and storage controllers, or between storage controllers.

IPR2014-00901
Patent 6,978,346 B2

Figure 3 of Hathorn is reproduced below.



Figure 3 is a block diagram of one embodiment of a remote dual copy system of the invention described in Hathorn.  Primary storage controller 322 communicates through port A 321 with secondary storage controller 332.  Ex. 1005, 8:11−15.  As shown in Figure 3, port A 321 acts as a channel link-level facility through communication links 350, dynamic switch 305, communication links 351, dynamic switch 315, and communication links 346 to communicate with secondary storage controllers 332 and/or 335.  *Id.*

### 3.  Claim 1

Claims 1 and 9 are the only independent claims of the '346 patent.  We begin our analysis with claim 1.  On this record, we are persuaded that there is a reasonable likelihood that Petitioner will prevail in establishing that claim 1 is obvious over Mylex and Hathorn.

Petitioner contends that every element of claim 1 is taught by Mylex with the exception of claim 1's limitation that requires "direct exchange of information between network interface controlling units."  Pet. 18.  Mylex

13

IPR2014-00901
Patent 6,978,346 B2

only discloses "heartbeat" communication, while Hathorn teaches use of the existing switch network for communication between RAID controllers. *Id.*

The preamble of claim 1 recites "a redundant interconnection between multiple hosts and a RAID." Mylex teaches "[e]ach controller has redundant paths to host systems and pairs of controllers provide redundant paths to disks." Ex. 1006, 15. Mylex also specifically discloses RAID controllers and RAID arrays. *Id.* at 11–12. Petitioner cites to the above described teachings of redundant paths and RAID arrays as meeting the preamble.[7] Pet. 20.

Claim 1 next recites "a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers." Mylex Figure 17 shows two RAID controllers identified as "0" and "1" respectively. "Mylex controllers support *active-active operation*; both controllers simultaneously satisfy I/O requests from SAN nodes." *Id.* at 16. Petitioner asserts that the disclosed RAID controlling units and association I/O requests from nodes meet the limitation. Pet. 21; Ex. 1003 ¶¶ 61–63.

The next limitation of claim 1 is "the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit." Mylex Figure 17

---

[7] Petitioner asserts the preamble of claim 1 is met by Mylex. Pet. 20. Here the preamble is part of the defined subject matter and is given patentable weight. *Bell Communications Research, Inc. v. Vitalink Communications Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

14

IPR2014-00901
Patent 6,978,346 B2

discloses RAID controller 0 includes Port 1 and a "Reserved" port while RAID controller 1 includes Port 2 and a "Reserved" port. Ports 1 and 2 and their associated Reserved ports are specified by Petitioner as meeting the four controlling unit limitations. Pet. 22, Ex. 1003 ¶¶ 64–65 (*see* Annotated Figure 17).

Patent Owner argues that "Mylex's RAID controllers have multiple 'ports,' not necessarily multiple network interface controllers." Prelim. Resp. 47. We construed "network interface controller" as "the part of a RAID controller that allows the RAID controller to communicate with another RAID controller." The construction is broad enough to include ports as disclosed in Mylex or Hathorn. We are not persuaded by Patent Owner's arguments to the contrary, which amount to no more than a denial that a port is a "network interface controller." *See* Prelim. Resp. 31–32.

Claim 1 next recites "a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers." Mylex teaches that various SAN components can be connected through hubs and switches. Ex. 1006, 19. Petitioner argues the Mylex disclosure of hubs and switches meets the limitation for connecting the first controller and the second controller to the hosts through a plurality of connection units. Pet. 23, Ex. 1003 ¶¶ 66–72.

Patent Owner contends Mylex teaches only one "connection unit" and disagrees with Dr. Horst's testimony about Hathorn's teachings. Prelim. Resp. 44–46. Petitioner must specify in the Petition "where each element of the claim is found in the prior art patents or printed publications relied upon." 37 C.F.R. § 42.104(b)(4)). Relying on Mylex *or* Hathorn does not meet Petitioner's obligation to be specific. On this record, however, we are

15

IPR2014-00901
Patent 6,978,346 B2

persuaded that Mylex's teachings have been shown to address sufficiently multiple connection units as claimed and as we have construed "connection units."

The next limitation of claim 1 is "wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units." Mylex teaches the use of external RAID array controllers for both read and write operations. Ex. 1006, 20, Figs. 12, 17 (disclosing RAID controllers connected to hosts via SAN network connecting units). Petitioner relies on the disclosure relating to read and write operations discussed above and the testimony of Dr. Horst to argue the limitation is taught by Mylex. Pet. 24 (citing Ex. 1003 ¶¶ 73–75).

The final recited element of claim 1 is "and the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit." Petitioner acknowledges Mylex discloses only heartbeat messages used for exchanging fault tolerance information. Pet. 26 (citing Ex. 1006, Fig. 17). Petitioner therefore argues that the "exchanges information" limitation is found in Hathorn. Petitioner contends, with reference to Figure 3, that Hathorn discloses that a port 324A of the "Storage Controller," i.e., "RAID controller," can exchange information with another port, for example 334B of another "RAID controller." Pet. 26 (citing Ex. 1003 ¶¶ 79–80). As presented by Petitioner, port 324A is the first network controlling unit and port 334B is the fourth network controlling unit. *Id.* Petitioner cites to other storage network

16

IPR2014-00901
Patent 6,978,346 B2

architecture shown in Hathorn to support the "exchanges information" limitation. *Id.* at 25–26.

Patent Owner argues that Mylex's reserved ports are inactive. Prelim. Resp. 41–43. We disagree with Patent Owner that it is therefore "impossible for both alleged first and fourth network controllers to exchange information because they are never active at the same time." *Id.* at 42. The Petitioner relies on Hathorn to meet the limitation, not Mylex. Patent Owner's argument regarding Hathorn is that the Petition does not cite to Hathorn. *Id.* at 43. This argument is not supported by the record. *See* Pet. 25–26, Ex. 1003 ¶¶ 79–80 (Annotated Figure 17 of Mylex).

Petitioner argues that one of ordinary skill would have been motivated to combine Hathorn with Mylex. Specifically:

> One of ordinary skill would have been motivated to study multiple examples of disk mirroring systems when designing a new RAID system. As a result of their similarity, one of ordinary skill would have been able to apply the fault tolerance teachings of Mylex to the system disclosed by Hathorn, or the *modifying NICs to communicate teachings of Hathorn to the system disclosed by Mylex with predictable results*.

Pet. 15 (citing Ex. 1003 ¶¶ 33–34)(emphasis added).

Patent Owner disagrees that there was motivation to combine Hathorn with Mylex. Prelim. Resp. 35–38. Patent Owner argues that the *only* motivation provided by Petitioner for the modification of Mylex's direct connection for communicating heartbeat messages with Hathorn's fibre loop connection is cost savings. *Id.* at 38. Although we disagree that cost savings is not a rationale to combine, Petitioner's showing on motive to combine goes beyond the cost saving argument. Pet. 15 (citing Ex. 1003 ¶¶ 33–34). Thus, Patent Owner's argument is not persuasive.

17

IPR2014-00901
Patent 6,978,346 B2

Petitioner presents evidence that both references are examples of disk mirroring systems which a person of ordinary skill would consider when designing a new RAID system. Ex. 1003 ¶¶ 33–34. The record before us is developed insufficiently to support Patent Owner's argument that there would not have been a reasonable expectation of success in making the combination. Prelim. Resp. 38. Even were there some evidence to support Patent Owner's argument, expectation of success may not be dispositive and "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Petitioner has provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *KSR*, 550 U.S. at 418.

On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claim 1 would have been obvious over Mylex and Hathorn.

### 4. Claim 9

Claim 9 includes limitations similar to claim 1. Petitioner relies on the evidentiary showing made with respect to claim 1 to allege most of the elements of claim 9 are taught. Pet. 38–42. The remaining limitations are discussed below.

The first remaining limitation of claim 9 is "wherein the first network interface controller in the first RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the second RAID controller." Petitioner argues that both Mylex and Hathorn

18

IPR2014-00901
Patent 6,978,346 B2

teach this element. Pet. 39–40. In connection with claim 1, however, Petitioner acknowledges that Mylex only discloses "heartbeat" communication, while Hathorn teaches use of the existing switch network for communication between RAID controllers. *Id.* at 18, 26. Therefore, in analyzing obviousness with respect to this limitation, which relates in part to "information transmitted," our institution decision is based on the disclosure of Hathorn. Petitioner has made a sufficient showing regarding how Hathorn addresses the claim limitation. *Id.* at 39–40.

The next remaining limitation is "wherein the second network interface controller in the first RAID controller is used for fault tolerance by performing functions of the first network interface controller in the second RAID controller when the second RAID controller is faulty." Petitioner again asserts Mylex and Hathorn as both showing the limitation. Pet. 41. For purposes of our decision, the disclosure of Mylex, which is relied on by Dr. Horst, addresses sufficiently the claim limitation. *See* Ex. 1003 ¶¶ 131–136.

The last remaining limitation is "wherein the second network interface controller in the second RAID controller is used for fault tolerance by performing functions of the first network interface controller in the first RAID controller when the first RAID controller is faulty." Petitioner asserts that Mylex teaches the limitation. Pet. 41–42, Ex. 1003 ¶ 137.

Patent Owner does not advance any new arguments specific to claim 9. On this record, we are persuaded that there is a reasonable likelihood that Petitioner will prevail in establishing that claim 9 would have been obvious over Mylex and Hathorn.

IPR2014-00901
Patent 6,978,346 B2

*5. Claims 2–8*

Claims 2–8 depend directly or indirectly from claim 1. Claim 1 was addressed above. We have reviewed the Petition with respect to claims 2–8. Pet. 27–37. The Petition is supported by the testimony of Dr. Horst. Ex. 1003 ¶¶ 81–118. On this record, we are persuaded that there is a reasonable likelihood that Petitioner will prevail in establishing that claims 2–8 would have been obvious over Mylex and Hathorn.

Petitioner argues that both Mylex and Hathorn teach the claim limitations of all dependent claims. Pet. 27–37. Petitioner has failed, however, to distinguish the two references for purposes of showing that each addresses the claim limitations differently or in any particular way. That is, Petitioner has not specified why Mylex is a better reference than Hathorn or Hathorn is a better reference than Mylex for any particular limitation. Accordingly, where Petitioner does not distinguish which reference is being relied on, institution is based on the arguments advanced regarding Mylex.

As an example of how the limitations of the dependent claims are taught, we analyze claim 2. Claim 2 depends from claim 1 and recites "said respective RAID controlling units are connected to the plurality of individual connecting units." Petitioner argues that the limitation is taught by Mylex's RAID controllers connected to a hub or switch. Pet. 27 (citing Ex. 1006, Figs. 20 and 21). Petitioner also relies on Mylex's teaching that "[s]witches, hubs and routers are interconnect devices that can be employed to construct SAN networks." *Id.* (citing Ex. 1006, 5, Figs. 12 and 17).

Hathorn is cited as also teaching the limitation of claim 2. Pet. 27. For reasons discussed above, we use Mylex and not Hathorn as a basis to institute review regarding all dependent claims 2–8.

20

IPR2014-00901
Patent 6,978,346 B2

On this record, we are persuaded that there is a reasonable likelihood that Petitioner will prevail in establishing that claims 2–8 would have been obvious over Mylex and Hathorn.

### 6. Summary

Based on the foregoing, on this record, we conclude that Petitioner has demonstrated a reasonable likelihood of prevailing on the challenge that claims 1–9 would have been obvious under 35 U.S.C. § 103 over Mylex and Hathorn.

### B. Obviousness of Claims 1–9 over Hathorn and Mylex

The asserted ground of unpatentability based on obviousness over Hathorn and Mylex[8] as to claims 1–9 is redundant in light of the grounds on the basis of which we have instituted review for the same claims. Petitioner does not present any argument that this ground is distinguished in any material way from the ground based on Mylex and Hathorn. We exercise our discretion to decline to authorize *inter partes* review of claims 1–9 on the asserted ground of obviousness over Hathorn and Mylex. *See* 35 U.S.C. § 325(d); 37 C.F.R. § 42.108(a); *Liberty Mutual Ins. Co. v. Progressive Ins. Co.*, Case CBM2012-00003, slip op. at 3 (PTAB Oct. 25, 2012), (Paper 7, Order (Redundant Grounds); *see also* Prelim. Resp. 47.

### C. Obviousness of Claims 1–9 over Deitz or Mylex with Griffith or DeKoning

For the reasons discussed in II.B. above, the asserted ground of unpatentability based on obviousness over as Deitz or Mylex with Griffith or

---

[8] This is not a different ground from Mylex and Hathorn, upon which we have instituted trial. We are not instituting review on Hathorn and Mylex as a separate ground from Mylex and Hathorn.

IPR2014-00901
Patent 6,978,346 B2

DeKoning as to claims 1–9 is redundant in light of the grounds on the basis of which we have instituted review for the same claims.

ORDER

In consideration of the foregoing, it is hereby:

ORDERED that *inter partes* review is instituted with respect to the following grounds of unpatentability: claims 1–9 as obvious over Mylex and Hathorn under 35 U.S.C. § 103;

FURTHER ORDERED, *inter partes* review is *not instituted* with respect to any other ground of unpatentability; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '346 patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

IPR2014-00901
Patent 6,978,346 B2

For PETITIONER:

Katherine Kelly Lutton
Timothy W. Riffe
FISH & RICHARDSON P.C.
lutton@fr.com
IPR27450-0011IP1@fr.com

For PATENT OWNER:

Matthew C. Phillips  (Lead Counsel)
Derek Meeker  (Back-up Counsel)
Alexander C.D. Giza  (Back-up Counsel)
RENAISSANCE IP LAW GROUP LLP
matthew.phillips@renaissanceiplaw.com
derek.meeker@renaissanceiplaw.com
agiza@raklaw.com

23

Trials@uspto.gov                                    Paper 22
571-272-7822                          Entered: December 11, 2014

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

INTERNATIONAL BUSINESS MACHINES CORPORATION
AND
ORACLE AMERICA, INC.,
Petitioners,

v.

ELECTRONICS AND TELECOMMUNICATIONS RESEARCH
INSTITUTE,
Patent Owner.
_____

Case IPR2014-00949
Patent 6,978,346 B2

Before BRIAN J. McNAMARA, MIRIAM L. QUINN, and
GREGG I. ANDERSON, *Administrative Patent Judges.*

ANDERSON, *Administrative Patent Judge.*

DECISION
Institution of *Inter Partes* Review
*37 C.F.R. § 42.108*

IPR2014-00949
Patent 6,978,346 B2

## I.   INTRODUCTION

On July 21, 2014, International Business Machines, Corporation and Oracle America, Inc. ("Petitioners") filed a Second Corrected Petition requesting an *inter partes* review of claims 1–9 of U.S. Patent No. 6,978,346 B2 (Ex. 1001, "the '346 patent").  Paper 6 ("Pet.").  Electronics and Telecommunications Research Institute ("Patent Owner") filed a Preliminary Response.  Paper 16 ("Prelim. Resp.").  Applying the standard set forth in 35 U.S.C. § 314(a), which requires demonstration of a reasonable likelihood that Petitioners would prevail with respect to at least one challenged claim, we institute an *inter partes* review of claims 1–9.  The Board has not made a final determination of the patentability of any claim.

### A.   Related Proceedings

Petitioners advise that the '346 patent is involved in the following co-pending district court cases:  *Safe Storage LLC v. StoneFly, Inc.*, 1-13-cv-01152; *Safe Storage LLC v. Int'l Bus. Machs. Corp.*, 1-13-cv-0 1151; *Safe Storage LLC v. Emulex Corp. et al.*, 1-13-cv-01150; *Safe Storage LLC v. 3PAR Inc.*, 1-13-cv-01088; *Safe Storage LLC v. Oracle Am. Inc. et al.*, 1-13-cv-01089; *Safe Storage LLC v. ATTO Tech. Inc. et al.*, 1-13-cv-01090; *Safe Storage LLC v. VMware Inc.*, 1-13-cv-00928; *Safe Storage LLC v. Promise Tech. Inc.*, 1-13-cv-00927; *Safe Storage LLC v. Nexsan Corp.*, 1-13-cv-00931; *Safe Storage LLC v. Overland Storage Inc.*, 1-13-cv-00932; *Safe Storage LLC v. IQSS LLC*, 1-13-cv-00930; *Safe Storage LLC v. Infortrend Corp.*, 1-13-cv-00929; *Safe Storage LLC v. Cisco Sys. Inc.*, 1-13-cv-00926; *Safe Storage LLC v. Silicon Graphics Int'l Corp.*, 1-12-cv-0 1629; *Safe Storage LLC v. Dot Hill Sys. Corp.*, 1-12-cv-01625; *Safe Storage LLC v. Hitachi Data Sys. Corp.*, 1-12-cv-01627; *Safe Storage LLC v. Dell Inc.*, 1-

2

IPR2014-00949
Patent 6,978,346 B2

12-cv-01624; *Safe Storage LLC v. NetApp Inc.*, 1-12-cv-01628; and *Safe Storage LLC v. Hewlett-Packard Co.*, 1-12-cv-01626, all pending in the United States District Court for the District of Delaware.[1] Pet. 1; Paper 5, 2–3. The '346 patent is the subject of an instituted *inter partes* review in *Dell Inc. v. Electronics and Telecommunications Research Institute*, Case IPR2013-00635 (PTAB) ("the '635 IPR"). *Id.* Additional petitions for review have been filed in *VMware, Inc. v. Electronics and Telecommunications Research Institute*, Case IPR2014-00901 (PTAB) and *International Business Machines Corp. v. Electronics and Telecommunications Research Institute*, Case IPR2014-00976 (PTAB). *Id.*

### B. '346 Patent

The '346 patent describes an apparatus with "redundant interconnection between multiple hosts and a redundant array of inexpensive disks (hereinafter referred to as 'RAID')." Ex. 1001, Abstract. As a result of the redundant interconnection, the apparatus allows increased bandwidth in the event one of the two RAID controllers 460 and 461 has a failure. *Id.* at 3:1–9.

---

[1] Petitioners list only the case numbers. The case names are provided from IPR2013-00635, which Petitioners identify here.

IPR2014-00949
Patent 6,978,346 B2

Figure 4 of the '346 patent is reproduced below:



Figure 4 is a block diagram of a host matching system including RAID 490 and its interconnection to host computers 400-405.  Ex. 1001, 2:64–3:6.  RAID 490 includes two RAID controllers 460, 461 and hubs 440, 441.  *Id.* at 3:10–18.  Each RAID controller includes a pair of network interface controllers.  For example, RAID controller 460 includes network interface controllers 470, 471, and RAID controller 461 includes network interface controllers 480, 481.  *Id.* at 3:11–13.  Each host computer has its own network interface controller (410 to 415), which connects the host computer through the hubs and to network interface controllers (470, 471, 480, 481) of RAID controllers 460, 461.  *Id.* at 3:31–35.

The '346 patent describes that the result is two independent networks with twice the bandwidth of a single network and a "communication passage" between the two RAID controllers.  *Id.* at 3:62–64.  The communication passage creates a "fault tolerant function" should one of RAID controllers 460 or 461 fail.  *Id.* at 3:64–66.  According to Figure 4, communications line 450 interconnects network interface controller 480 of

4

IPR2014-00949
Patent 6,978,346 B2

RAID controller 461 and network interface controller 470 of RAID controller 460. *Id.* at 4:2–6; Fig. 4. Then, RAID controller 461 may send information to RAID controller 460. *Id.* In like manner, network interface controller 471 of RAID controller 460 may be connected over communications lines to network interface controller 481 of RAID controller 461, allowing RAID controller 460 to send information to RAID controller 461. *Id.* at 3:66–4:2.

By the arrangement described, the apparatus continues to operate in the event either RAID controller 460 or 461 has an "occurrence of an error." Ex. 1001, 4:19–25. The interconnected network interface controller of the operational RAID controller assumes the functions of the network interface controller of the failed RAID controller. *Id.*

## C. Illustrative Claim

Claim 1, one of the two independent claims of the challenged claims, is reproduced below:

> 1. An apparatus for a redundant interconnection between multiple hosts and a RAID, comprising:
>
> a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers, the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network controlling unit and a fourth network controlling unit; and
>
> a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers, wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units, and the first network controlling unit exchanges information with the fourth network controlling

5

IPR2014-00949
Patent 6,978,346 B2

unit, and the second network controlling unit exchanges
information with the third network controlling unit.

*Prior Art Relied Upon*

Petitioners rely upon the following prior art references.  Pet. 4–5.

| Reference | Description | Publication or Issue Date | Exhibit No. |
|---|---|---|---|
| Hathorn | US 5,574,950 | Nov. 12, 1996 | Ex. 1005 |
| Mylex | Storage Area Networks; Unclogging LANs and Improving Data Accessibility, Mylex Corporation (1998) | May 29, 1998[2] | Exs. 1006 and 1009 |
| Griffith | US 6,401,170 B1 | Aug. 18, 1999 | Ex. 1007 |
| Deitz | US 6,578,158 B1 | Oct. 28, 1999 | Ex. 1008 |
| DeKoning | US 6,073,218 | Dec. 23, 1996 | Ex. 1010 |

*E.  The Alleged Grounds of Unpatentability*

Petitioners allege the following grounds for unpatentability.  Pet. 3–4.

| Claims | Grounds | References |
|---|---|---|
| 1–9 | § 103 | Mylex and Hathorn |
| 1–9 | § 103 | Hathorn and Mylex |
| 1–9 | § 103 | Deitz or Mylex and Griffith or DeKoning |

*F.  Claim construction*

The Board interprets claims using the broadest reasonable

construction in light of the specification of the patent in which they appear.

---

[2] Petitioners assert the Mylex paper was publicly available for download via
www.mylex.com on May 29, 1998.  Pet. 4.

6

IPR2014-00949
Patent 6,978,346 B2

37 C.F.R. § 42.100(b); *see also* Office Patent Trial Practice Guide, 77 Fed. Reg. 48,756, 48,766 (Aug. 14, 2012).

### 1. *"RAID" (Claims 1 and 9)*

Petitioners assert that "RAID" should be construed as "redundant array of independent disks." Pet. 5 (citing Ex. 1001, Abstract; Declaration of Dr. Robert Horst, Ex. 1003 ¶¶ 14–16.) Patent Owner does not propose a construction for "RAID" but rather argues that technical details of a RAID are "relevant to an analysis of the challenges raised in this Petition." Prelim. Resp. 13. Determining the ordinary and customary meaning of the term as that meaning would be understood by a person of ordinary skill in the art does not require us to incorporate technical details of a construed term.

"RAID" is well understood by a person of ordinary skill in the art as an acronym for "redundant array of inexpensive disks." Ex. 1001, Abstract. Dr. Horst's testimony corroborates the stated understanding of the person of ordinary skill as set forth in the '346 patent. Ex. 1003 ¶¶ 14–16. Consistent with our construction from the '635 IPR, we construe "RAID" to mean "redundant array of inexpensive disks."

### 2. *"RAID controller/RAID controlling unit" (Claims 1 and 9)*

Petitioners propose that "RAID controller" and "RAID controlling unit" should both be construed as "a component that controls operation of the RAID." Pet. 6 (citing Ex. 1003 ¶¶ 14–16.) Patent Owner acknowledges that Petitioners' proposal is the same as our construction of the term from the '635 IPR, which Patent Owner characterizes as "not incorrect." Prelim. Resp. 17–18. Patent Owner goes on to state that "it would be useful in deciding the patentability issues in this case to elaborate on what the terms in that interpretation mean." *Id.* at 17. To the extent Patent Owner is arguing a

7

IPR2014-00949
Patent 6,978,346 B2

different construction than what we found in the '635 IPR, we disagree.
Patent Owner's arguments relate to patentablity issues. Although a specific
construction may well determine patentability, a proper construction is not
based upon the patentability issues.

Thus, consistent with our construction from the '635 IPR, we construe
"RAID controlling unit" and "RAID controller" to mean "a component that
controls operation of the RAID."

### 3. *"exchange/exchanges information" (Claims 1 and 9)*

Petitioners propose that the phrases "exchange information" and
"exchanges information" should both be construed to mean "to transmit and
receive information reciprocally." Pet. 6 (citing Ex. 1003 ¶¶ 14–16.) Patent
Owner notes correctly that Petitioners' proposal is consistent with our
construction from the '635 and '152 IPRs[3]. Prelim. Resp. 20. Patent Owner
relies on the prosecution of the application, where "exchanges information"
was added by amendment, to argue that "exchanges information" takes place
via the "connection units." *Id.* at 20 (citing Ex. 1001, Fig. 4, elements 440
and 441.)

The claims use "exchange" and "exchanges information" according to
their ordinary sense: to transmit and receive information reciprocally.[4] The
claim recites the structures between which information is exchanged, i.e.,
between the RAID controlling units and the host computers, between the
first and fourth network controlling units, and between the second and third

---

[3] *Dell Inc., Hewlett-Packard Company, and NETAPP, Inc.*, Case IPR2014-
00152 (PTAB).

[4] *Definition exchange (vb) (3),* WEBSTER'S THIRD NEW INTERNATIONAL
DICTIONARY, UNABRIDGED (1993), *available at*
http://lionreference.chadwyck.com (Dictionaries/Webster's Dictionary)
(Exhibit 3001).

8

IPR2014-00949
Patent 6,978,346 B2

network controlling units. The claim language requires only the information to and from the host computers to be exchanged through the connection units. The Specification of the '346 patent is consistent with the ordinary meaning of giving and receiving information reciprocally, because it describes that information is transmitted to and from a network interface controller of a first RAID and another network interface controller of a second RAID. Ex. 1001, 3:66−4:12.

Consistent with our construction from the '635 IPR, we construe "exchange/exchanges information" to mean "to transmit and receive information reciprocally."

### 4. "connection unit/hub/switch" (Claim 5)

Petitioners propose the phrase "connection unit" should be construed, consistently with the '635 IPR construction of the term, as "a hub or switch." Pet. 6 (citing Ex. 1003 ¶¶ 14−16.) Petitioners cite to the Specification for support. *Id.* (citing Ex. 1001, 3:13−18.) Patent Owner agrees. Prelim. Resp. 18.

Thus, consistent with the definition provided in the Specification and our construction from the '635 IPR, "connection unit" is "a hub or switch."

### 5. "network interface controller"/"network controlling unit"/"network interface controlling unit" (Claims 1 and 9)

We did not interpret "network interface controller"[5] in the '635 IPR. Petitioners propose that the phrases "network interface controller," "network controlling unit," and "network interface controlling unit" should be

---

[5] Patent Owner acknowledges "network controlling unit" and "network interface controller" are synonymous. Prelim. Resp. 20. For purposes of this decision we agree and reference "network interface controller."

9

IPR2014-00949
Patent 6,978,346 B2

construed as "the part of a RAID controller that allows the RAID controller to communicate with the 'connection units.'" Pet. 6 (citing Ex. 1003 ¶¶ 14−16.) Patent Owner acknowledges that Petitioners' proposal is "not incorrect." Prelim. Resp. 19. Regardless, Patent Owner's proposal adds specifics regarding the ports associated with a "network interface controller." *Id.* Patent Owner's proposed construction of the term is "a controller that <u>includes one or more ports</u> as an interface to a computer network and that supplies communication functionality when attached to the computer network." *Id.* (citing Declaration of Dr. Thomas M. Conte,[6] Ex. 2002 ¶ 44.)

The Specification describes each "network interface controller" as having a counterpart "network interface controller," each "network interface controller" associated with a separate RAID controller. Ex. 1001, 2:26−30. Furthermore, "information from a second network interface controller 622 of a first RAID controller 620 is sent to a first network interface controller 632 of a second RAID controller 630, and information from a second network interface controller 632 of the second RAID controller 630 is transmitted to a first network interface controller 621 of the first RAID controller 620." *Id.* at 4:40−53.

Thus, we construe the "network interface controller" to mean "the part of a RAID controller that allows the RAID controller to communicate with another RAID controller." Pet. 6 (citing Ex. 1003 ¶¶ 14−16.)

---

[6] Dr. Conte's Declaration is part of Patent Owner's Response in the '635 IPR.

IPR2014-00949
Patent 6,978,346 B2

## II.  ANALYSIS

### A.  *Obviousness of Claims 1–9 over Mylex and Hathorn*

Petitioners contend that claims 1–9 of the '346 patent are obvious under 35 U.S.C. § 103 over Mylex and Hathorn.  Pet. 17–42.  To support this position, Petitioners rely on the testimony of Dr. Horst.  Ex. 1003 ¶¶ 56–138.

### 1.  *Mylex*

Mylex generally describes Storage Area Networks ("SAN") and associated architecture of such networks.  Ex. 1006, 4.[7]  Storage Area Networks can be configured with switched fabrics or hubs and switches to exchange data between nodes of the network.  *Id.* at 8.

Figure 6 of Mylex is reproduced below.



Figure 6.  SAN With Switched and Shared (Loop) Interconnects

Figure 6 shows that switches are used to create Fibre Channel fabric.  *Id.* Mylex describes that hub-connected Storage Area Networks bandwidth per node decreases as more nodes are added while bandwidth of fabric connected nodes increases as nodes are added.  *Id.*

---

[7] Page references are to Mylex page numbers at the bottom right corner of each page.  Petitioners use the same numbers and not the exhibit page numbers centered at the bottom of the page.

IPR2014-00949
Patent 6,978,346 B2

Figure 7 of Mylex is reproduced below.



Figure 7. Four Node Cluster With Shared Access to RAID Arrays

Figure 7 shows a four node cluster with shared access to RAID arrays. *Id.* at 9. Mylex describes that external RAID controllers can be used in a write-back caching scheme to protect data. *Id.* at 12.

Figure 15 of Mylex is reproduced below.



Figure 15. DAC SX SCSI Array Controller Failover

As shown in Figure 15, Mylex describes that if a controller fails, the surviving controller senses the absence of heartbeats, fails over the ID of the active port on the failed controller to its reserved port, and updates its data structures with configuration information stored on disk. *Id.* at 18.

### 2. *Hathorn Overview*

Hathorn discloses a remote copy system with dynamically modifiable ports on the storage controller that are alternatively configurable. Ex. 1005, Abstract. A primary storage controller can appear as a host processor to a secondary storage controller. *Id.* Hathorn describes a method for communicating between host processors and storage controllers, or between storage controllers.

12

IPR2014-00949
Patent 6,978,346 B2

Figure 3 of Hathorn is reproduced below.



Figure 3 is a block diagram of one embodiment of a remote dual copy system of the invention described in Hathorn.  Primary storage controller 322 communicates through port A 321 with secondary storage controller 332.  Ex. 1005, 8:11–15.  As shown in Figure 3, port A 321 acts as a channel link-level facility through communication links 350, dynamic switch 305, communication links 351, dynamic switch 315, and communication links 346 to communicate with secondary storage controllers 332 and/or 335.  *Id.*

### 3. Claim 1

Claims 1 and 9 are the only independent claims of the '346 patent. We begin our analysis with claim 1.  On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claim 1 is obvious over Mylex and Hathorn.

Petitioners contend that every element of claim 1 is taught by Mylex with the exception of claim 1's limitation that requires "direct exchange of

13

IPR2014-00949
Patent 6,978,346 B2

information between network interface controlling units." Pet. 16. Mylex only discloses "'heartbeat'" communication, while Hathorn teaches use of the existing switch network for communication between RAID controllers. *Id.*

The preamble of claim 1 recites "a redundant interconnection between multiple hosts and a RAID." Mylex teaches "[e]ach controller has redundant paths to host systems and pairs of controllers provide redundant paths to disks." Ex. 1006, 15. Mylex also specifically discloses RAID controllers and RAID arrays. *Id.* at 11−12. Petitioners cite to the above described teachings of redundant paths and RAID array as meeting the preamble.[8] Pet. 19.

Claim 1 next recites "a first RAID controlling units and a second RAID controlling unit for processing a requirement of numerous host computers." Mylex Figure 17 shows two RAID controllers identified as "0" and "1" respectively. "Mylex duplex RAID controllers are used for processing a requirement of host computers." Pet. 19–20 (citing Ex, 1006, 16.) Petitioners assert that the disclosed RAID controlling units and associated relationship with the host computer of Mylex meets the limitation. Pet. 21; Ex. 1003 ¶¶ 61−63. Hathorn includes similar disclosures which are also cited by Petitioner to teach the limitation. *Pet.* 21.

The next limitation of claim 1 is "the first RAID controlling unit including a first network controlling unit and a second network controlling unit, and the second RAID controlling unit including a third network

---

[8] Petitioners asserts the preamble of claim 1 is met by Mylex. Pet. 19. Here the preamble is part of the defined subject matter and is given patentable weight. *Bell Commc'ns Research, Inc. v. Vitalink Commc'ns Corp.*, 55 F.3d 615, 620 (Fed. Cir. 1995).

14

IPR2014-00949
Patent 6,978,346 B2

controlling unit and a fourth network controlling unit." Mylex Figure 17 discloses RAID controller 0 includes Port 1 and a "Reserved" port while RAID controller 1 includes Port 2 and a "Reserved" port. Ports 1 and 2 and their associated Reserved ports are specified by Petitioners as meeting the four controlling unit limitations. Pet. 20 (*see* Annotated Figure 17.)

Patent Owner argues that "Mylex's RAID controllers have multiple 'ports,' not necessarily multiple network interface controllers." Prelim. Resp. 46. We construed "network interface controller" as "the part of a RAID controller that allows the RAID controller to communicate with another RAID controller." The construction is broad enough to include ports as disclosed in Mylex or Hathorn. We are not persuaded by Patent Owner's arguments to the contrary, which amount to no more than a denial that a port is a "network interface controller." *See* Prelim. Resp. 30–31.

Claim 1 next recites "a plurality of connection units for connecting the first RAID controlling units and the second RAID controlling unit to the numerous host computers." Mylex teaches that various SAN components can be connected through hubs and switches. Ex. 1006, 19. Petitioners argue the Mylex disclosure of hubs and switches meets the limitation for connecting the first controller and the second controller to the hosts. Pet. 21 (citing Ex. 1006, 19.)

Patent Owner contends Mylex teaches only one "connection unit," citing to Figure 17 of Mylex. Prelim. Resp. 43. Patent Owner argues the use of "hubs and switches" in Mylex is an imprecise sentence and Mylex intends only a single "hub or switch." *Id.* at 44. Second, Patent Owner argues the teachings of Mylex in Figure 6, showing both a hub and a switch, cannot be used to "mix and match" with what is shown in Figure 17, which

15

IPR2014-00949
Patent 6,978,346 B2

"shows only one connection unit." *Id.* at 43–45. Third, discounting Dr. Horst's Declaration, paragraph72, Patent Owner argues Hathorn, which does show multiple switches, does not suggest the same in Mylex. *Id.* at 45. We are not persuaded and give credit to Dr. Horst's Declaration. On this record, however, we are persuaded that Mylex's teachings have been shown to address sufficiently multiple connection units as claimed and as we have construed "connection units."

The next limitation of claim 1 is "wherein the first RAID controlling unit and the second RAID controlling unit directly exchange information with the numerous host computers through the plurality of connecting units." Mylex teaches the use of external RAID array controllers for both read and write operations. Ex. 1006, 20, Figs. 12, 17 (disclosing RAID controllers connected to hosts via SAN network connecting units.) Petitioners rely on the disclosure relating to read and write operations discussed above to argue the limitation is taught by Mylex. Pet. 21.

The final recited element of claim 1 is "and the first network controlling unit exchanges information with the fourth network controlling unit, and the second network controlling unit exchanges information with the third network controlling unit." Petitioners acknowledge Mylex discloses only heartbeat messages used for exchanging fault tolerance information. Pet. 23 (citing Ex. 1006, Fig. 17.) Petitioners, therefore, argue that the "exchanges information" limitation is found in Hathorn. Petitioners contend, with reference to Figure 3, that Hathorn discloses that port 324A of the "Storage Controller," i.e., "RAID controller," can exchange information with another port, for example 334B of another "RAID controller." Pet. 23 (citing Ex. 1003 ¶¶ 79–80.) As presented by Petitioners, port 324A is the

16

IPR2014-00949
Patent 6,978,346 B2

first network controlling unit and port 334B is the fourth network controlling unit. *Id.* Petitioners cite to other storage network architecture shown in Hathorn to support the "exchanges information" limitation. *Id.* at 25–26.

Patent Owner argues that Mylex's reserved ports are inactive. Prelim. Resp. 40–42. We disagree with Patent Owner that it is, therefore, "impossible for both alleged first and fourth network controllers to exchange information because they are never active at the same time." *Id.* at 41. The Petition relies on Hathorn to meet the limitation, not Mylex. Patent Owner's argument regarding Hathorn is that the Petition does not cite to Hathorn. *Id.* at 42. This argument is not supported by the record. *See* Pet. 25–26, Ex. 1003 ¶¶ 79–80 (Annotated Figure 17 of Mylex.)

Petitioners argue that one of ordinary skill would have been motivated to combine Hathorn with Mylex. Specifically:

> One of ordinary skill would have been motivated to study multiple examples of disk mirroring systems when designing a new RAID system. As a result of their similarity, one of ordinary skill would have been able to apply the fault tolerance teachings of Mylex to the system disclosed by Hathorn, or the *modifying NICs to communicate teachings of Hathorn to the system disclosed by Mylex with predictable results*.

Pet. 14 (citing Ex. 1003 ¶¶ 33–34) (emphasis added.)

Patent Owner disagrees that there was motivation to combine Hathorn with Mylex. Prelim. Resp. 35–37. Patent Owner argues that the *only* motivation provided by Petitioners for the modification of Mylex's direct connection for communicating heartbeat messages with Hathorn's fibre loop connection is cost savings. *Id.* at 37. Although we disagree that cost savings is not a rationale to combine, Petitioners' showing on motive to combine

17

IPR2014-00949
Patent 6,978,346 B2

goes beyond the cost-saving argument. Pet. 14 (citing Ex. 1003 ¶¶ 33–34.) Thus, Patent Owner's argument is not persuasive.

Patent Owner argues there would not have been a reasonable expectation of success in making the combination. Prelim. Resp. 37. Petitioners present evidence that both references are examples of disk mirroring systems which a person of ordinary skill would consider when designing a new RAID system. Ex. 1003 ¶¶ 33–34. The record before us is developed insufficiently to support Patent Owner's argument that there would not have been a reasonable expectation of success in making the combination. Prelim. Resp. 37. Even were there some evidence to support Patent Owner's argument, expectation of success may not be dispositive and "any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 420 (2007). Petitioners have provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Id.* at 418.

On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claim 1 would have been obvious over Mylex and Hathorn.

### *4. Claim 9*

Claim 9 includes limitations similar to claim 1. Petitioners rely on the evidentiary showing made with respect to claim 1 to allege most of the elements of claim 9 are taught. Pet. 36–40. The remaining limitations are discussed below.

18

IPR2014-00949
Patent 6,978,346 B2

The first remaining limitation of claim 9 is "wherein the first network interface controller in the first RAID controller supplies data to the host computers connected through the plurality of connection units and processes information transmitted from the second network interface controller in the second RAID controller." Petitioners argue that both Mylex and Hathorn teach this element. Pet. 36–38. In connection with claim 1, however, Petitioners acknowledge that Mylex only discloses "heartbeat" communication, while Hathorn teaches use of the existing switch network for communication between RAID controllers. *Id.* at 16, 28. Therefore, in analyzing obviousness with respect to this limitation, which relates in part to "information transmitted," our institution decision is based on the disclosure of Hathorn. Petitioners have made a sufficient showing regarding how Hathorn addresses the claim limitation. *Id.* at 38–39.

The next remaining limitation is "wherein the second network interface controller in the first RAID controller is used for fault tolerance by performing functions of the first network interface controller in the second RAID controller when the second RAID controller is faulty." Petitioners again assert Mylex and Hathorn as both showing the limitation. Pet. 38–39. For purposes of our decision, the disclosure of Mylex, which is relied on by Dr. Horst, addresses sufficiently the claim limitation. *See* Ex. 1003 ¶¶ 133–135.

The last remaining limitation is "wherein the second network interface controller in the second RAID controller is used for fault tolerance by performing functions of the first network interface controller in the first RAID controller when the first RAID controller is faulty." Petitioners assert that Mylex teaches the limitation. Pet. 39, Ex. 1003 ¶ 137.

19

IPR2014-00949
Patent 6,978,346 B2

Patent Owner does not advance any new arguments specific to claim 9. On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claim 9 would have been obvious over Mylex and Hathorn.

*5. Claims 2–8*

Claims 2–8 depend directly or indirectly from claim 1. Claim 1 was addressed above. We have reviewed the Petition with respect to claims 2–8. Pet. 24–34. The Petition is supported by the testimony of Dr. Horst. Ex. 1003 ¶¶ 81–118. On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claims 2–8 would have been obvious over Mylex and Hathorn.

Petitioners argues that both Mylex and Hathorn teach the claim limitations of all dependent claims. Pet. 24–34. Petitioners have failed, however, to distinguish the two references for purposes of showing that each addresses the claim limitations differently or in any particular way. That is, Petitioners have not specified why Mylex is a better reference than Hathorn or Hathorn is a better reference than Mylex for any particular limitation. Accordingly, where Petitioners do not distinguish which reference is being relied on, institution is based on the arguments advanced regarding Mylex.

As an example of how the limitations of the dependent claims are taught, we analyze claim 2. Claim 2 depends from claim 1 and recites "said respective RAID controlling units are connected to the plurality of individual connecting units." Petitioners argue that the limitation is taught by Mylex's RAID controllers connected to a hub or switch. Pet. 24 (citing Ex. 1006, Figs. 20 and 21.) Petitioners also rely on Mylex's teaching that

20

IPR2014-00949
Patent 6,978,346 B2

"[s]witches, hubs and routers are interconnect devices that can be employed to construct SAN networks." *Id.* (citing Ex. 1006, 5, Figs. 12 and 17.)

Hathorn is cited as also teaching the limitation of claim 2. Pet. 27. For reasons discussed above, we use Mylex and not Hathorn as a basis to institute review regarding all dependent claims 2–8.

On this record, we are persuaded that there is a reasonable likelihood that Petitioners will prevail in establishing that claims 2–8 would have been obvious over Mylex and Hathorn.

### 6. Summary

Based on the foregoing, on this record, we conclude that Petitioners have demonstrated a reasonable likelihood of prevailing on the challenge that claims 1–9 would have been obvious under 35 U.S.C. § 103 over Mylex and Hathorn.

### B. Obviousness of Claims 1–9 over Hathorn and Mylex

The asserted ground of unpatentability based on obviousness over Hathorn and Mylex[9] as to claims 1–9 is redundant in light of the grounds on the basis of which we have instituted review for the same claims. Petitioners do not present any argument that this ground is distinguished in any material way from the ground based on Mylex and Hathorn. We exercise our discretion to decline to authorize *inter partes* review of claims 1–9 on the asserted ground of obviousness over Hathorn and Mylex. *See* 35 U.S.C. § 325(d); 37 C.F.R. § 42.108(a); *Liberty Mutual Ins. Co. v. Progressive*

---

[9] This is not a different ground from Mylex and Hathorn, upon which we have instituted trial. We are not instituting review on Hathorn and Mylex as a separate ground from Mylex and Hathorn.

IPR2014-00949
Patent 6,978,346 B2

*Casualty Ins. Co.*, Case CBM2012-00003, slip op. at 3 (PTAB Oct. 25, 2012), (Paper 7, Order (Redundant Grounds)); *see also* Prelim. Resp. 46.

### C.  Obviousness of Claims 1–9 over Deitz or Mylex with Griffith or DeKoning

For the reasons discussed in II.B. above, the asserted ground of unpatentability based on obviousness over as Deitz or Mylex with Griffith or DeKoning as to claims 1–9 is redundant in light of the grounds on the basis of which we have instituted review for the same claims.

### ORDER

In consideration of the foregoing, it is hereby:

ORDERED that *inter partes* review is instituted with respect to the following ground of unpatentability:   claims 1–9 as obvious over Mylex and Hathorn under 35 U.S.C. § 103;

FURTHER ORDERED, *inter partes* review is *not instituted* with respect to any other ground of unpatentability; and

FURTHER ORDERED that pursuant to 35 U.S.C. § 314(a), *inter partes* review of the '346 patent is hereby instituted commencing on the entry date of this Order, and pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4, notice is hereby given of the institution of a trial.

IPR2014-00949
Patent 6,978,346 B2

For PETITIONER:

Todd Friedman
todd.friedman@kirkland.com

Gregory Arovas
greg.arovas@kirkland.com

Eugene Goryunov
eugene.goryunov@kirkland.com

Benjamin Lasky
benjamin.lasky@kirkland.com


For PATENT OWNER:

Matthew Phillips
matthew.phillips@renaissanceiplaw.com

Alexander Giza
agiza@raklaw.com

## CERTIFICATE OF SERVICE

On June 8, 2016, the foregoing brief was submitted to the Court by CM/ECF and thereby served on all parties.

/s/ *Michael R. Rueckheim*

Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Ste. 2800
Houston, TX 77010
(713) 654-5300

## CERTIFICATE OF COMPLIANCE WITH
## TYPE-VOLUME LIMITATION

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7). According to the word processing system used to prepare this document, the brief contains 13,234 words.

Date: June 8, 2016

/s/ *Michael R. Rueckheim*

Michael R. Rueckheim
FISH & RICHARDSON P.C.
1221 McKinney Street, Ste 2800
Houston, TX 77010
(713) 654-5300